**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:16-cr-0018-WTL-CMM |
| | ) | |
| ANDREW N. ROGERS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT ANDREW ROGERS' MOTION FOR SPECIFIC DISCOVERY**

---

Defendant Andrew Rogers, by and through undersigned counsel, and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution; and Rules 12(B)(3)(e) and 16 of the Federal Rules of Criminal Procedure, hereby moves this Court to enter an order requiring the government and/or any state law enforcement or other agency working on this case or any case matter related to any government witness, including any Federal Bureau of Prisons (BOP) personnel, to disclose and provide the specific information and materials listed below known, or that with the exercise of due diligence, should be known to the government and the aforementioned individuals and agencies.

### I.    General request for discovery and *Brady* material and information

Mr. Rogers respectfully requests that the prosecution provide all discoverable and *Brady* material and information in this case.

### II.    Background

On January 14, 1985, Andrew Rogers was born in Pekin, Illinois.  Mr. Rogers

had a difficult childhood that led to a series of petty crimes throughout his young life, but he had never been sentenced to serve a lengthy period of incarceration until May 16, 2013, when he was sentenced to 27 years in federal prison for a $220 robbery of a Subway sandwich shop.  This sentence dwarfed anything he had ever before received, with the longest previous sentence being five years in state prison, never serving more than approximately 1 ½ years at a time.

Following sentencing, the BOP transferred Mr. Rogers from Tazewell County Jail to MCC Chicago and eventually to USP Terre Haute ("THP"), where he arrived on July 25, 2013.  At THP, Mr. Rogers was placed in general population.  Only a month and a half after arriving at THP, on September 9, in an apparent suicide attempt, Mr. Rogers ingested a bottle of Tegretol pills that belonged to his cellmate.[1]

At the prison medical unit, Mr. Rogers said that he feared for his safety because of his refusal to participate in violent acts at the behest of a white supremacist prison gang called the Soldiers of Aryan Culture ("SAC").  Mr. Rogers explained that a SAC member approached him and said that Mr. Rogers needed to "put some work in for them," meaning commit violence as directed by SAC.  Mr. Rogers told THP personnel that he refused to participate in any actions with SAC and that he "didn't want to hurt anybody."  Mr. Rogers stated, "I'm not a violent person, I don't want to hurt anyone." The prison investigated and determined Mr. Rogers' fear to be valid and placed him in protective custody.

Unfortunately, protective custody in the BOP meant that Mr. Rogers would be

---

[1] Although BOP personnel concluded at the time that this was not a sincere suicide attempt, Mr. Rogers later attempted to hang himself, not succeeding only because the self-fashioned rope broke.

housed in the Special Housing Unit (SHU).  "Despite the very different purposes of the SHU, all inmates including those in protection status are exposed to the same security and operational restrictions as well as the same access to programs and privileges." CNA, *Federal Bureau of Prisons: Special Housing Unit Review and Assessment*, Dec. 2014, at 82, available at https://www.bop.gov/resources/news/pdfs/CNA-SHUReportFinal_123014_2.pdf [hereinafter "CNA Audit"].  Although the BOP claims that protective custody status in a SHU is "non-punitive," the 2014 audit of BOP SHUs found otherwise:

> [T]his is clearly not the case when examining the units from an operational and program standpoint.  Inmates in protective custody and investigative status [who] are housed in SHU experience the same living conditions as those placed in what is an explicitly punitive environment.

*Id.* at 219.  The audit noted the problematic nature of treating individuals seeking protection in the same way as those serving punishment:

> Inmate movement procedures, including application of restraints, are the same; the frequency of recreation and telephone access is the same, as was the frequency of visits at all but two facilities visited.  With the exception of minor differences in personal property allowed and in-cell programming opportunities, the day-to-day conditions of confinement were not much different.  Considering that one status is nonpunitive and that some individuals are included strictly as a result of being verified as requiring protection, serious consideration should be given to reevaluating the day-to-day conditions of confinement for individuals who have been verified as needing protection.

*Id.* at 83; *see also id.* at 217-18 (same).  This "application of the same security and operational restrictions to the protective custody population as to others in administrative segregation is contrary to nationally accepted practices."  *Id.* at 83; *see also id.* at 220 ("Housing protective custody inmates in a punitive setting clearly contradicts best correctional practices.").  In its response to this audit, the BOP "concur[red] that it is desirable to provide inmates who are in verified protective custody

the opportunities to participate in programs and privileges equivalent to what is available to general population inmates." Federal Bureau of Prisons, *Special Housing Unit Review and Assessment Report Response*, Feb. 2015, at 2, available at https://www.bop.gov/resources/news/pdfs/CNA_Response-V05a-saa.pdf.

Now, several years after the situation that led to the death of Mr. Rogers' cellmate, Thomas Sim, even the Department of Justice agrees that, "[g]enerally, inmates who require protective custody should not be placed in restrictive housing." U.S. Dept. of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing*, Jan. 2016, at 97, available at https://www.justice.gov/restrictivehousing [hereinafter DOJ Restrictive Housing Report]. Rather, the Department now recognizes:

> When an inmate faces a legitimate threat from other inmates, correctional officials should seek alternative housing, by transferring the threatened inmate either to the general population of another institution or to a special-purpose housing unit for inmates who face similar threats, with conditions comparable to those of general population.

*Id.* at 98.

Although Mr. Rogers was in protective custody, he was treated the same as someone who had committed a serious violation. This meant he was locked down for 23 hours a day in almost complete isolation. He was housed with one other man in a small cell that contained not only their beds but also the two men's toilet, sink, and shower. (*See* Exhibits 1, 2 (photos of Mr. Rogers' cell).) According to information provided in discovery, Mr. Rogers allegedly told the facility warden right after Mr. Sim's death, "I am not going to do the rest of my time in a bathroom with another inmate."

More than a month before Mr. Sim's death, it appears that Mr. Rogers was scheduled for transfer to USP Atwater, where he would have been returned to general population. For an as yet unknown reason, however, the transfer never occurred and

Mr. Rogers remained in the SHU at THP.  He remained in the THP SHU even though
the BOP had established a reintegration housing unit (RHU) in Oakdale, Louisiana,
which could house protective custody inmates in general population conditions.

The impact of SHU placement clearly had (and continues to have) an impact on
Mr. Rogers' mental health.  "Social science and clinical literature have consistently
reported that when human beings are subjected to social isolation and reduced
environmental stimulation, they may deteriorate mentally and in some cases develop
psychiatric disturbances."  *United States v. Lopez*, 327 F.Supp. 2d 138, 143-44 (D.P.R.
2004) (quoting *Madrid v. Gomez*, 889 F.Supp. 1146, 1230 (N.D.Cal.1995)); *see also* S.
Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L & Pol'y 325
(2006).  Inmates who already suffer from mental health issues are likely to suffer
increased severity of symptoms in a SHU placement due to the lack of adequate
treatment.  The Bureau of Prisons itself and the Department of Justice Office of Inspector
General have recognized that restrictive housing, such as SHU placement, can cause
psychological harm and significant adverse effects on inmates' mental health.  Office of
the Inspector General U.S. Department of Justice, *Review of the Federal Bureau of
Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, July 2017, at 1,
available at https://oig.justice.gov/reports/2017/e1705.pdf [hereinafter "OIG Report"]
(citing, *e.g.*, BOP Program Statement 5310.16, Treatment and Care of Inmates with
Mental Illness (May 1, 2014), 16).  The BOP SHU audit specifically recommended that
"[a]ny inmates who are found to be decompensating from the effects of restrictive
housing should be transferred to a mental health unit for treatment and observation."
CNA Audit at 232.

While in the SHU, Mr. Rogers experienced persistent mental health issues, including severe depression.  *Prior to the homicide* charged in this case, Mr. Rogers repeatedly informed medical staff that he was "very depressed" and repeatedly requested medication to address his depression.  Regrettably, it was not until five days *after* the homicide—almost three months after Mr. Rogers' first request for medication—that the BOP finally prescribed antidepressant medication.  Even then, Mr. Rogers rarely saw a doctor face to face, with THP instead depending on "tele-psychiatry." Rather than provide Mr. Rogers with the needed treatment before the homicide, THP mental health staff instead gave Mr. Rogers a "workbook" on depression that he could review on his own.

The 2014 SHU audit confirmed that mental health treatment for prisoners in SHUs was lacking in three important areas:  "1) proper mental health diagnoses; 2) more effective treatment; and 3) providing sufficient psychiatric staffing."  CNA Audit at iv; *see also id.* at 223 (same).  The audit's review of randomly selected SHU inmates by experienced psychiatrists found a number of inmates exhibiting significant mental health symptoms but not receiving the appropriate level of care.  *Id.* at 223.  A contributing factor to this incorrect level of care was that "very few" of the mental health assessments occurred "in private settings on a face-to-face basis."  *Id.*  Not only were the assessments inadequate, the care was lacking, too.  The audit's project psychiatrists determined that "treatment offered by the Bureau was insufficient or inappropriate in over half of the cases."  *Id.*  There was a "significant lack of coordination" between psychology staff who cannot prescribe medications and psychiatric staff who are prescribing the psychotropic medications.  *Id.* at 224.

Here, despite repeated requests from Mr. Rogers while he was detained in the SHU under protective custody, the BOP did not provide him antidepressant medication until five days after his cellmate was killed.  And now, Mr. Rogers is charged with this killing and the government is seeking to take his life for it.  Notably, the decision to seek the death penalty was not made by just the U.S. Attorney or the Criminal Division of the U.S. Department of Justice.  Rather, the warden of the Terre Haute complex stated that the official BOP position was a recommendation of the death penalty for Mr. Rogers.  On behalf of the BOP, the warden sought the death penalty claiming, in part, that Mr. Rogers is a future danger based on statements Mr. Rogers made to the warden almost immediately following homicide, which was still days before the BOP finally prescribed medication to Mr. Rogers.

Now almost four years after this homicide, Mr. Rogers remains in SHU confinement.  To make matters worse, however, for a lengthy period, the BOP did not allow him to remain in one spot for long.  Rather, the BOP continuously moved Mr. Rogers back and forth between the SHU at THP and the SHU at FCI Terre Haute.  Even though the issues created by the movement have recently been resolved, Mr. Rogers remains housed in the SHU at THP, a situation that the Department of Justice Office of Inspector General has acknowledged creates significant dangers for mental health deterioration.  *See* OIG Report, at 1, 16.

Mr. Rogers is charged by indictment with Murder in the First Degree in violation of 18 U.S.C. § 1111.  (Doc. 1.)  The Indictment sets forth notice of special findings pursuant to 18 U.S.C. §§ 3591 & 3592(c) that render Mr. Rogers eligible for the death penalty if he is found guilty of the offense charged.  (Doc. 1, pp. 2-3.)  On May 31, 2016,

the United States filed its Notice of Intent to Seek the Death Penalty.  (Doc. 13.)  The
Notice of Intent alleges, *inter alia*, that the offense was committed in an especially
heinous, cruel, or depraved manner; that the offense was committed after substantial
planning and premeditation; and that Mr. Rogers is a future danger because he is likely
to commit criminal acts of violence in the future that would constitute a continuing and
serious threat to the lives and safety of others.  Despite Mr. Rogers' offer to plead guilty
in exchange for a sentence of life without parole, the government persists in seeking the
death penalty.

The government has provided initial paper discovery that mostly relates directly
to what allegedly happened on December 26, 2013, and two video files relating to the
interrogation[2] and medical exam of Mr. Rogers.  Mr. Rogers now seeks additional,
specific discovery necessary for him to defend himself in both the guilt and penalty
phases of this case.

### III.   Legal discussion

#### A.  Discovery law

In *Brady*, the Supreme Court held that "suppression by the prosecution of
evidence favorable to an accused upon request violates due process where the
evidence is material either to guilt *or to punishment* for the offense, irrespective of the
good faith or bad faith of the prosecution."  373 U.S. at 87 (emphasis added).  Indeed,
*Brady* was itself a capital case that involved the suppression of favorable evidence

---

[2] For an unknown reason, investigative personnel decided to record the interrogation of
Mr. Rogers from *outside* the room where the interrogation occurred.  Thus, the
interrogation itself is completely inaudible (at least in recordings provided in discovery
so far).

related to the capital sentencing determination. *Id.* at 84-86 (affirming state-court

decision remanding for retrial as to penalty only).

Capital defense counsel have a constitutional obligation to investigate and

present mitigating evidence to the jury:

> The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence. "As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." Mitigating evidence plays an overwhelmingly important role in the "just imposition of the death penalty." It "affords an opportunity to humanize and explain-to individualize a defendant outside the constraints of the normal rules of evidence." In light of its importance, investigation and preparation of a case in mitigation should begin prior to trial, well before any determination of guilt at the first stage.

*Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001) (citations omitted).

In *United States v. Bagley*, 473 U.S. 667, 676 (1985), both the Supreme Court

*and the government* recognized the need of the defense to conduct adequate

investigation and formulate strategy based on the complete disclosure of favorable

material:

> The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.
>
> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

473 U.S. at 682-83.

Importantly, the "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." *Dennis v. United States*, 384 U.S. 855, 873 (1966); *see also United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (*Brady* duty extends to searches of files by law enforcement for exculpatory evidence maintained by branches of government aligned with prosecution).

It is well established that *Brady* material includes impeachment material. *Giglio v. United States*, 405 U.S. 150 (1972). Questions regarding a prosecution witness's credibility should be resolved by the jury; the prosecution should not withhold "evidence that would have allowed defense counsel the means to test [a prosecution witness]'s credibility in the crucible of cross-examination." *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000); *see also Boss v. Pierce*, 263 F.3d 734, 740 n. 9, 746 (7th Cir. 2001) (granting habeas corpus relief for failure to disclose impeaching information; holding that impeachment evidence is favorable to the defense and rejecting state court "assumption that suppressed evidence must be exculpatory to satisfy the requirements of *Brady*").

In determining the constitutional materiality of potentially favorable information, neither the prosecution nor the Court should employ the backwards-looking *Brady* materiality standard in this pre-trial context. *See United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (expressing the view "that the post-trial 'materiality' standard is irrelevant to pretrial and in-trial *Brady* decisions to be made by prosecutors

10

and trial judges" (quoting *United States v. Safavian,* 233 F.R.D. 205, 206-07 (D.D.C.

2006)); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1232 (D. Nev. 2005) ("[T]he

government urges *Brady*'s materiality standard is the limit of the duty to disclose.  This

court cannot agree. . . .   *Brady*'s concern whether a constitutional violation occurred

after trial is a different question than whether *Brady* is the full extent of the prosecutor's

duty to disclose pretrial."); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis.

2004) ("[I]n the pretrial context, the court should require disclosure of favorable

evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial.

The judge cannot know what possible effect certain evidence will have on a trial not yet

held."); *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198-99 (C.D. Cal. 1999)

(determining that *Brady* materiality standard "is only appropriate, and thus applicable, in

the context of appellate review").  These decisions are in line with the Supreme Court's

decision in *Strickler v. Greene*, 527 U.S. 263 (1999), which distinguished "*Brady*

material" from a "*Brady* violation":

> Thus the term "*Brady* violation" is sometimes used to refer to any breach
> of the broad obligation to disclose exculpatory evidence – that is, to any
> suppression of so-called "*Brady* material" – although, strictly speaking,
> there is never a real '*Brady* violation' unless the nondisclosure was so
> serious that there is a reasonable probability that the suppressed evidence
> would have produced a different verdict.

*Id.* at 281 (footnote omitted).  At this stage, the Court should hold that the prosecution

has an obligation to produce "*Brady* material" regardless of whether a post-trial analysis

would determine that a failure to do so was a "*Brady* violation."

As Judge Alex Kozinski of the Ninth Circuit has recently discussed, the position

adopted by the Department of Justice that exculpatory information need be provided

only if it meets the retrospective materiality analysis runs contrary to the philosophy

behind the due-process obligation to produce such information:

> This puts prosecutors in the position of deciding whether tidbits that could
> be helpful to the defense are significant enough that a reviewing court will
> find it to be material, which runs contrary to the philosophy of the
> *Brady*/*Giglio* line of cases and increases the risk that highly exculpatory
> evidence will be suppressed.  Beyond that, we have what I have described
> elsewhere as an "epidemic of *Brady* violations abroad in the land," a
> phrase that has caused much controversy but brought about little change
> in the way prosecutors operate in the United States.

Alex Kozinski, *Criminal Law 2.0,* 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, viii-ix (2015)

(quoting *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, J.,

dissenting from denial of rehearing en banc)) (footnotes omitted).

While the Due Process Clause provides a starting point for the government's

disclosure obligations, Federal Rule of Criminal Procedure 16 "is broader than *Brady*."

*United States v. Baker*, 453 F.3d 419, 424 (7th Cir. 2006); *see also United States v.

Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("Rule 16 differs from *Brady*, which rests upon

due process considerations, and provides the minimum amount of pretrial discovery

granted in criminal cases."); *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970)

("[T]he disclosure required by Rule 16 is much broader than that required by the due

process standards of *Brady*.").

The burden of materiality under Rule 16 is "normally is not a heavy burden;

rather, evidence is material as long as there is a strong indication that it will play an

important role in uncovering admissible evidence, aiding witness preparation,

corroborating testimony, or assisting impeachment or rebuttal."  *United States v. Lloyd*,

992 F.2d 348, 351 (D.C. Cir. 1993) (internal citation and quotation marks omitted).  "The

language and the spirit of [Rule 16] are designed to provide to a criminal defendant, in

the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case."  *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).

Furthermore, information is material under Rule 16 even if it is not itself admissible.  *See United States v. Holihan*, 236 F. Supp. 2d 255, 260 (W.D.N.Y. 2002) ("Discovery is material if the information sought is relevant to the case and will lead to the discovery of admissible evidence.").  "'Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense.'  The Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant."  *United States v. Martinez*, 844 F.Supp. 975, 982 (S.D.N.Y. 1994) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir.1993)).

It is crucial that any disclosures be made at a time early enough to allow the defense to investigate, follow up, and make use of the information in a meaningful manner.  As the Second Circuit has observed:

> The limited *Brady* material disclosed . . . could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired.  The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case.

*Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001), *cited with approval in United States v. Knight*, 342 F.3d 697, 709 (7th Cir. 2003).

### B.  The legal bases for the discovery requested in this case.

Most of the specific items sought in this Motion relate to either (i) the conditions and circumstances that led up to the homicide with which Mr. Rogers is charged, or (ii)

13

the future dangerousness or lack of future dangerousness of Mr. Rogers.  The first category is potentially relevant to Mr. Rogers' state of mind at the time of the alleged offense and therefore may be admissible or lead to admissible evidence supporting the submission of lesser included offenses or affirmative defenses at the guilt/innocence stage of the trial.  But the Court need not decide such evidentiary matters at this time in order to grant this Motion in its entirety.  All of the items requested are relevant to any penalty phase trial that may be held, because they relate to the circumstances of the alleged offense as well as the future dangerousness or lack of future dangerousness of Mr. Rogers.

The Supreme Court has repeatedly held that the Eighth Amendment "require[s] that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality op.)) (emphasis in original *Lockett* plurality opinion).  The Court has specifically rejected the view that evidence needs to have some nexus to the crime to be mitigating, holding that "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284-285 (2004) (quoting *State v. McKoy*, 372 S.E.2d 12, 45 (N.C. 1988) (Exum, C.J., dissenting)); *see also* Ayers v. Belmonte, 549 U.S. 7, 21 (2006) (describing jury's penalty-phase task as weighing "the finite aggravators against the potentially infinite mitigators"); *Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987) (jury could not be precluded from considering nonstatutory

mitigating circumstances); *see generally* 18 U.S.C. § 3592(a) ("finder of fact shall

consider *any* mitigating factor . . ." (emphasis added)).  Thus, for example, a capital

defendant has a due process right to present mitigating evidence of his positive

adjustment to prison.  *Skipper v. South Carolina*, 476 U.S. 1, 10 (1986).

Because of the wide range of evidence that can be considered mitigating, the

burden to receive discovery relating to mitigation is low:

> In order to receive discovery related to mitigation evidence, the requesting
> party "need only establish a 'substantial basis for claiming' that a
> mitigating factor will apply at the penalty phase, in order to invoke the
> Government's obligation under Brady and its progeny to produce any
> evidence which is material to that mitigating factor."

*United States v. Con-Ui*, No. 3:13-CR-123, 2016 WL 4140520, at *3 (M.D. Pa. Aug. 4,

2016) (quoting *United States v. Beckford*, 962 F. Supp. 804, 811 (E.D. Va. 1997)).

To be sure, the requests set forth in this Motion are numerous and wide-ranging.

But that reflects the extraordinary breadth of the factors that may be relevant to a capital

jury's determination whether to impose the ultimate sentence of death and counsel's

duty to make informed and strategic decisions concerning what evidence should be

presented after thorough investigation.  *See generally*, *e.g.*, *Kansas v. Carr*, 136 S. Ct.

633, 642 (2016) ("Whether mitigation exists . . . is largely a judgment call (or perhaps a

value call); what one juror might consider mitigating another might not."); *Wiggins v.

Smith*, 539 U.S. 510, 524 (2003) (citing ABA Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989), regarding the

importance of thorough defense investigation).  Undersigned counsel for Mr. Rogers are

experienced capital defense counsel with specific experience defending BOP

homicides.  Counsel are aware that the government either has the information

requested or such information is readily available to the government on request.

It is important to view each request through the context of this specific case. This is a case where Mr. Rogers sought protective custody to escape a racist prison gang because, in his words, "I'm not a violent person, I don't want to hurt anyone." In response to his request for protection, the BOP placed him in restrictive conditions known to impact an individual's mental health. Then, when Mr. Rogers specifically requested medical treatment for depression, THP chose instead to give him a "workbook."

Mr. Rogers' counsel are investigating the role that BOP neglect of inmate medical and mental health played in the homicide at issue. Counsel anticipate that the discovery sought will show a systemic deliberate indifference to mental health needs of inmates throughout the BOP and especially in THP.

The government cannot claim ignorance of information suggesting that the BOP and THP in particular were failing to provide adequate mental health treatment to inmates in SHU detention, including those in protective custody, who were treated just like those serving a disciplinary sanction (but for an indeterminate period). These failings have been the subject of multiple government reports, discussed *supra*.

Nor can the prosecution claim that it is not in possession, custody, or control of all of the information requested herein. Many of the requests are for information in the possession of the BOP. In this case, the BOP has acted hand-in-glove with the prosecution. The BOP investigated this case. The BOP provided documents and other evidence to the prosecution. And, prior to death-penalty authorization, the Department of Justice sought and obtained the BOP's official position advocating for the death penalty against Mr. Rogers.

16

Furthermore, much of the data requested can be easily compiled by the BOP. In fact, the BOP has previously done so when ordered in other federal capital cases such as *Con-Ui*, *supra*; *United States v. Sablan*, No. 08-cr-0259 (E.D. Cal.); *United States v. Watland*, No. 11-cr-0038 (D. Colo.); *United States v. Richardson*, No. 08-cr-139 (N.D. Ga.); *United States v. McCluskey*, No. 10-cr-2734 (D.N.M.); and *United States v. Caro*, No. 06-cr-0038 (D. Colo.).

For example, in *United States v. Watland*, a BOP homicide case, the court issued a sweeping order that the government produce nationwide data similar to that requested here. (Exhibit 3, partial transcript *United States v. Watland*, No. 11-cr-0038-JLK (Aug. 9, 2011) (Doc. 167).) The court in *Watland* summarized the breadth of discovery in cases such as this:

> [W]e are to leave no stone unturned in the discovery process of death penalty cases. And I can only say in that regard that the Government seeks the death penalty. That's the Government's right to do so in this case. But when that happens, it – it sets forth a very – veritable avalanche of information that defense counsel and their experts must have.

(*Id.* at 57.) The court, therefore, granted the defense discovery motion "in every particular." (*Id.*) When the government failed to comply with this order, the magistrate judge took the extraordinary step of commanding that the government fully document its compliance with each discovery request and declaring, under oath, that all documents had or had not been produced; if the government represented that documents had been produced, the government was required to provide "a clear, unequivocal statement as to why the government believes that the court should accept that representation." (Minute Order (Doc. 476), *United States v. Watland*, No. 11-cr-0038-JLK, at 3 (May 16, 2012), attached as Exhibit 4).

The information Mr. Rogers requests herein is relevant to the defense's analysis of whether to present expert opinion testimony regarding prison conditions to Mr. Rogers' jury.  It will likely also be useful to provide necessary rebuttal evidence to the prosecution's claim in aggravation that Mr. Rogers should be sentenced to death on the ground that he would pose a danger to others in the future.  (*See* Doc. 13, p. 3, ¶ C.1.); *see also Wiggins*, 539 U.S. at 524 ("The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'").

Counsel for Mr. Rogers would be ineffective in failing to fully investigate and demand of the government information that could undermine the prosecution's future-dangerousness argument.  The Supreme Court has recognized the importance of providing a defendant with the opportunity to rebut future dangerousness arguments:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

*Skipper*, 476 U.S. at 5 n.1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)); *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) (due process requires opportunity for defendant to "deny or explain" a showing of future dangerousness).

Similarly, in *United States v. Johnson*, 02-cv-06998 (N.D. Ill. December 13, 2010) (opinion attached as Exhibit 5), the court granted habeas and vacated a death sentence because defense counsel was ineffective in failing adequately to investigate and challenge prosecution testimony on future dangerousness.  To rebut evidence that the

18

defendant would not be a future danger because of the ability to house him at ADX under the strictest conditions, the government called a former BOP warden as an expert.  (Exhibit 5 at 2-3.)  This expert gave testimony that the government later admitted was misleading, but defense counsel had failed to challenge him on his inaccurate assertions.  (Exhibit 5 at 3, 5.)  The court found this failure to be prejudicial: "But the Court finds that future dangerousness, and the Government's ability to protect against it, is an especially important factor in death penalty cases generally, as well as in this case particularly."  (Exhibit 5 at 5.)  The court went on to recognize that empirical studies demonstrate the impact of future dangerousness evidence in the jury's life or death decision:

> This conclusion also finds support in the empirical research on the subject. A number of studies suggest that future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death.  *See, e.g.,* John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework,* 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed] ... offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

(Exhibit 5 at 6.)

Here, like in *Johnson*, counsel will be ineffective if they do not adequately challenge the government's argument of future dangerousness.  But the tools to do so lie in the first instance in the hands of the party seeking to take Mr. Rogers' life.

Experience with the modern federal death penalty amply demonstrates that capital jurors may consider the type of material sought herein—such as that relating to BOP prison conditions—to be mitigating factors that could support the imposition of a

sentence less than death.  For example, the following mitigating factors have been found by capital jurors in BOP homicide cases:

***United States v. William Sablan:***

- "The circumstances that led to Joey Estrella's death existed, at least in part, because of the failure(s) by BOP officials to properly do their job(s)."

- "Prior to Joey Estrella's death, correctional officer Fuller failed to respond to one or more duress alarms from cell 124 despite his duties to the contrary."

- "Prior to Joey Estrella's death, inmate Arthur Peck told correctional officer Forsythe that Rudy Sablan was choking Joe Estrella, but Forsythe did not intervene despite his duties to the contrary."

- "Prior to Joey Estrella's death, inmate Arthur Peck told correctional officer Forsythe that the occupants of cell 124 were fighting, but Forsythe did not intervene despite his duties to the contrary."

- "Prior to Joey Estrella's death, correctional officers were aware that the occupants of cell 124 were drinking hooch, but did not intervene despite their duties to the contrary."

- "Upon William Sablan's arrival at the United States Penitentiary-Florence, the BOP failed to conduct a psychological/medication evaluation despite the fact that his transfer papers indicated mental concerns and recommended that BOP officials 'review *PSY/MED* on arrival'."[3]

***United States v. Rudy Sablan:***

- "Upon William Sablan's arrival at the United States Penitentiary-Florence, the Bureau of Prisons ("BOP") placed him in cell 124, the Special Housing Unit, along with Rudy Sablan and Joey Estrella, despite the fact that the cell was designed to house only 2 people."

- "The circumstances that led to Joey Estrella's death existed, at least in part, because of the failure(s) by BOP officials to properly do their job(s), by allowing alcohol and weapons in the cell."

- "The BOP, [*sic*] didn't do their job by faulty logic of putting William and Rudy in the same cell."

---

[3]  Verdict form attached hereto as Exhibit 6.

- "Joey died because the guards failed to do 30-minute rounds."[4]

***United States v. Barry Byron Mills:***

- "Daily life for inmates in a federal penitentiary is dangerous and violent."

- "Daily life for inmates in a federal penitentiary is particularly dangerous for white inmates, as they are a minority in the system."[5]

***United States v. Brian Richardson:***

- "Brian Richardson has spent almost his entire adult life in some of the most brutal and overcrowded prisons in the United States."

- "Brian Richardson was subject to constitutionally inadequate mental health support while in the California State Prison system."

- "Brian Richardson's experiences in prison and his exposure to the convict code and prison culture of various prisons explains, in part, his fatal attack on Steven Obara."

- "The circumstances that led to Steven Obara's death existed, at least in part, because BOP officials put Brian Richardson and Mr. Obara in the same cell when they should not have been housed together."

- "If sentenced to life in federal prison without release, Brian Richardson will be sent to ADX where he will live in solitary confinement with limited human contact."[6]

***United States v. Ellis Joseph Mosher:***

- "There are no options for weakness in prison."

- "Ellis Joseph Mosher can comply with institutional rules."

- "Ellis Joseph Mosher spent the last ten years in some form of solitary confinement."

- "Ellis Joseph Mosher responded well to supermax prison conditions."

- "Ellis Joseph Mosher completed programs of self-improvement."[7]

---

[4]  Verdict form attached hereto as Exhibit 7.
[5]  Verdict form attached hereto as Exhibit 8.
[6]  Verdict form attached hereto as Exhibit 9.
[7]  Verdict form attached hereto as Exhibit 10.

***United States v. Michael O'Driscoll:***

- "The Federal Bureau of Prisons is capable of fashioning conditions of confinement that will isolate and punish Mr. O'Driscoll for the murder of Robert Frankhouser."[8]

In light of these verdict forms and the current standard of practice in BOP homicide cases that are authorized for federal capital prosecutions, defense counsel would risk someday being found to have provided constitutionally ineffective assistance of counsel to Mr. Rogers if they did not obtain, and make good use of, the type of information and materials sought by the specific requests set forth in this Motion.

## IV.    Specific discovery and *Brady* requests

With this legal framework in mind, Mr. Rogers makes the following specific requests.  Although defense counsel set forth herein a number of specific discovery and *Brady* requests, counsel are mindful of the Supreme Court's admonition that "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."  *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *see also Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009) ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.").  By making such specific requests, Mr. Rogers in no way seeks to lessen the affirmative obligation of the prosecution to provide discovery and *Brady* material as required by Rule 16 and the Due Process Clause of the Fifth Amendment, respectively.  *See Boss*, 263 F.3d at 743 ("Allowing the government to withhold favorable material evidence that it receives from defense witnesses upsets the balance *Brady* and its progeny strike.  The consequence of adopting the state's position would

---

[8]   Verdict form attached hereto as Exhibit 11.

work a real injustice.  In effect, it would punish the defense for not obtaining evidence it

had no reason to believe existed."); *Crivens v. Roth*, 172 F.3d 991, 997–98 (7th Cir.

1999) ("We agree with other circuits that have explained that 'the availability of

information is not measured in terms of whether the information is easy or difficult to

obtain but by whether the information is in the possession of some arm of the state.'").

    The requested discovery items fall into nine categories:

A.    Discovery related to this incident specifically;

B.    Discovery related to Mr. Rogers' incarceration in the BOP;

C.    Discovery related to the BOP generally;

D.    Discovery related to THP;

E.    Discovery specifically related to medical or mental health treatment;

F.    Discovery of information relating to the decedent;

G.    Discovery of Bureau of Prisons documents regarding the officers working in the THP SHU on December 26, 2013;

H.    Discovery regarding witnesses working with the government or providing information to the government;

I.    Issues regarding discovery already produced that is redacted or illegible;

J.    An anticipated trial witness list.

    Throughout this Motion, the term "documents" includes, without limitation, and

whether in electronic or paper format, the following: correspondence, email

communications, memoranda, reports, handwritten notes, photographs, electronic

computer entries, audio recordings, video recordings, audiovisual recordings,

spreadsheets and other compilations of data, slideshows and/or PowerPoint

presentations, as well as drafts and final versions of each of these items.

    Mr. Rogers respectfully asks the Court to order the following materials pursuant

to Rule 16 and *Brady*:

**A.  Discovery related to this incident specifically**

1.  An opportunity for the defense team and defense experts to tour USP Terre Haute in person and to view and photograph the prison, including, without limitation, the Special Housing Unit.  The defense seeks an order permitting digital photography, video, and the use of electronic measuring equipment.  The Court's order should further specify that any BOP personnel supervising or observing the defense tour are prohibited from revealing any information about the defense tour to the prosecution or anyone working with the prosecution in this case.  The Court should further order that the BOP is not to reveal any video of the defense tour to the prosecution or anyone working with the prosecution in this case.

2.  Any and all documents relating to investigation by the Federal Bureau of Investigation (FBI) and/or the BOP of the Thomas Sim homicide on December 26, 2013, including, without limitation, the following documents:

    a.  Correspondence between or among FBI agents, SIS staff, or other BOP personnel;

    b.  Handwritten notes taken by FBI agents, SIS staff, or other BOP personnel;

    c.  Written reports prepared by FBI agents, SIS staff, or other BOP personnel; and

    d.  Any and all documents, or communications of any kind, reflecting the division of labor between the FBI and SIS with regards to the Sim homicide investigation.

3.  Any and all mass interview forms prepared in relation to the Sim homicide investigation.

4.  A copy of the THP SHU inmate and housing roster for December 25, 2013.

5.  Any and all documents relating to interviews of inmates in connection with the Sim homicide investigation, including, without limitation, investigators' handwritten or computer entry notes.

6.  Any and all documents created and maintained by the SIS office in relation to the Sim homicide investigation, including, without limitation, the materials required by the SIS Inmate Investigation File Check List such as inmate profiles, inmate incident reports, reports of incident, and Disciplinary Hearing Officer (DHO) reports.

7.  All Board of Inquiry Reports concerning the Sim homicide.

8.  Any and all correspondence, emails, notes, memoranda, or other documents between or among BOP personnel, FBI personnel, and/or DOJ personnel regarding the decision to seek the death penalty in this case.

9.  Any and all phone logs, calendar entries, datebooks, or other documents relating to conversations between or among BOP personnel, FBI personnel, and/or DOJ personnel regarding the decision to seek the death penalty in this case.

10. Any drafts of the memorandum analyzing the justification for seeking the death penalty in this case located in discovery at Bates pages 000799-000805.

11. Any and all documents relating to SIS card files and other files and materials regarding the following:

    a.  Andrew Rogers;

    b.  Thomas Sim;

    c.  The Soldiers of Aryan Culture or SAC.

12. Any and all documents relating to SIS briefings of or presentations to BOP and FCC Terre Haute executive staff regarding the Sim homicide investigation.

13. Any and all documents prepared by or maintained by the Office of Internal Affairs and/or the Office of Inspector General relating to the Sim homicide investigation.

14. Any computer entries by BOP personnel relating to the death of Thomas Sim.

15. All documents, including the tape recordings of any hearings, related to any BOP disciplinary or administrative proceedings, involving inmates or staff, related to the death of Thomas Sim.

16. Any information regarding the author and date of a handwritten note alleging that Mr. Rogers made a statement threatening a guard found at pages 000490 and 000491 of discovery.

17. Any and all recordings of radio communications at THP from 12:01 a.m. to 10:00 a.m. on December 26, 2013.

18. Any crime scene video relating to the death of Thomas Sim.

19. Any video of the autopsy of Thomas Sim.

**B.  Discovery related to Mr. Rogers' incarceration in the BOP**

20. All telephone recordings ("jail calls") of Mr. Rogers.

25

21.   Copies of all letters and emails to and from Mr. Rogers.

22.   Any and all documents relating to the THP's acceptance, designation, and classification, and transportation of Andrew Rogers.

23.   Any documents relating to requests for transfer for Andrew Rogers, including but not limited to, any communications regarding eligibility and suitability for transfer, requests for review, and all other documents and communications.

24.   All information obtained at any time by the Designation and Sentencing Computation Center (DSCC) that references Andrew Rogers, and all pipeline information related to his transfer to any BOP facility, including, without limitation, any information sent to a receiving facility or any information given to transportation officers regarding classification or security issues for Mr. Rogers.

25.   The Memorandum dated 09-12-2013 by B. English, CMC, USP Terre Haute, referenced in the CIM Case Information Summary for Andrew Rogers dated October 15, 2014.

26.   All documents, communications, memoranda, recordings, and all other forms of memorialization of any communication between Mr. Rogers and the THP Warden following Mr. Sim's death, including, but not limited to, any and all materials forward by the THP Warden to the any prosecutorial or law enforcement agency concerning statements made by Mr. Rogers, and opinions expressed by the Warden regarding this case.

27.   Documents are continuously being generated by the BOP regarding Mr. Rogers.  Accordingly, the defense requests updated BOP documents regarding Mr. Rogers—including, without limitation, documents contained in Mr. Rogers' Central Inmate File, his medical file, SENTRY entries regarding Mr. Rogers, trust account files regarding Mr. Rogers, and Mr. Rogers' visitation records and visitors list—to be provided to the defense in a timely manner at a frequency of no less than every 30 days.

### C.  Discovery related to the Bureau of Prisons generally

28.   The BOP Performance Budget Congressional Submissions for fiscal years 2013-2017.

29.   A list of the number of series 100 incidents of assaults on inmates as counts and rates per year at each United States Prison each year between January 1, 2009, and December 31, 2013.[9]

---

[9] With regard to any BOP data, Mr. Rogers asks that raw data be provided in spreadsheet format rather than PDF to the extent possible.  Mr. Rogers also asks that the BOP provide a codebook for the data elements contained in the spreadsheets.

30. The Correctional Services Significant Incident Data for incidents of assaults on inmates as counts and rates per 5,000 inmates for all United States Prisons for each year between January 1, 2009, and December 31, 2013.

31. The number of homicides committed in United States Prisons for each year between January 1, 2004, and December 31, 2013, and the institutions where the homicides occurred.

32. A list of the number of series 100 incidents of assaults on inmates as counts and rates per year in each Special Housing Unit in BOP facilities each year between January 1, 2004, and December 31, 2013.

33. The number of homicides committed in Special Housing Units in BOP facilities for each year between January 1, 2004, and December 31, 2013, and the institutions where the homicides occurred.

34. The Federal Bureau of Prisons State of the Bureau Report for the years 2008-2014.

35. Copies of all Prison Social Climate Surveys.

36. Any and all documents relating to reports of Code 101 violations within the BOP from January 1, 2009, through December 31, 2013, including graphs, supporting data, and supporting documentation.

37. Any and all documents relating to reports of Code 104 violations within the BOP from January 1, 2009, through December 31, 2013, including graphs, supporting data, and supporting documentation.

38. Any and all BOP After-Action Reports prepared from January 1, 2009, through December 31, 2013.

39. Any and all documents relating to the BOP's mission critical post initiative, including, without limitation, the following:

    a. A memorandum from the Assistant Director of Correctional Programs describing how each BOP facility was to gather information for 6 months regarding overtime and staffing under the mission critical post initiative;

    b. The information gathered in response to such memorandum; along with and supporting documentation;

    c. Any and all documents reflecting the BOP's analysis of such information and/or evaluation of the effectiveness of the mission critical post initiative.

40. Any and all documents relating to BOP or THP policies, practices, guidelines, or procedures for conducting mass interviews.

41. Any and all documents relating to the U.S. General Accountability Office's February 2009 Report to Congressional Requesters titled, "Bureau of Prisons: Written Policies on Lateral Transfers and Assessment of Temporary Assignments Needed" (GAO-09-141), including, without limitation, the following:

   a. Any and all documents relating to then-BOP Director Harley Lappin's February 5, 2009 letter to the U.S. Government Accountability Office regarding a draft of this report;

   b. Any and all documents relating to the initial "systematic assessment of Correctional Services 'mission critical post' use at BOP's field locations" referenced in then-BOP Director Harley Lappin's February 5, 2009 letter to the U.S. Government Accountability Office;

   c. Any and all documents relating to any resulting modification of Correctional Services Program Review guidelines as referenced in then-BOP Director Harley Lappin's February 5, 2009 letter to the U.S. Government Accountability Office;

   d. Any and all documents relating to "[s]ubsequent, regularly-scheduled reviews of institutions" as referenced in then BOP-Director Harley Lappin's February 5, 2009 letter to the U.S. Government Accountability Office.

42. Any and all documents relating to the average length of SHU incarceration for each BOP facility for the time period January 1, 2009, through December 31, 2013.

43. Any and all documents relating to BOP and/or THP policies, procedures, practices, or guidelines regarding SHU housing decisions for inmates in disciplinary segregation or administrative detention for the time period January 1, 2009, through December 31, 2013.

44. Any and all documents indicating that SHU housing may contribute to mental health conditions, including, but not limited to, depression, anxiety, or bipolar disorder.

45. Any and all documents reflecting training of BOP staff regarding policies and procedures for supervising inmates in the SHU prior to and including December 26, 2013.

46. Any and all documents relating to the CNA Analysis & Solutions December 2014 report titled, "Federal Bureau of Prisons:  Special Housing Unit Review and Assessment," including, without limitation, any documents provided by BOP to CNA Analysis & Solutions.

47. Any and all documents relating to the creation of the Reintegration Housing Unit (RHU) at Oakdale, Louisiana, including, without limitation, the following:

    a. Any and all documents relating to the need or desire for the creation of the RHU;

    b. Any and all documents relating to criteria for placement in the RHU;

    c. Any and all documents relating to the means and/or methods for placement of an inmate in the RHU;

    d. Any and all documents relating to inmates placed in the RHU in 2013;

    e. The October 2013 memorandum regarding procedures and criteria for placement of inmates in the RHU referenced in the CNA Audit at page 220.

48. Any and all documents relating to the transition of FCI Otisville, New York to a Security Threat Group Drop-Out institution, including, without limitation, the following:

    a. Any and all documents relating to the need or desire for the creation of the Security Threat Group Drop-Out institution;

    b. Any and all documents relating to criteria for placement in the Security Threat Group Drop-Out institution;

    c. Any and all documents relating to the means and/or methods for placement of an inmate in the Security Threat Group Drop-Out institution;

    d. Any and all documents demonstrating the number of and facility of origin for inmates placed in the Security Threat Group Drop-Out institution from opening to the present.

49. Any and all documents relating to BOP guidelines for assessing, classifying, and validating an inmate as a gang/STG member, associate, or affiliate for the period of January 1, 2009, through December 31, 2013.

50. Any and all documents relating to referrals of inmate criminal matters for investigation that result in either investigation by an outside agency or prosecution.

51. Any and all documents relating to the amount of time from a request for transfer to transfer for inmates who are in SHU placement due to protective custody status for the time period January 1, 2004, through December 31, 2013.

52. Any and all documents relating to the philosophy, practices, and activities of the Soldiers of Aryan Culture or SAC in the BOP, including, without limitation:

    1. Documents relating to any "constitutions" for the Soldiers of Aryan Culture or SAC;

2. Documents relating to membership in the Soldiers of Aryan Culture or SAC and how an inmate becomes a member of the Soldiers of Aryan Culture or SAC;

3. Documents relating to alleged gang-related disciplinary violations by Soldiers of Aryan Culture or SAC members and affiliates.

4. Any and all documents relating to efforts by the Soldiers of Aryan Culture or SAC to increase their power and influence in the BOP.

5. Any and all documents relating to the Soldiers of Aryan Culture or SAC at FCC Terre Haute.

53. Any and all documents relating to the institutional conduct of BOP inmates who have been convicted of committing a murder in prison after the prison murder conviction, including, without limitation, those inmates who have been found by a capital jury to pose a future danger.

54. Any and all documents relating to the ability of USP-ADMAX (ADX) to safely and securely house BOP inmates who have been convicted of committing a murder or other violent act in prison.  This request includes, but is not limited to, the following:

a. Documents providing the data referenced on pages 58-66 of the CNA Audit and in Tables 13, 14, 15, 16, 17, 18, 19, 20, and Figure 3 of the CNA Audit.

b. Any documents of a similar nature for the time period following those referenced in the CNA Audit to the present.

**D. Discovery related to USP Terre Haute**

55. Any and all documents reflecting staffing and staff assignments at THP for December 1-31, 2013.

56. Any and all daily unit logs for the THP SHU regardless by what name they are known for December 1-31, 2013.

57. All video footage taken in the THP SHU for December 1-31, 2013.

58. Any and all documents reflecting the number of inmates in the THP SHU for January 1, 2009, through December 31, 2013, with indication whether the inmate was in the SHU for disciplinary segregation, protective custody, or other administrative detention.

59. Any and all daily Lieutenants logs for December 1, 2013, through December 31, 2013.

60. Any and all monthly Lieutenants' Meeting minutes for December 1, 2013, through June 1, 2014.

61. Any and all documents relating to Wardens/Executive staff meetings, Department Head Meetings for January 1, 2013, through June 1, 2014.

62. Any and all documents relating to BOP investigation of inmate-on-inmate or inmate-on-staff violence at THP prior to December 27, 2013, including, without limitation, the following:

    a. Reports, files, letters, memoranda, complaints, disciplinary reports, or other information;
    b. Board of Inquiry Reports;
    c. Regional Inquiry Team Reports;
    d. After-Action Reports;
    e. Local Inquiry Team Reports;
    f. Summary Reports;
    g. Drafts of and memoranda or correspondence related to the Reports identified in (a) through (e);
    h. Documents reflecting any THP response and/or corrective action plan developed and/or implemented in response to the recommendations set forth in the Reports identified in (a) through (e).
    i. Documents, records, working papers, and/or personal records created by members of the Boards or Teams selected to prepare any of the Reports identified in (a) through (e).

63. Any incident reports, reports of incidents, or other reports files, letters, memoranda, complaints, disciplinary reports, documents, or other information related to any incident where staff responded to the THP yard or an individual cell at THP from January 1, 2004, to December 31, 2013.

64. Any reports, files, letters, memoranda, complaints, disciplinary reports, or information related to security problems involving the care and protection of inmates at THP from January 1, 2004, to December 31, 2013. This request includes, but is not limited to, all identified security issues, problems, concerns, and policies. This request also includes, but is not limited to, all changes in security policies, protocols, and arrangements.

65. All key indicator data or correctional services significant incident data for THP for January 1, 2009, through December 31, 2013, including, but not limited to, data reflecting rates of assaults on inmates, rates of assaults of staff, hit rates of random urinalysis and hit rates of suspect group urinalysis tests.

66. Any and all documents reflecting guidelines, policies, protocols, or rules regarding the conducting of rounds in the THP SHU prior to and including December 26, 2013.

67. Any and all documents reflecting policies, guidelines, or protocols governing cell searches at THP, including, without limitation, any document reflecting any internal procedures enacted by THP to implement the section of the policy statement entitled, "Search of Inmate Housing and Work Areas §552.14," from the date THP opened to the present.

68. Any and all housing unit log books or documents for the SHU at THP, including, without limitation, documents relating to cell searches and unit activity, for the time period of January 1, 2013, through December 31, 2013.

69. Any and all documents reflecting SHU meetings regarding Andrew Rogers or Thomas Sim.

70. The latest two Institutional Character Profile reports prepared for THP prior to December 26, 2013.

71. Any and all documents relating to Annual Refresher Training Agenda and/or Annual Training Plan, including, without limitation, all training committee meeting minutes and recommendations, specialty training, and rationale for the training for January 1, 2009, through June 1, 2014.

72. All After Action Reviews for all incidents of group disturbance, homicide, assault, bribery of a correctional officer, indictment of a correctional officer, smuggling of contraband or violation of civil rights at THP for each year between January 1, 2004, and December 31, 2013.

73. A description of all Bureau of Prisons referrals to the Office of the Inspector General of the Department of Justice for THP for each year between January 1, 2004, and December 31, 2013.

74. The number of instances in which prisoners were transported outside of THP for any trauma care each year between January 1, 2004, and December 31, 2013.

75. Any reports, files, letters, memoranda, complaints, disciplinary reports, or information related to any changes made regarding security as it relates to the care and protection of inmates at THP from January 1, 2004, through December 31, 2013.

76. Maps or diagrams of the following as they existed on December 26, 2013: THP; the tiers and specific cell assignments of THP.

77. Any and all Unit Officers' Post Orders in effect on December 26, 2013.

78. All logbooks/files/folders or other information storage device regarding: shakedowns, confiscation, alcohol-testing, pat-and-search visuals, metal detector, referred-to-prosecution, Captain's file for THP from January 1, 2004, through December 31, 2013.

79. A copy of any Division Program Review of THP addressing compliance with laws, rules, regulations or Bureau of Prison policy statements relating to prison staffing or prison safety for each year for the period between January 1, 2004, and December 31, 2013.

80. Any and all Correctional Services quarterly perpetual audit schedule and audits and correction action plans for THP for the period of January 1, 2010, through December 31, 2014.

81. Any and all documents relating to SIS intelligence briefings provided to THP executive staff for the period of January 1, 2010, through December 31, 2014.

82. The total number of Bureau of Prisons correctional officer positions eliminated at THP for each year from January 1, 2004, through December 31, 2013.

83. Any reports, files, letters, memoranda, complaints, disciplinary reports, or information in whatever form it may exist, related to allegations of criminal activity, false information, official misconduct or negligence by any BOP personnel including guards, administrators, and contractors at THP from January 1, 2004, through December 31, 2013.

84. Copies of all indictments of BOP staff at THP per year from January 1, 2004, through December 31, 2013.

85. Any and all documents relating to Labor/Management Relations at THP from January 1, 2004, through December 31, 2013, including, without limitation, minutes of Labor/Management meetings.

86. Any and all Unfair Labor Practices and local labor grievances filed at the local and regional level regarding THP from January 1, 2004, through December 31, 2013.

87. All Correctional Services Program Reviews and responses that have been conducted and completed in regard to THP from the date it opened to the present.

88. All ACA reviews that have been conducted and completed in regard to THP from the date it opened to the present.

89. A copy of BOP Institution Supplement THX-5217.01K, Operation and Security of the Special Confinement Unit.

90. Any and all documents reflecting needs for separation between groups and specific prisoners and any and all policies and protocols regarding the same from January 1, 2004, through December 31, 2013.

91. Any and all of the following policy documents relating to and/or applicable at THP during 2013:

    a.  Institutional or Complex Supplements to BOP Program Statements;

    b.  Operations Memoranda;

    c.  Technical Reference Manuals;

    d.  Document Retention Policies; and

    e.  Memoranda regarding the placement and transfer of inmates.

92.  Information regarding security staff vacancies and reason for vacancy from January 1, 2004, through December 31, 2013.

93.  Any and all documents relating to administrative remedies submitted by any THP inmate from January 1, 2004, through December 31, 2013, concerning the Soldiers of Aryan Culture or SAC, including, without limitation, BP-8s, BP-9s, BP-10s, and BP-11s.

94.  Any and all documents relating to direction from management to THP staff requesting or requiring that staff document their observations of inmates and inmate group activities, for the time period of January 1, 2004, through December 31, 2013.

95.  Any and all documents relating to daily reports that memorialize or summarize BOP staff observations of inmate activities or groupings, including, without limitation, daily sensitive reports, for THP for the time period of January 1, 2009, through December 31, 2013.

96.  Any and all documents relating to entries in the Information Management System at THP for the time period of July 1, 2013, through December 31, 2013.

97.  Any and all documents relating to Staff Duty Officer reports for THP for the time period of January 1, 2004, through December 31, 2013.

98.  Any and all documents relating to monthly Lieutenants' meetings at THP for the time period of January 1, 2004, through December 31, 2013, including, without limitation, minutes of such meetings.

99.  The SIA and SIS manuals in effect at THP on December 26, 2013.

100. Any and all documents reflecting policies for single-celling or double-celling inmates either in SHUs within the BOP generally or in the SHU at THP specifically.

101. Any employee "grievance" of whatever kind and name it may be known filed by any correctional officer or other employee at THP from January 1, 2010, through December 31, 2014.

102. Any and all documents regarding first responder training provided to institutional staff at THP from January 1, 2010, through December 31, 2014.

103. Any and all documents reflecting mental health training for THP staff from January 1, 2013, to present.

104. All documentation, minutes, or notes of whatever kind and in whatever form of all warden/executive staff meetings and or department head meetings that occurred at or regarding THP from January 1, 2010, through December 31, 2014.

105. Copies of the position descriptions for the Warden, Associate Wardens and Captains that were prepared for use by the THP from the date that it was open until present.

106. A copy of any organizational hierarchy chart of administrative and staff employees of THP for 2013.

107. Copies of all Duty Officer Incident reports or reports of incident forms for THP from January 1, 2009, through December 31, 2014.

108. All documents or electronically stored information regarding complaints of whatever kind made by any Correctional Officer (CO) against the Administration or any member thereof or regarding safety or security at THP from the date that THP opened until present.

109. A list of all lawsuits against personnel of FCC Terre Haute, in official capacity or in personal capacity where related to employment, for the period of January 1, 2005, to present.

110. Any and all documents relating to formal and informal materials and investigative materials maintained by the SIS/SIA office at USP Terre Haute regarding the inmates listed in Appendix 1, including, without limitation, STG and/or suspected gang activity.

111. Any and all documents contained in or relating to the Posted Picture Files, STG files, AIMS information, Disruptive Group Validation packages and information, cell assignment records, and Presentence Investigation Reports regarding the inmates listed in Appendix 1.

112. It is important and material to the preparation of Mr. Roger's defense to have photographs of BOP inmates who are potential trial witnesses, because many BOP inmates are known to others not by their true names but rather by "street" names or prison nicknames. Thus, when conducting investigation interviews of current or former BOP inmates, the defense team is unable to adequately identify certain individuals by using those individuals' names, whereas having photographs of those individuals will often trigger recognition by the interviewee.  Color photographs of the inmates listed in Appendix 2.

113. Any and all documents relating to inmate profiles, inmate incident reports, and Disciplinary Hearing Officer (DHO) reports for the inmates listed in Appendix 2.

114. Any and all documents regarding requests for protective custody for the inmates listed in Appendix 2.

115. Any and all Special Housing Unit Records (form BP-A292.052) for the inmates listed in Appendix 2.

116. Any and all SENTRY records for the inmates listed in Appendix 2.

117. Any and all TruIntel entries for the inmates listed in Appendix 2, including without limitation Global Inmate Reports.

118. Any and all Presentence Investigation Reports for the inmates listed in Appendix 2.

119. Any and all written correspondence, email correspondence, or telephone calls to or from Jeremy Edwards, Terry Ackroyd, or William Roehm for the period July 25, 2013, through December 31, 2013.

120. Any and all documents relating to the August 18, 2014, disassociation interview with Jeremy Edwards, potentially kept on file at the Sacramento Intelligence Unit.

121. A copy of the autobiography provided by Jeremy Edwards on or about July 29, 2014.

122. A copy of a letter to Joshua "Red" Daly relating to Jeremy Edwards, with an Item Number DC-14-00286 and an Evidence Number DC-14-00280.

123. Any and all documents reflecting the menu of food served in the SHU at THP for the dates December 24-26, 2013.

### E.  Discovery specifically related to medical and mental health treatment

124. Any and all records, including, but not limited to, handwritten notes or contemporaneous entries by other means (audio recorded, etc.) for any medical provider seeing, treating, evaluating, or providing services to Andrew Rogers at any facility where Mr. Rogers has been housed while in federal custody, whether BOP or U.S. Marshals Service.  This request includes, without limitation, the following:

   a.  Records from THP;

   b.  Records from Chicago MCC;

36

    c.  Records from Tazewell County Justice Center;

    d.  Records from off-site or tele-psychiatry providers.

125. A copy of the workbook on depression provided to Andrew Rogers on October 9, 2013.

126. Any and all mental health records of Thomas Sim, including, but not limited to, those maintained in the Prisons Electronic Medical Record System and Psychology Data System (BEMR-PDS).

127. Any and all documents describing or outlining "meaningful contact" with inmates with mental health conditions, from January 1, 2011, to present.

128. Any and all documents reflecting BOP or THP policy for the diagnosis and/or documentation of mental health conditions and the provision of mental health treatment in effect for January 1-December 31, 2013.

129. Any and all documents reflecting guidelines or policies for the use of tele-psychiatry for the year 2013 at BOP generally and THP specifically.

130. Any and all documents relating to the BOP Mental Health Prevalence Project.

131. Copies of the BOP Psychology Services Manual in effect for 2013 to present.

132. Any and all documents relating to the U.S. Department of Justice Bureau of Justice Statistics' September 2006 Special Report titled, *Mental Health Problems of Prison and Jail Inmates*, including, without limitation, any and all documents providing data underlying the statistical conclusions in Table 16.

133. Any and all documents relating to the U.S. Department of Justice Office of the Inspector General Audit Division's February 2008 report titled, *The Federal Bureau of Prison's [sic] Efforts to Manage Inmate Health Care* (Audit Report 08-08), including, without limitation, the following:

    a.  Any and all documents reviewed relating to FCC Terre Haute;

    b.  Any and all documents reflecting a response by the BOP or FCC Terre Haute.

134. Any and all documents relating to the U.S. Department of Justice Office of the Inspector General Audit Division's March 2016 report titled, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Evaluation and Inspection Division 16-02).

135. Any and all documents relating to the U.S. Department of Justice Office of the Inspector General Audit Division's June 2016 report titled, *The Federal Bureau*

*of Prisons' Reimbursement Rates for Outside Medical Care* (Evaluation and Inspections Division 16-04).

136. Any and all documents relating to the U.S. Department of Justice Office of the Inspector General's report titled, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (Evaluation and Inspections Division 17-05), including, without limitation, the following:

 a. Any and all documents reflecting the data cited in the following paragraph:

   BOP data showed that, as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's FY 2016 Performance Budget Congressional Submission cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness. Moreover, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness.

 OIG Report, p. ii.

 b. Any and all documents reflecting the data cited in the following paragraph:

   The BOP's data indicates that approximately 22 percent of inmates in RHUs had a history of mental illness at the end of FY 2014.  Specifically, according to our analysis of BOP data, 37 percent of ADX inmates, 27 percent of SMU inmates, and 21 percent of SHU inmates had a history of mental illness.

 OIG Report, p. 35 (footnote omitted).

 c. Any and all documents reflecting the average length of SHU stays for the years 2013-2017 across the BOP for inmates designated MHCL 1, 2, 3, and 4, broken down by MHCL level.

 d. Any and all documents reflecting the average length of SHU stays for the years 2013-2017 at THP for inmates designated MHCL 1, 2, 3, and 4, broken down by MHCL level.

 e. Any and all documents underlying the 2015 estimate of the BOP Chief Psychiatrist that approximately 40 percent of BOP inmates have mental illness.

 f. A copy of the letter from Thomas E. Perez, Assistant Attorney General, DOJ Civil Rights Division, and David J. Hickton, U.S. Attorney, Western

District of Pennsylvania, to the Honorable Tom Corbett, Pennsylvania Governor's Office, May 31, 2013.

137. Any and all documents reflecting any change in treatment rates for inmates with any mental health condition at THP since adoption of the 2014 BOP mental health policy.

138. Any and all documents relating to the implementation of Institution Care Coordinator and Reentry (CCARE) Teams at any BOP facility.

139. Any and all documents relating to the timing in the BOP generally or THP specifically of responses to requests for medication for the period January 1, 2004, through December 31, 2013.

140. Any and all documents relating to the types of psychiatric medicine available at THP for the period January 1, 2013, to present, including, without limitation, any documents relating to THP formulary medications.

141. Any and all documents reflecting the number of requests for Wellbutrin and the number of approvals of such requests for the BOP during the period January 1, 2004, to present.

142. Any and all documents reflecting the number of inmates designated MHCL 1, 2, 3, 4 at THP for each year from 2010-2014, broken down by MHCL classification.

143. Any and all documents reflecting the number of inmates designated MHCL 1, 2, 3, 4 housed at any time in the SHU at THP for each year from 2010-2014, broken down by MHCL classification.

144. Any and all documents reflecting treatment protocols for inmates with suspected or diagnosed mental health conditions in the SHU at THP for each year from 2013-2017.

145. Any and all documents reflecting psychologist and psychiatrist staffing for the BOP for January 1, 2013, to present.

146. Any and all documents reflecting THP staffing of psychologist and psychiatrist positions for January 1, 2013, to the present.

147. Any and all documents reflecting the identity of mental health practitioners and officers designated by the THP warden to visit SHU inmates for each day for October-December 2013.

148. Any and all documents relating to medical providers at FCC Terre Haute for the period January 1, 2004, to present, including, without limitation, contracts with outside medical providers and solicitations for offers.

149. A listing of all medical and mental health staff at FCC Terre Haute for the period of June 1, 2013, to present.

150. Any and all documents reflecting medical and/or mental health staffing and/or staff vacancies for FCC Terre Haute for the period June 1, 2013, to present.

151. Any and all documents relating to mental health programming options available at THP for the period June 1, 2013, to present.

152. Any and all documents reflecting medical and/or mental health guidelines, policies, or protocols in place at FCC Terre Haute for the period June 1, 2013, to present.

153. Any and all documents relating to response times between requests and responses for psychological or psychiatric services at THP and in the BOP generally from June 1, 2013, to present.

154. Any and all documents reflecting job descriptions for each psychologist or psychiatrist employed at THP for January 1, 2013 to present.

155. The entire personnel files, including, without limitation, curriculum vitae/resumes, employment applications, reviews, complaints, and disciplinary actions for all medical or mental health personnel who have evaluated or treated Andrew Rogers, including, but not limited to, the following:

   a. Sara Booth, RN
   b. Tracy Heiser, RN
   c. Joseph May, RN
   d. Kelly Scamihorn, RN
   e. Michele Smith, RN
   f. Matthew Worthington, RN
   g. Sarah Wence, RN
   h. Erin Conner, PsyD
   i. Erin E. Buchanan, Psychology predoctoral intern/PsyD
   j. Stephen Eckert, PhD
   k. Stacie Kalvels, PsyD
   l. Jasmine Jones, Psychology predoctoral intern
   m. Melissa Macke, Psych Tech
   n. Ericka Schmitt, PsyD
   o. Dr. Wolfson (first name unknown)
   p. William Wilson, MD
   q. Roger Cox, FNP
   r. Diana Sanchez, MD
   s. Heather Mata, PA
   t. Diana Rypska, PsyD
   u. Jessica Sawyer, LPN
   v. Tammy McDaniel, RN

### F.  Discovery of information related to the decedent

156. Any and all reports, transcripts, or other documents in the possession, custody, or control of any government agency of any investigation regarding Thomas Sim.

157. Any and all reports, transcripts, or other documents in the possession, custody, or control of any government agency referencing any suspected crime of violence, whether completed or not, wherein Thomas Sim is mentioned.

158. Any and all information in the possession of any government agency connecting Thomas Sim to any act of violence.

159. Any and all documents relating to the THP's acceptance, designation, and classification, and transportation of Thomas Sim.

160. Any and all documents relating to any investigation, assessment, and/or treatment of Thomas Sim for mental health issues.

161. Any and all Presentence Investigation Reports for Thomas Sim.

162. Thomas Sim's entire BOP Central Inmate file.

163. Any Administrative Detention Orders referencing Thomas Sim.

164. Any Disciplinary Segregation Orders referencing Thomas Sim.

165. Any photographs of Thomas Sim within the possession, custody, or control of the U.S. government.

### G.  Discovery of Bureau of Prisons documents regarding the officers working in the THP SHU on December 26, 2013

166. The names and assignments of all officers, staff, and others working at THP on December 25-27, 2013.

167. The names and reports generated of all individuals who operated cameras or recording devices at THP on December 26, 2013.

168. All information regarding the policies in effect at THP on December 26, 2013, concerning the "planned response" of all employees at THP to a body alarm and/or other emergency situations.

169. All performance logs for all Associate Wardens and Captains that were employed by BOP and assigned to THP in the 6 months preceding December 26, 2013.

170. Copies of the Institutional Training File, including office of personnel file (OPF), training file, and background file for officers on duty during the shift ending on the morning of December 26, 2013.

### H.  Discovery regarding witnesses working with the government or providing information to the government

171. The name, address, date of birth of any cooperating witness.

172. The case number and name of the prosecutions in which the cooperating witness utilized in this case has previously been utilized as a cooperating witness.

173. The case names and numbers of any trials or evidentiary hearings at which the cooperating witness has testified concerning: his or her own prior criminal activity; payments or rewards provided him by the federal or state government; efforts made to induce others to participate in criminal activity; or other purported law enforcement-related matters.

174. Any information, whether or not memorialized in a memorandum, agent's report or other writing, regarding promises of immunity or leniency, preferential treatment or other inducements made to the cooperating witness, or to any family member, friend or associate of the cooperating witness, in exchange for cooperation, including dismissal or reduction of charges, assisting in matters of sentencing or deportation, or promises regarding payments for expenses or testimony or eligibility for any award or reward.

175. Any statement made, or information or document provided by a prospective government cooperating witness that conflicts in part or in whole with: (1) the statement of another prospective witness; (2) a prior statement made by the same government cooperating witness; or (3) any other documents or witness.

176. Any report, document or information which details the criminal activities of the cooperating witness which were undertaken by said witness with or without the authority or approval of the federal or any state government, but for which the federal government or any state government has elected, formally or informally, not to prosecute.

177. All records available to federal or state government agencies reflecting the arrest, conviction and investigative history of any cooperating witness.

178. Information concerning misconduct by the cooperating witness including misconduct that reflects on the lack of candor, truthfulness or law-abiding character of the cooperating witness, such as uncharged criminal conduct or fraud.

179. All information, records and transcripts which in any way indicate or reveal that any prospective cooperating witness, or any witness in general, in connection

42

with this or any other case, has provided untruthful false, misleading, incomplete or inaccurate information or testimony to: any federal or state law enforcement officer or agency, grand jury, or federal or state trial court while testifying.

180. If given a polygraph exam, the results of any polygraph examination performed on any potential cooperating witness as well as any information concerning the unwillingness of any potential government witness to submit to a polygraph examination.

181. All recordings of telephone calls made by any known government witness (whether or not the witness has been identified as a government informant) from December 26, 2013, to present.

182. All copies of letters or correspondence or emails received or sent by any known government witness (whether or not the witness has been identified as a government informant) from December 26, 2013, to present.

### I. Issues regarding discovery already produced that is redacted or illegible

183. Any and all documents that were Bates-numbered for this case by the U.S. Attorney's Office but not yet turned over to the defense in discovery.

184. Unredacted copies of all documents turned over to the defense in discovery in a redacted format.

### J. An anticipated trial witness list

185. Pursuant to 18 U.S.C.A. § 3432, the government is required to produce a witness list, including addresses, prior to trial.  Because of the time that has elapsed since the alleged incident, as well as the quantity of discovery already provided in this case, the three days provided by statute will be inadequate for Mr. Rogers to prepare adequately for trial in this case.  Accordingly, the Court should order the government to provide a complete witness list as soon as possible so that Mr. Rogers can properly prepare for trial.

## V. Conclusion

WHEREFORE, for the aforementioned reasons and for any other reasons which may appear to this Honorable Court, Mr. Rogers, while reserving the right to seek additional discovery pending future developments in the case, respectfully asks the Court to enter an order requiring the government to provide the defense with the specific items of discovery and *Brady* material and information requested herein.

43

DATED this 21st day of September 2017.

Respectfully submitted,

*S/Nathan D. Chambers*
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-2222
Facsimile: (303) 825-4010
nchambers@nathanchamberslaw.com


*S/Patrick J. Burke*
Patrick J. Burke
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-3050
Facsimile: (303) 825-2992
Patrick-J-Burke@msn.com


*S/Monica Foster*
Monica Foster
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

*S/Gwendolyn M. Beitz*
Gwendolyn M. Beitz
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Gwendolyn_Beitz@fd.org

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*S/Monica Foster*
Monica Foster
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

**Appendix 1**

Ackroyd, Terry, 66343-065
Anderson, Michael, Reg. No. 29447-034
Armstrong, Telly, Reg. No. 17695-058
Brown, Ruel, Reg. No. 56242-018
Carr, Bryan, Reg. No. 21354-032
Cenkse, Thomas, Reg. No. 10929-040
Conley, Kenneth, Reg. No. 28560-298
Craddock, Orillion, Reg. No. 34164-183
Decker, Andre, Reg. No. 4224-052
Dick, Ronald, Reg. No. 14883-075
Dotson, Jonathon, Reg. No. 43972-060
Edwards, Jeremy, Reg. No. 59066-112
Erickson, Robert, Reg. No. 11360-073
Jackson, Sky The Mile, Reg. No. 73336-065
Labart, Ronald, Reg. No. 45869-008
Larimer, Eric, Reg. No. 07688-030
Lombard, Derek, Reg. No. 15131-041
McMillan, Frederick, Reg. No. 34331-037
Nettles, George, Reg. No. 93650-280
Newkirk, Angelo, Reg. No. 60032-056
Northern, Eric, Reg. No. 34029-044
Nunn, Lionel, Reg. No. 23344-016
Roehm, William, Reg. No. 04840-061
Shaw, Johnny, Reg. No. 11161-030
Townley, Terry, Reg. No. 06612-051
Ugdah, Shadeed, Reg. No. 06565-007
Wasson, Bradley, Reg. No. 05166-748
White, John, Reg. No. 11728-002
Willings, Michael, Reg. No. 05112-036
Willoughby, Michael, Reg. No. 22092-045

**Appendix 2**

Ackroyd, Terry, 66343-065

Adkins, Jaramy, Reg. No. 07838-088

Agu, Amboni, Reg. No. 70875-083

Alcaraz, Epifanio, Reg. No. 12115-002

Alston, Nicholas, Reg. No. 07102-089

Alwan, Waad, Reg. No. 13523-033

Anderson, Edwin, Reg. No. 11438-031

Anderson, Michael, Reg. No. 29447-034

Anderson, Ronald, Reg. No. 42668-177

Angulo-Delmoral, Miguel (Yanguna), Reg. No. 16997-208

Anthony, Donald, Reg. No. 24710-047

Archambault, James, Reg. No. 03650-073

Armstorng, Telly, Reg. No. 17695-058

Austead, Christopher, Reg. No. 10034-173

Austin, Jared, Reg. No. 24356-045

Badillo, Michael, Reg. No. 11682-280

Baker, Cory, Reg. No. 15018-042

Barnette, Jimmy, Reg. No. 17731-026

Barrandey, Christopher, Reg. No. 27480-180

Bell, Renaldo, Reg. No. 06072-063

Benitez, Rogelio, Reg. No. 33920-048

Beshears, Jason, Reg. No. 23412-045

Bibbs, William, Reg. No. 47202-039

Bonner, Anthony, Reg. No. 38881-083

Bowen, Dennis, Reg. No. 21506-031

Bowman, Cedrick, Reg. No. 42098-037

Boyce, Arthur, Reg. No. 55748-066

Brown, Jay Joseph, Reg. No. 06227-033

Brown, Joseph, Reg. No. 56605-053

Brown, Ruel, Reg. No. 56242-018

Burris, Justin, Reg. No. 54277-060

Bush, Aeron, Reg. No. 17047-081

Cajero, Ricardo, Reg. No. 11980-002

Cantrell, Nicholas, Reg. No. 63144-065

Carr, Bryan, Reg. No. 21354-032

Carter, Eddie, Reg. No. 20551-424

Cartwright, Temarcus, Reg. No. 22705-076

Cenkse, Thomas, Reg. No. 10929-040
Chapek, Timothy, Reg. No. 74720-065
Chavez, Robert, Reg. No. 21971-051
Chavez-Castillo, Daniel, Reg. No. 60111-108
Conley, Kenneth, Reg. No. 28560-298
Craddock, Orillion, Reg. No. 34164-183
Criss, Brandon, Reg. No. 10286-028
Curtis, Carlos, Reg. No. 61776-053
Darrington, Frederick, Reg. No. 19930-045
Davis, Allen, Reg. No. 12328-031
Davis, Kirk, Reg. No. 47235-048
Decker, Andre, Reg. No. 4224-052
Deleon, Jose, Reg. No. 31950-034
Deleon, Juan, Reg. No. 21190-180
Dick, Ronald, Reg. No. 14883-075
Dixon, Thomas, Reg. No. 10908-028
Dotson, Jonathon, Reg. No. 43972-060
Edwards, Jeremy, Reg. No. 59066-112
Erickson, Robert, Reg. No. 11360-073
Evans, Del, Reg. No. 22618-424
Evans, Ricky, Reg. No. 20224-076
Evans, Terrance, Reg. No. 22491-057
Ferguson, Chris, Reg. No. 16094-041
Figures, Phillip, Reg. No. 19908-047
Fleming, Curtis, Reg. No. 16309-171
Fuentes, Sotero, Reg. No. 24771-208
Galati, Stephen, Reg. No. 38826-004
Garcia, Diego, Reg. No. 64554-051
Gardner, Eddie, Reg. No. 55656-004
Garrison, Phillip, Reg. No. 25861-056
Gatcomb, George, Reg. No. 10059-036
Gill, Rashawn, Reg. No. 04787-061
Gonzalez, Anthony, Reg. No. 96133-004
Gonzalez, Hector, Reg. No. 68671-066
Greene, Douglas, Reg. No. 20551-058
Greene, Melvin, Reg. No. 71045-004
Guerrero-Torres, Jesus, Reg. No. 60424-112
Hamlin, Loren, Reg. No. 24504-047
Harvell, Ronnie, Reg. No. 08444-007
Haskell, Walter, Reg. No. 14223-041

Hatchett, Marcus, Reg. No. 24828-057
Hermanm, Terrion, Reg. No. 14995-026
Hermosillo, Omar, Reg. No. 46800-180
Hernandez, Juan, Reg. No. 48358-039
Herring, Kevin, Reg. No. 12082-029
Hines, Corey, Reg. No. 31660-044
Hooker, Michael, Reg. No. 21708-045
Houser, Joshua, Reg. No. 45828-039
Hubbert, Willie, Reg. No. 07458-089
Hubbs, Keith, Reg. No. 56145-112
Hunter, Herman, Reg. No. 19457-058
Ingram, Leroy, Reg. No. 39693-083
Jackson, Sky The Mile, Reg. No. 73336-065
Jaimes-Jurado, Miguel, Reg. No. 04105-180
Jarnagin, Sterling, Reg. No. 02600-748
Jenkins, Raymond, Reg. No. 12905-007
Jennings, Leandre, Reg. No. 24200-047
Jim, Brennon, Reg. No. 32087-051
Johnson, Adonis, Reg. No. 12091-078
Johnson, John, Reg. No. 42143-074
Kahl, Yori, Reg. No. 04565-059
Kale, David, Reg. No. 20498-058
Kent, David, Reg. No. 57948-180
Labart, Ronald, Reg. No. 45869-008
Lamb, Winsdell, Reg. No. 12217-029
Larch, Tanner, Reg. No. 27242-058
Larimer, Eric, Reg. No. 07688-030
Larvie, Brice, Reg. No. 13409-073
Lazenby, Andre, Reg. No. 18215-016
Light, Augustus, Reg. No. 11181-041
Lindley, Thomas, Reg. No. 10483-010
Lipscomb, Kristopher, Reg. No. 62187-019
Livingston, Dominique, Reg. No. 17777-280
Lombard, Derek, Reg. No. 15131-041
Luther, Marcus, Reg. No. 89184-008
Manuel, Jermail, Reg. No. 59214-054
Marshall, Deric, Reg. No. 44031-061
Martin, Mandel, Reg. No. 24147-013
Martin, Matthew, Reg. No. 09431-028
Martinez, Alfredo, Reg. No. 49214-180

Martinez, Antonio, Reg. No. 67245-280
Martinez, Edwin, Reg. No. 11771-041
Martinson, Jaimeson, Reg. No. 11330-041
Mays, Andre, Reg. No. 22217-045
McBride, John, Reg. No. 56955-060
McIntosh, Rodney, Reg. No. 35074-044
McKissic, Robert, Reg. No. 14210-026
McMillan, Frederick, Reg. No. 34331-037
Mendez, Juan, Reg. No. 18233-075
Miller, Todd, Reg. No. 07685-089
Montgomery, John, Reg. No. 06623-088
Montgomery, Lamont, Reg. No. 34946-044
Moore, Maurice, Reg. No. 46709-039
Morah, Carlton, Reg. No. 66369-061
Morgan, Francis, Reg. No. 24468-038
Morris, Tyrese, Reg. No. 62281-054
Morrisette, Medicine, Reg. No. 09620-059
Mullins, Brian, Reg. No. 19398-031
Myers, Terrell, Reg. No. 14628-171
Nettles, George, Reg. No. 93650-280
Newkirk, Angelo, Reg. No. 60032-056
Nilsen, Jamie, Reg. No. 11760-059
Northern, Eric, Reg. No. 34029-044
Nunn, Lionel, Reg. No. 23344-016
Nyuon, Emmanuel, Reg. No. 11743-273
O'Brien, Ryan, Reg. No. 10299-032
Olsson, Matthew, Reg. No. 22713-045
Patterson, David, Reg. No. 20300-076
Patterson, Kevin, Reg. No. 31856-074
Perez, Gerardo, Reg. No. 96133-079
Phipps, Ronald, Reg. No. 73009-012
Pierce, Christopher, Reg. No. 51007-056
Prince, Alfred, Reg. No. 11132-064
Quintanilla, Miguel, Reg. No. 56027-079
Rader, Randy, Reg. No. 10562-084
Ragland, Gerald, Reg. No. 00952-380
Rand, Ronald, Reg. No. 94839-180
Rector, Clifford, Reg. No. 42650-074
Reyes Pena, Manuel, Reg. No. 09794-000
Reynolds, Curtis, Reg. No. 4409-026

Riddick, James, Reg. No. 54921-083
Rodriguez, Alexis, Reg. No. 35004-069
Roehm, William, Reg. No. 04840-061
Rogers, Leshawn, Reg. No. 21131-047
Ruiz, Eric, Reg. No. 17965-112
Saldana, Porfirio, Reg. No. 26208-198
Schimmel, David, Reg. No. 06721-017
Serrano Ramos, Orlando, Reg. No. 35672-019
Shannon, Calvin, Reg. No. 16195-075
Shaw, Johnny, Reg. No. 11161-030
Smith, Arthur, Reg. No. 11375-059
Smith, Ricky, Reg. No. 50044-056
Smoot, Charles, Reg. No. 63253-066
Sorrell, Shannon, Reg. No. 03552-061
Spann, Kevin, Reg. No. 27583-054
Sprouse, Donny, Reg. No. 14231-084
Stamp, Jody, Reg. No. 11888-040
Steele, Boris, Reg. No. 08810-003
Steele, Victor, Reg. No. 04395-090
Stenger, James, Reg. No. 09271-030
Stewart, Walter, Reg. No. 01699-046
Surles, Encines, Reg. No. 54480-019
Sylla, Pascal, Reg. No. 07955-028
Taylor, Terry, Reg. No. 44843-061
Terry, James, Reg. No. 21919-018
Thomas, Charles, Reg. No. 71273-308
Thomas, Jermaine, Reg. No. 70110-061
Thomas, Shanon, Reg. No. 23486-047
Thompson, Rodney, Reg. No. 29247-179
Tijerina, Javier, Reg. No. 76844-079
Tillman, James, Reg. No. 69960-067
Toels, Brian, Reg. No. 39706-037
Toliver, Jonathon, Reg. No. 39518-048
Tolliver, Brooke, Reg. No. 11235-007
Tompkins, Delbert, Reg. No. 08224-027
Toney, Jason, Reg. No. 34923-083
Torres, Alex, Reg. No. 79004-180
Toudle, Lejeevan, Reg. No. 31327-007
Townley, Terry, Reg. No. 06612-051
Townsend, Deandre, Reg. No. 18783-076

Trujillo, Lonnie, Reg. No. 17143-081
Ugdah, Shadeed, Reg. No. 06565-007
Vancannon, Troy, Reg. No. 12479-029
Vangessel, Christopher, Reg. No. 21854-031
Vasquez, Orlando, Reg. No. 38348-048
Vaughn, Rex, Reg. No. 12673-032
Villar-Villar, Nestor, Reg. No. 23494-180
Wagoner, Ronald, Reg. No. 31340-074
Wagoner, Ronald, Reg. No. 31340-074
Waite, Michael, Reg. No. 98438-004
Walt, Jesse, Reg. No. 13494-030
Wardwell, Brian, Reg. No. 14034-081
Warlin, Chad, Reg. No. 07880-040
Wasson, Bradley, Reg. No. 05166-748
Weir, Joseph, Reg. No. 15526-032
Wesley, Kendrick (West), Reg. No. 25276-076
White, John, Reg. No. 11728-002
White, Matthew, Reg. No. 24143-045
Williams, Muhammad, Reg. No. 07382-017
Willings, Michael, Reg. No. 05112-036
Willoughby, Michael, Reg. No. 22092-045
Wilson, Judas, Reg. No. 91404-020
Wood, Garner, Reg. No. 41127-039
Woods, Germain, Reg. No. 07106-380
Wozencraft, Ivin, Reg. No. 26598-051
Wright, Gregory, Reg. No. 19424-045
Yansane, Patrick, Reg. No. 28857-016
Yazzie, Jerome, Reg. No. 65015-051
Youngbey, John, Reg. No. 36334-007