**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:16-cr-0018-WTL-CMM |
| | ) | |
| ANDREW N. ROGERS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT ANDREW ROGERS' MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY (Doc. 13) FOR THE GOVERNMENT'S INTENTIONAL WITHHOLDING AND DESTRUCTION OF *BRADY* INFORMATION**

---

Defendant Andrew Rogers, by and through undersigned counsel, and pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution respectfully moves the Court to strike the Notice of Intent to Seek the Death Penalty (Doc. 13) for the government's intentional failure to produce and destruction of information favorable to Mr. Rogers.  Because this information could have made the difference between life and death for Mr. Rogers, to allow the government to proceed to seek the death penalty would violate Mr. Rogers' constitutional rights.  Mr. Rogers further states as follows:

**I.      Introduction**

In the last several weeks, counsel for Mr. Rogers have become aware that one of the prosecutors in charge of this case during the death-penalty authorization process conducted more than a dozen witness interviews, which revealed information favorable to Mr. Rogers.  Mr. Rogers has also become aware of rampant misconduct in the Department of Justice Capital Case Section (CCS).  The government never disclosed

any of this information to Mr. Rogers.  The prosecutor who conducted the interviews destroyed any record of the interviews and then attempted to cover up what he had done.

The defense's knowledge about these misdeeds did not come through a mea culpa on the part of the government.  Rather, counsel learned of this malfeasance unexpectedly through an exhibit filed in a different district in a civil lawsuit against the Department of Justice.

## II.    Background

On December 26, 2013, correctional personnel discovered Mr. Rogers' cellmate, Thomas Sim, dead from multiple stab wounds.  Within hours, Mr. Rogers confessed to the killing.  Initial witness interviews of all of the prisoners in the unit where the homicide occurred were conducted over the next two days.

On March 12, 2014, the warden of USP Terre Haute provided the official Bureau of Prisons (BOP) position in support of the death penalty for Mr. Rogers.  On April 14, 2014, two of the decedent's brothers stated their position in favor of the death penalty.

The DOJ has very specific guidelines for when a case may be authorized for capital prosecution and the process for how that decision is made.  *See* United States Attorneys Manual § 9-10.000 Capital Crimes, available at

https://www.justice.gov/usam/usam-9-10000-capital-crimes (last visited January 23, 2018) [hereinafter "U.S.A.M."].  Ultimately, authorization has to come from the Attorney General.  *Id.* at § 9-10.130  But the Attorney General is advised in this decision by the Capital Case Section and a specific Capital Review Committee.  *See id.* at §§ 9-10.040, 9-10.080, 9-10.130.  After receiving information mandated by the U.S.A.M., discussed

2

further, *infra*, the Capital Review Committee makes a recommendation to the Attorney General whether to authorize the death penalty. *Id.* at § 9-10.130.

On February 9, 2015 defense counsel for Mr. Rogers made a written presentation to the United States Department of Justice (DOJ) Capital Review Committee, arguing why the DOJ should not authorize the case against Mr. Rogers for pursuit of the death penalty. On March 9, 2015, Rogers' counsel traveled to Washington, D.C. and made their oral presentation to the Capital Review Committee. Undersigned counsel Monica Foster made the presentation for Mr. Rogers. The Capital Review Committee was chaired by the head of the Capital Case Section, P. Kevin Carwile. Prior to defense counsel making their presentation, the U.S. Attorney's Office provided limited discovery about the offense and about the issue of the death penalty.

Subsequently, the Attorney General authorized and directed the United States Attorney for the Southern District for Indiana to file its request for the death penalty. The indictment against Mr. Rogers was filed on May 17, 2016. (Doc. 1.) The Notice of Intent to Seek Death Penalty (Doc. 13) was filed two weeks later.

### III. The recent revelation of the government's suppression and destruction of information undermining the government's case for the death penalty.

There is currently an ongoing lawsuit in the United States District Court for the District of Connecticut between a longtime DOJ capital prosecutor and the DOJ. Former capital prosecutor Jacabed Rodriguez-Coss has sued the attorney general, alleging that she suffered gender-based discrimination in the Capital Case Section. *See* Complaint, *Rodriguez-Coss v. Sessions*, No. 3:16-cv-00633, Doc. 1 (D. Conn. Apr. 21, 2016). Ms. Rodriguez-Coss alleges an environment in which sexual misconduct was

routinely tolerated and in which male attorneys were treated favorably while similarly situated female attorneys were treated unfavorably.  *Id.*

In response to the defendant's motion for summary judgment, Ms. Rodriguez-Coss filed several deposition transcripts and witness declarations.  Among the items submitted was a sworn declaration from Amanda Haines, which is attached as Exhibit 1. Declaration of Amanda Haines in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, *Rodriguez-Coss v. Sessions*, No. 3:16-cv-00633, Doc. 46-8 (D. Conn. Dec. 23, 2017) [hereinafter "Haines Declaration" or "Haines Decl."].  Ms. Haines was an award-winning attorney with the DOJ for 22 years, from 1995 until 2017, including four years in the CCS.  (*Id.* at ¶ 3 and resume attached thereto.)  In her declaration, Ms. Haines describes the "serious failures and deficiencies by male attorneys of the Capital Case Section during [her] tenure that did not result in any investigations or disciplinary proceedings despite the fact that these deficiencies were brought to management's attention."  (*Id.* at ¶ 4.)

Ms. Haines describes specifically that the CCS attorney in charge of the death-penalty protocol review of the case against Mr. Rogers intentionally destroyed favorable information and then provided false information in an effort to cover up his misdeeds:

> 9.      In 2014, I was subsequently assigned to another capital prosecution that had been previously handled by two of my male colleagues in the Capital Case Section, *United States v. Andrew Rogers*, Dkt. No. 16-0018-WTL-CMM, pending in the Southern District of Indiana. *Rogers* had previously been assigned to Capital Case Section Trial Attorney James D. Peterson, who is male, during the protocol review stage.
>
> 10.      After familiarizing myself with *Rogers*, I learned that Mr. Peterson had committed a fundamental error in judgment and a violation

of the "*Ogden Memo*,"[1] *by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr. Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.*

11. *I again made my supervisors, Messrs. Carwile and Kinsey, aware of these serious issues, including the fact that some of what Mr. Peterson had discussed with the witnesses was arguably Brady[2] impeachment material, which needed to be disclosed to the defense. Upon information and belief, Mr. Peterson's actions were also reported to then Deputy Assistant Attorney General Sung-Hee Suh, who was assigned to oversee the Capital Case Section. Again, to my knowledge and notwithstanding my disclosures, no investigation was instituted to determine whether discipline was appropriate nor was I ever interviewed as part of any investigation into the failures and deficiencies I cited. I believe based upon my subsequent interaction with Messrs. Carwile, Kinsey, and Peterson, who has received numerous awards lauding his work, that there was never any investigation done nor any discipline imposed. To the contrary, the Rogers case was simply reassigned from me to other attorneys in the Section (it has been reassigned three times since then).*

(*Id.* at ¶¶ 9-11 (emphasis added).)

Ms. Haines also describes how "Mr. Carwile also promoted and condoned a hostile work environment in the Capital Case Section." (*Id.* at ¶ 13.) Ms. Haines describes a work environment in which "sexual harassment was rampant" and "Mr. Carwile appeared to condone the on-the-road exploits of his male attorneys, including bragging about sexual conquests and showing naked pictures of women in the office to male colleagues during office hours." (*Id.*)

---

[1] Deputy Attorney General David W. Ogden, *Memorandum for Department Prosecutors: Guidance for Prosecutors Regarding Criminal Discovery* (Jan. 4, 2010), https://www.justice.gov/archives/dag/memorandum-department-prosecutors [hereinafter "Ogden Memo"].
[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

**IV.    The U.S. Constitution requires the government to preserve and produce information favorable to the defense.**

Fundamental to our constitutional system of justice is that the government may not withhold information beneficial to the defense case.  "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment for the offense, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  "Impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule."  *United States v. Bagley*, 473 U.S. 667, 767 (1985).

This requirement stems from the constitutional principle that prosecutors' duty is not to obtain convictions, but to do justice:

> For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that "justice shall be done."  He is the "servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

*United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (quoting *Berger v. United States*, 295 U.S. 78 (1935)).  Even in the absence of a specific request, the prosecution has a constitutional duty to turn over favorable information.  *Id.* at 112.

In addition to the Fifth Amendment due process requirement to disclose favorable information under *Brady* and its progeny, Mr. Rogers has a Sixth Amendment right to the effective assistance of counsel in both the death-penalty authorization phase and at trial.  Counsel cannot effectively represent Mr. Rogers when the government interferes with their ability to do so.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.").

Furthermore, because the government is seeking the most severe penalty—to take the life of one of its citizens—the Eighth Amendment requires greater procedural safeguards to protect each of these other constitutional protections.  *See*, *e.g.*, *Ring v. Arizona*, 536 U.S. 584, 605-06 (2002) ("no doubt that '[d]eath is different'" (citation omitted)); *Spaziano v. Florida*, 468 U.S. 447, 459 (1984) (citing Court's prior recognition of the "qualitative difference of the death penalty"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (death is "qualitatively different").

The government's constitutional duty to disclose favorable information entails an ancillary duty to preserve such information.  The government violates the Due Process Clause by destroying favorable information regardless of good or bad faith.  *Brady*, 373 U.S. at 87; *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) ("The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence."); *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("[T]he bad-faith destruction of potentially exculpatory evidence—or destruction of evidence with apparent exculpatory value, even without bad faith—violate[s] a criminal defendant's right to due process of law."); *Daily*, 786 F.3d at 550 ("Though *Brady* did not announce a duty to preserve evidence, a duty to refrain from bad-faith destruction flows necessarily, and obviously, from its familiar holding that suppression of material exculpatory evidence violates due process.").

## V.      The government's conduct in this case should, at a minimum, prohibit the government from pursuing the death penalty.

The United States government comes before this Court seeking to take the life of Andrew Rogers.  It has taken four years to get to this point in the case.  During those

years, the government conducted an investigation and went through a very specific process to obtain authorization from the Attorney General to pursue the death penalty. But that process and the case that has resulted from it are irremediably tainted by the government's secret destruction of *Brady* information.

The Court surely recalls the prosecution of the late Senator Ted Stevens for ethics violations, which ended with the conviction being vacated and the case being dismissed after serious discovery violations came to light.  In the aftermath of that case, the DOJ went through a thorough review of its discovery practices (largely at judicial insistence) and claimed to have learned lessons about the importance of maintaining and producing potentially favorable information.  These lessons were supposedly learned years before Mr. Rogers allegedly killed his cellmate.  In the Stevens case, the presiding judge, the Hon. Emmett G. Sullivan, said, "In nearly 25 years on the bench, . . . I've never seen anything approaching the mishandling and misconduct that I've seen in this case."  Anna Stolley Persky, *A Cautionary Tale: The Ted Stevens Prosecution*, Washington Lawyer, Oct. 2009, https://www.dcbar.org/bar-resources/publications/washington-lawyer/articles/october-2009-ted-stevens.cfm (attached as Exhibit 2).  Judge Sullivan did not see what apparently happened in this capital case.

In this case, a senior prosecutor in a section of the U.S. Department of Justice dedicated to analyzing potential capital cases and prosecuting those cases intentionally destroyed information that could have been the difference between authorization or non-authorization for a capital prosecution or between a verdict for life and a verdict for death.  He then attempted to cover it up.  When the misconduct was called to the

attention of his supervisors, including a deputy assistant attorney general, the DOJ did

nothing.  Nothing, that is, but reassign *the whistleblower* off the case.[3]  The DOJ

revealed none of this information to the defense or, presumably, to the other members

of the Capital Review Committee, allowing the case to proceed through the review

process.

Even after indictment, the government—fully aware of its constitutional

obligations—has come before this Court claiming to have clean hands and to be in full

compliance with its *Brady* obligations: "The United States agrees to disclose information

in her [*sic*] possession, custody, and control as necessary to comply with the

requirements of *Brady*, *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act

(18 U.S.C. § 3500)."  (Response of the United States of America to Motion for Specific

Discovery, Doc. 57, at 11[4]; *see also*, *e.g.*, *id.* at 87 ("The government will produce

documents as necessary to comply with her [*sic*] obligations under Rule 16, *Brady*,

*Giglio*, and the Jencks Act.").)  But the government has been aware since 2014 that this

simply is not so.

Unfortunately, it appears that Mr. Rogers' is not the only capital prosecution

plagued by discovery violations.  Ms. Haines describes taking over the case of *United

States v. Hammer*, No. 96-cr-0239 (M.D. Penn.), only to learn that "significant deadlines

had been missed and that important documents had not been reviewed or produced."

(Haines Decl. at ¶ 7.)  She goes on to tell of "unearthing dispositive *Brady* information

---

[3] According to Haines' declaration, there have been five CCS attorneys assigned to this case throughout the years.  It is unknown at this time if that seemingly high level of turnover is related in any way to the government's suppression and destruction of evidence or other misconduct.

[4] Page number references are as numbered in the government's Response, not ECF.

only weeks before trial." (*Id.*)  Despite bringing the "failures and deficiencies in *Hammer*

to the attention of the Capital Case Section's supervisors, namely Capital Case Section

Chief Kevin Carwile and Principal Deputy Chief Gwynn X. Kinsey," no investigation was

conducted nor any discipline imposed.  (*Id.* at ¶ 8.).  That Hammer's originally imposed

death sentence was vacated as a consequence of proceedings brought under 28

U.S.C. § 2255 for *Brady* violations, renders this subsequent CCS conduct more

concerning.  *See United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005).

But the government's discovery shenanigans in capital cases do not end with

those discovered by Ms. Haines.  At roughly the time that Mr. Peterson was destroying

his notes in this case, another federal court was issuing a lengthy and stinging

condemnation of gross discovery misconduct in a capital case.  *See* Supervisory

Opinion, *United States v. Pedersen and Grigsby*, No. 3:12-cr-00431-HA, Doc. 475, at 18

n. 11 (D. Or. Aug. 4, 2014).  In *Pedersen and Grigsby*, the Honorable Ancer L. Haggerty

of the United States District Court for the District of Oregon describes how he arrived at

a position where "the court did not believe it was in a position to rely on the

representations of the prosecution team as the prosecution team had failed to turn over

a startling amount of information in reference to this court's Order . . . and had denied

the existence of documents later found to be in its possession."  *Id.* at 39.  Judge

Haggerty discussed how the government also was not candid with the court about the

discovery issues: "Perhaps the most troubling aspect of the discovery production in this

case is that the government did not acknowledge what it must have known to be

widespread problems until late in the case."  *Id.* at 46.

What has occurred in this case is far more egregious than in *Pedersen and Grigsby*, because there the misconduct was largely on the part of a state police detective and the discovery problems were the result of laziness and mismanagement. Here, however, the Haines Declaration states that a Capital Case Section attorney intentionally destroyed *Brady* information and then lied to cover it up.

It is shocking that prosecutors in the section dedicated solely to capital cases would be so cavalier in regard to a defendant's life—and would be so cavalier in direct contradiction to DOJ policies and Supreme Court precedent. DOJ policies formulated in the aftermath of the Stevens case required that Mr. Peterson document and preserve information about his interviews and preferably not conduct such witness interviews without an agent or other person present:

> Although not required by law, generally speaking, witness interviews should be memorialized by the agent. Agent and prosecutor notes and original recordings should be preserved, and prosecutors should confirm with agents that substantive interviews should be memorialized. When a prosecutor participates in an interview with an investigative agent, the prosecutor and agent should discuss note-taking responsibilities and memorialization before the interview begins (unless the prosecutor and the agent have established an understanding through prior course of dealing). Whenever possible, prosecutors should not conduct an interview without an agent present to avoid the risk of making themselves a witness to a statement and being disqualified from handling the case if the statement becomes an issue. If exigent circumstances make it impossible to secure the presence of an agent during an interview, prosecutors should try to have another office employee present.

Ogden Memo, Step 1(B)(8). Supreme Court precedent and DOJ policy required that Mr. Peterson disclose the information gained in those interviews to the defense. *E.g.*, *Brady*, 373 U.S. at 87; Ogden Memo, Step 1(B)(8)(a) ("Material variances in a witness's statements should be memorialized, even if they are within the same interview, and they should be provided to the defense as *Giglio* information."); Appendix to November 15,

2017 Order, *National Association of Criminal Defense Lawyers v. Executive Office for United States Attorneys and United States Department of Justice*, Doc. 42 (Nov. 15, 2017), at 9 [hereinafter "Blue Book"][5] ("Department of Justice policy requires that federal prosecutors and investigators memorialize any material variances in a witness's statements, even if within the same interview.  Ogden Memo, Step I(B)(8)(a).  Such differences should then be turned over to the defense as potential impeachment evidence.").  Mr. Peterson, however, intentionally destroyed any documentation of his interviews.  Then, he apparently lied to cover up his failure to preserve and produce this information.[6]

This was not an isolated incident or a single transgression.  The Haines Declaration reveals that Mr. Peterson interviewed more than a dozen witnesses who "were suspected of having information that was potentially harmful to the government's penalty phase case."  (Haines Decl., ¶ 10.)  The Haines Declaration further reveals that "what Mr. Peterson had discussed with the witnesses was arguably *Brady* impeachment material, which needed to be disclosed to the defense."  (*Id.* at ¶ 10.)

---

[5] Portions of the DOJ discovery manual, commonly referred to as the Blue Book, have recently been disclosed in this suit under the Freedom of Information Act.  Because only select portions were disclosed, page number references are to the ECF page.

[6] There is no indication that Mr. Peterson transferred the information from his notes to other reports, which were then disclosed to the defense.  The defense has received nothing in discovery that would appear to be reports of interviews by Mr. Peterson, and the Haines Declaration indicates that there was no memorialization of the interviews. *Cf. Killian v. United States*, 368 U.S. 231, 242 (1961) (holding that there was no impermissible destruction of evidence where agents' notes "were made only for the purpose of transferring the data thereon to the receipts to be signed by [informant], and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice").

By separate motion, Mr. Rogers will be seeking specific discovery related to the destruction of the *Brady* information discussed herein. But there is no realistic way any discovery will shed adequate light on the content of interviews that took place more than three years ago. *See California v. Trombetta*, 467 U.S. 479, 487 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."). The Seventh Circuit has previously recognized the irremediable nature of the destruction of exculpatory information:

> Under the reasoning of *Killian* and *Youngblood*, bad-faith destruction of exculpatory evidence is an immediate constitutional violation. It may or may not eventually cause harm, but harm is a separate issue. Destruction is not easy to remedy. Deliberate destruction of evidence with potential or apparent exculpatory value can make it impossible for the accused to receive due process of law, regardless of the procedural posture of the criminal case at the time of the destruction. . . . The outright destruction of exculpatory evidence raises immediate constitutional concern because the resulting prejudice to the defense is permanent. Whatever unfairness results from the destruction will infect all future proceedings because the exculpatory evidence will continue to be unavailable.

*Armstrong*, 786 F,3d at 552.

Here, the exact content of the interviews Mr. Peterson conducted is crucial. Mr. Peterson's recognition of the importance of taking notes during these interviews demonstrates that the government was aware that it needed to record precisely what the witnesses relayed. And Mr. Peterson's decision to destroy any documentation of these interviews rather than convey them to the defense demonstrates just how important the information surely was. Now, however, there is no way to recreate what was said. This is especially true for knowing what was shown or conveyed to the witnesses by Mr. Peterson and what impact that information may have had on the witnesses' memories. Today, the influence on those witnesses' memories is certainly

irreparable.  *See*, *e.g.*, *Identifying the Culprit: Assessing Eyewitness Identification* 1-2,

Committee on Scientific Approaches to Understanding and Maximizing the Validity and

Reliability of Eyewitness Identification in Law Enforcement and the Courts, National

Research Council (2014), available at

http://www.nap.edu/download.php?record_id=18891# (last visited January 23, 2018)

("We also have learned that these qualified perceptual experiences are stored by a

system of memory that is highly malleable and continuously evolving, neither retaining

nor divulging content in an informational vacuum.  The fidelity of our memories to actual

events may be compromised by many factors at all stages of processing, from encoding

to storage to retrieval.  Unknown to the individual, memories are forgotten,

reconstructed, updated, and distorted.").

       Mr. Peterson's intentional destruction of his interview notes is exacerbated by the

decisions of his supervisors and those who took over this case after him to continue to

keep the witness interviews a secret from the defense.  According the DOJ Blue Book:

"[T]he Department of Justice Policy (USAM 9-5.001 D.1) is to disclose exculpatory

information 'reasonably promptly' after it is discovered."  Blue Book at 6.  Here, not only

was the information not disclosed reasonably promptly after it was discovered, but the

government actually continued to withhold the information for years, to be discovered

only by chance after a former CCS lawyer filed a civil lawsuit in a district almost a

thousand miles away, alleging rampant gender-based discrimination and other

misconduct.

       Although bad faith is not required to establish a *Brady* violation, it is important to

recognize the purposefulness of what occurred here.  The hiding of information

favorable to Mr. Rogers—by Mr. Peterson in the first instance and other DOJ officials who were aware of his misconduct—was not an instance of acting "in good faith and in accord with their normal practice." *Killian*, 368 U.S. at 242.  Instead, the destruction of this important information can be seen as nothing short of "a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." *Trombetta*,467 U.S. at 488.

The outrageousness of the government's conduct would be enough to merit the sanction sought if it began and ended with the hiding of favorable information from Mr. Peterson's interviews.  But beyond Mr. Peterson's destruction of exculpatory information specific to Mr. Rogers, the Haines Declaration brings to light significant institutional problems with federal death-penalty authorizations and prosecutions.  The Haines Declaration demonstrates a Capital Case Section where supervision is almost non-existent and where professional misconduct and due process violations under *Brady* are routinely tolerated.  The Haines Declaration demonstrates that federal capital prosecutors have been allowed to violate their *Brady* obligations with impunity.  When serious concerns about nondisclosures of *Brady* material were brought to the attention of supervisors by seasoned federal prosecutors, it appears that no investigation was conducted and no correction occurred.

Furthermore, the CCS appears to be run as a boys' club with a high tolerance for sexual misconduct and sexual discrimination.  While this is seriously troubling standing alone, it is especially troubling in this case, which never should have been authorized for the death penalty.  The case against Mr. Rogers screams of contributory negligence on the part of the BOP.  It is an alleged killing by a man warehoused in the segregated

Special Housing Unit (SHU) after he sought protective custody because he did not want to engage in gang violence.  While in the SHU, he sought mental health assistance and medication, but he was essentially ignored until after he allegedly killed his cellmate. Thus, this is a case where it is hard to understand the authorization process.  Hard that is until one realizes that Mr. Rogers' female attorney made the presentation on his behalf to the Capital Review Committee chaired by the man accused of being the leader of the sexual harassment and discrimination.[7]

The specific misconduct in this case and the general tolerance for misconduct in the CCS seriously undermines the integrity of the capital review process.  Authorization depends on a "proper individualized consideration of the appropriate factors relevant to each case."  U.S.A.M. at § 9-10.030.  During the review process, the prosecution is required to give "counsel for the defendant a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty."  *Id.* at § 9-10.080.  Obviously, defense counsel cannot present information that the government has hidden from it and then destroyed.  And obviously a woman attorney is not going to be given the respect she and her case deserve by someone who tolerates and encourages sexual misconduct and discrimination and holds to the view that "women only go to law school to find rich husbands."  (Haines Decl. at ¶ 12).

---

[7] Should discovery reveal that gender animus played a role in authorizing Mr. Rogers' case for death-penalty prosecution, Mr. Rogers reserves the right to raise an equal-protection challenge.  *See generally United States v. Virginia*, 518 U.S. 515, 531 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

The death-penalty authorization process depends on the Attorney General and the Capital Review Committee receiving accurate and complete information about a case. *See id.* at §§ 9-10.080, 9-10.130, 9-10.140.  This is a finely adjusted process where it is crucial that decision-makers have all necessary information to "determine whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death . . . ." *Id.* at § 9-10.140(C).  This includes information about "[t]he strength and nature of the evidence[.]" *Id.* at § 9-10.140(D)(1).  "Reviewers are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant." *Id.*  But if those ambiguities are hidden and never put before the reviewers, there is nothing to resolve.

In short, the Attorney General authorized a capital prosecution based on inaccurate and misleading information in a biased process.  Government prosecutors then came before this Court and assured it that the government understands and is in compliance with its disclosure obligations under *Brady*.  The Court should not permit this fraud to continue without consequence.

It is unknown whether the information suppressed and destroyed was material only to the death penalty.  If it is, the appropriate remedy, at a minimum, is for the Court to strike the Notice of Intent to Seek the Death Penalty and not permit the government to pursue that penalty.  *See generally Brady*, 373 U.S. at 84-86 (affirming state-court

decision remanding for retrial as to penalty only).  If the suppressed and destroyed evidence has broader relevance, other remedies will be appropriate.[8]

The Court has authority to strike the Notice of Intent under its constitutional authority as well as its general supervisory authority.  "The court has inherent authority to regulate the administration of criminal justice among the parties before the bar." *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980).

The government's conduct here is an affront to the judicial system itself and has, in a way, sought to make the Court complicit in its misconduct.  The government has brought a capital proceeding before this Court, and the Court has understandably assumed that the government conducted the death-penalty authorization process in good faith.  The recently discovered information demonstrates, however, that the government has enlisted the Court in a sham proceeding where the death penalty was authorized by the use of unconstitutional tactics.  *See id.* (approving use of supervisory power to dismiss a criminal case to "prevent[] the court from condoning a fraud perpetrated upon it").  To allow the government to continue to pursue the death penalty in this case "would make the federal courts 'accomplices in the willful disobedience of a Constitution they are sworn to uphold.'"  *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 223 (1960)).

In the aftermath of the Stevens case, former U.S. Attorney for the District of Columbia Joseph E. diGenova was quoted as saying, "This has built up over the years—the people at [the Justice Department] have come to believe that they are

---

[8] As he learns more about the misconduct in the CCS and how it may have impacted this prosecution, Mr. Rogers reserves the right to request additional sanctions, up to dismissal.

immune, that nobody can touch them, and that judges will ignore their prosecutorial misconduct[.]"  Persky, *supra* (first alteration in original).  Sadly for our constitutional system of justice, it appears that little has changed and few lessons have been learned. It is apparent that in this most serious of cases, where a man's life is literally on the line, the DOJ has continued its attitude of seeking victory ahead of justice in the seeming belief that courts will turn a blind eye.  This Court should not condone or tolerate such conduct.

Because the government failed to disclose favorable information that was harmful to the government's sentencing case and destroyed that information and covered up that destruction, this Court should strike the Notice of Intent to Seek the Death Penalty and preclude the government from pursuing the death penalty.

Mr. Rogers submits that he has provided the Court with ample information to grant the requested relief on the filings.  If the Court is not so inclined, however, Mr. Rogers requests an evidentiary hearing at which the Court can take testimony from, at a minimum, Ms. Haines, Mr. Peterson, and others involved with the death-penalty authorization process and the subsequent prosecution of this case.

WHEREFORE, for the aforementioned reasons and for any other reasons that appear to this Honorable Court, Mr. Rogers asks that the Court strike the Notice of Intent to Seek the Death Penalty (Doc. 13) and preclude the government from seeking the death penalty in this case.

DATED this 29th day of January 2018.

Respectfully submitted,

*S/Nathan D. Chambers*
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-2222
Facsimile: (303) 825-4010
nchambers@nathanchamberslaw.com

*S/Monica Foster*
Monica Foster
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

*S/Patrick J. Burke*
Patrick J. Burke
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-3050
Facsimile: (303) 825-2992
Patrick-J-Burke@msn.com

*S/Gwendolyn M. Beitz*
Gwendolyn M. Beitz
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Gwendolyn_Beitz@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2018, a copy of the foregoing **Defendant Andrew Rogers' Motion To Strike The Notice Of Intent To Seek The Death Penalty (Doc. 13) For The Government's Intentional Withholding And Destruction Of Brady Information** was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the court's system.
.

*S/Monica Foster*
Monica Foster