UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:16-cr-0018-WTL-CMM |
| | ) | |
| ANDREW N. ROGERS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ANDREW ROGERS' REPLY IN SUPPORT OF HIS MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY (Doc. 13) FOR THE GOVERNMENT'S INTENTIONAL WITHHOLDING AND DESTRUCTION OF *BRADY* INFORMATION (Doc. 92)**

Defendant Andrew Rogers, by and through undersigned counsel, hereby files his Reply in support of his Motion to Strike the Notice of Intent to Seek the Death Penalty (Doc. 13) for the Government's Intentional Withholding and Destruction of *Brady* Information (Doc. 92) [hereinafter "Motion to Strike NOI" or "Doc. 92"]. The government has filed a response (Doc. 99) [hereinafter "Government NOI Response" or "Doc. 99"].

**I.   Introduction**

"Something is rotten in the state of Denmark."

- *Hamlet*, Act 1, Scene IV

When Marcellus spoke these words to Horatio, he was speaking not just of the nation of Denmark but of the governing hierarchy. For just as a fish rots from its head, so rotted Denmark. Marcellus could have been speaking about the Capital Case Section of the United States Department of Justice (CCS), for there is something rotten in CCS, starting at its head. A senior trial attorney has filed a sworn declaration with a

United States district court in which she describes an environment rife with unethical conduct, corruption, and abuse, starting at the very top.

The taint from that environment did not remain in Washington, D.C., but infected the very case before this Court—with government attorneys withholding and destroying information favorable to Mr. Rogers; disclosing that information only after defense counsel learned about its existence (but not substance) on their own and brought it to this Court's attention; and engaging in highly unusual conduct during the death penalty authorization process (also referred to as the "Protocol process") in an effort to undermine legitimate mitigation and ensure a particular result.

The crux of the government's argument in opposition to Mr. Rogers' motion is that former DOJ prosecutor Amanda Haines—someone with no reason to help Andrew Rogers—committed perjury in her sworn declaration. In her declaration, filed in a separate, gender-discrimination case, Ms. Haines made very specific allegations about the manner in which CCS attorney James D. Peterson handled the investigation of this case and about the poor attention CCS pays to its constitutional obligations in these most serious of cases. Once that information was brought to this Court's attention, the government obtained a declaration from Mr. Peterson in which he and CCS attempt to justify his conduct and save the possibility of a death sentence in this case. (Doc. 99-1 [hereinafter also referred to as "Peterson Declaration"].)

The bottom line is that what Ms. Haines swore to and what Mr. Peterson now claims cannot both be true. While Mr. Peterson's account smacks of post-hoc justification and has internal inconsistencies that should cause the Court to question its veracity on its face, the only way for the Court to get to the bottom of this is to hold an

2

evidentiary hearing at which the Court can judge the credibility of these very different positions. In aid of that hearing, the Court should order full and appropriate discovery.[1]

The Government Response to the Motion to Strike NOI and the Peterson Declaration frankly raise more questions than they answer. Allegedly, seven months after the Capital Review Committee submitted its memorandum recommending the death penalty (prepared by Mr. Peterson), someone at "the executive level" of the Department of Justice had an "urgent question" about Mr. Rogers' rebuffed efforts to obtain mental health treatment. (Doc. 99-1 at ¶ 9.) While Mr. Peterson and the government are rather cryptic about who this "executive level" person may have been, Mr. Peterson's memorandum that has now been disclosed makes clear that it was Capital Case Section Chief P. Kevin Carwile. *See* (Doc. 100-2 (subject of memorandum stating that the request was from the Capital Case Section Chief).)

The oddity of this request highlights the problematic nature of the death penalty authorization in this case. The government's response spends a page and a half discussing the capital case review process. But the government omits the unorthodox nature of the process that was followed in this case. As described by the government, the process is supposed to culminate with a memorandum from the Capital Review Committee to the Attorney General, who then makes the final decision. (Doc. 99 at 4-5; *see also See* United States Attorneys Manual § 9-10.130, available at https://www.justice.gov/usam/usam-9-10000-capital-crimes (last visited February 27, 2018) [hereinafter "U.S.A.M."].) Once the Committee makes its recommendation to the

---

[1] Mr. Rogers' discovery requests will be discussed in his reply to the government's response to his First Supplemental Motion for Specific Discovery. (Doc. 94.)

Attorney General, its work is done.  The Committee convened for this specific purpose—and only this purpose—is then disbanded, its work having concluded.  As Mr. Peterson states in his declaration, CCS attorneys serve two distinct functions.  One is as prosecutors for trial and post-conviction litigation.  (Doc. 99-1 at ¶ 3.)  Obviously, that role can be served only once a prosecution has been initiated.  Mr. Peterson played no such role in this case.  (Doc. 99-1 at ¶¶ 4, 17.)  The second is "to shepherd cases through the Protocol process—a wholly separate *and ministerial* function."  (Doc. 99-1 at ¶ 3 (emphasis added).)  That was Mr. Peterson's sole function here.  (Doc. 99-1 at ¶¶ 4, 17.)  Neither of the functions of a CCS attorney includes acting as an investigator after the case has been shepherded to the Attorney General.

What the Court and the defense have now learned as the result of Mr. Rogers' motion is that *after* this case had passed the Capital Review Committee and a recommendation had been sent to the Attorney General in April 2015, CCS Chief P. Kevin Carwile instructed CCS attorney Peterson—not an FBI agent or other investigator—to conduct witness interviews in an apparent attempt to undermine the claims of Mr. Rogers' counsel that he had sought mental health treatment but was denied.  (*See* Doc. 100-2 at 1.)  This violated DOJ policy for the death penalty authorization process, for conducting investigations, and for creating and maintaining potentially discoverable material.

The U.S.A.M. sets out a regimented procedure for determining whether a case will be authorized for the death penalty.  *See, e.g.*, U.S.A.M. §§ 9-10.060, 9-10.080, 9-10.130.  Once a recommendation is submitted to the Attorney General, there is no other role for CCS.  The only action contemplated between the time of the Committee

4

memorandum and the Attorney General's decision is if the U.S. Attorney or Assistant Attorney General whose case it is wishes to respond to the Committee's analysis in a memorandum directed to the Deputy Attorney General. U.S.A.M. § 9-10.130. Late investigation by a CCS attorney on the order of the CCS Chief after the Committee recommendation has been made is not part of any approved procedure. Further, having the attorney conduct the investigation rather than a law enforcement agent is contrary to the Ogden Memo.

What makes the conduct in this case all the more troubling is the timing of this late investigation by a non-investigator. The Committee recommendation was forwarded to the Attorney General in April 2015. (Doc. 99-1 at ¶ 8.) Mr. Peterson received "urgent" instruction from Mr. Carwile to conduct this investigation in November 2015, some seven months later. (Doc. 99-1 at ¶ 9.) The government does not say what made this question so urgent or why it arose so long after the Capital Review Committee heard information, made its recommendation, and disbanded. Nor does the government say why it came from Mr. Carwile, whose role in the process should have long previously ceased.

One thing that might have spurred Mr. Carwile to order this investigation is that he learned of a letter that was intercepted by Bureau of Prisons personnel in September of 2015. That letter was purportedly from Mr. Rogers to Mr. Carwile. (Attached as Exhibit 1.) The letter challenged Mr. Carwile's manhood and referred to him by several vulgar names including "dicksmoker," "piggie," and "bitch." The letter also included threatening language toward Mr. Carwile.

5

Relatively soon after that letter was obtained, Mr. Carwile ordered Mr. Peterson to conduct investigation that could challenge the credibility of Mr. Rogers' claims in mitigation. For reasons described, *supra*, the use of a CCS attorney to conduct this oddly timed investigation was contrary to death-penalty-authorization protocol. The use of any attorney to conduct this investigation was further in violation of DOJ protocol generally. The government misses the point of Mr. Rogers' citation to the Ogden Memo. The point is not, as the government claims (Doc. 99 at 12-13), that the Ogden Memo confers any rights on Mr. Rogers. The point is to demonstrate the egregiousness of the government's conduct in this case. Indeed, this case illustrates why policies like those in the Ogden Memo have been adopted. Despite DOJ policy that (i) prosecutors are not to conduct witness interviews alone, Ogden Memo, Step 1(B)(8), and (ii) the government must disclose favorable information "reasonably promptly," Blue Book at 6,[2] the government chose (i) to have a CCS lawyer conduct 12 witness interviews in a murder case without an agent present, and (ii) to withhold, not only the original documentation of the interviews, but also a memorandum that was purportedly created specifically for disclosure to the defense. It was only after the defense filed a motion with a sworn declaration bringing the existence of these interviews to light that the government saw fit to disclose the second. It is safe to assume that if Ms. Rodriguez-Coss had never filed her gender-discrimination suit, the government never would have disclosed even the limited information it has now provided.

---

[2] As described in Mr. Rogers' Motion to Strike NOI, Blue Book page references are to Appendix to November 15, 2017 Order, *National Association of Criminal Defense Lawyers v. Executive Office for United States Attorneys and United States Department of Justice*, No. 1:14-cv-00269, Doc. 42 (D.D.C. Nov. 15, 2017).

**II. Neither the Peterson Declaration nor the recently disclosed August 2017 memorandum demonstrates that the government did not destroy, and is not currently withholding, information favorable to Mr. Rogers.**

The government contends that the disclosure of a memorandum purportedly created in August of 2017 specifically for the purpose of disclosure to the defense (Doc. 99-1 at ¶ 31)—though not disclosed until February 2018, after the filing of Mr. Rogers' Motion to Strike NOI—"precludes any argument that the government prejudicially suppressed evidence." (Doc. 99 at 7.) But the three-plus page memorandum the government has disclosed (which includes a half-page block quote twice repeated) (Doc. 100-2) is a poor substitute for the actual information gained from the *twelve* interviews Mr. Peterson claims to have conducted. While Mr. Peterson claims that "several" of the twelve people he interviewed did not have significant memories about Mr. Rogers, for those who did, he "contemporaneously noted their observations in a word processing document . . . ." (Doc. 99-1 at ¶¶ 13-14.) That document is not what has been provided.

The government's two-pronged argument is that (i) the information Mr. Peterson gained from his interviews is not favorable to the defense, and (ii) by now disclosing the August 2017 memorandum, the government has not suppressed any favorable information. The government's argument fails in several ways.

First, the Court has serious reason to question the credibility of the Peterson Declaration when it was prompted by the sworn declaration of another CCS attorney accusing him of severe misconduct, including lying about witness interviews and destroying potentially favorable information. The only way for the Court to resolve this is through appropriate discovery and an evidentiary hearing.

Second, it is simply untrue to say that there is no favorable information even in the summaries provided in the August 2017 memorandum. Perhaps most troubling about the August 2017 memorandum is the assertion that Dr. Steven Eckert, the head of psychology for FCC Terre Haute, contradicted the report of another doctor at Terre Haute who claimed to have evaluated Mr. Rogers following an apparent suicide attempt. (Doc. 100-2 at 1.) On September 9, 2013, Mr. Rogers ingested a bottle of Tegretol. Dr. Ericka Schmitt completed a report and a Suicide Risk Assessment (SRA), both of which purport to be from that same day and both of which state that Dr. Schmitt evaluated Mr. Rogers on that date. But Mr. Peterson's August 2017 memorandum indicates that Dr. Eckert stated this did not happen. (Doc. 100-2 at 1.) Rather, it appears that Dr. Eckert said that Mr. Rogers was not evaluated until Dr. Eckert himself did so some 48 hours later. Dr. Eckert's report of evaluating Mr. Rogers is actually dated September 12, 2013, three days after the apparent suicide attempt. Unfortunately, because Mr. Peterson's August 2017 memorandum paraphrases Dr. Eckert, it is rather unclear what the doctor actually said. Perhaps the professed "complete[] and accurate[]" summaries contained in Mr. Peterson's original 2015 memorandum (Doc. 99-1 at ¶ 14) could shed some light on this question.

Bureau of Prisons policy requires that a Suicide Risk Assessment be completed within 24 hours of an inmate exhibiting behavior suggestive of self-harm, such as ingesting a bottle of pills. *See* BOP Program Statement 5324.08, Suicide Prevention Program at 10 (Mar. 15, 2007). As recognized by the supposed urgent request from the executive level of the DOJ, everyone acknowledges that the BOP's failure to provide timely mental health treatment is a critical issue in this case. It thus could not be more

8

pertinent if the head of psychology for FCC Terre Haute accused another doctor of falsifying reports to claim that Mr. Rogers was evaluated in the required time period when he really was not. According to Dr. Schmitt's reports she did; but according to Mr. Peterson's memorandum, Dr. Eckert claims she did not. Mr. Peterson asserts in both his declaration and the August 2017 memorandum that he spoke to Dr. Schmitt, but there is no indication at all of what she said.

Third, the Court should not be satisfied that the August 2017 memorandum—created almost two years after the interviews in question—constitutes adequate disclosure of the information gained from the original interviews. Mr. Peterson's declaration states that he "contemporaneously noted" what witnesses told him in his original memorandum for the Attorney General. (Doc. 99-1 at 3.) The information in the August 2017 memorandum, however, is more properly characterized as summaries of what a few witnesses said. The information contained therein certainly is not consistent with contemporaneous notes made during the course of an interview. (Doc. 100-2.) In fact, the only verbatim statements are not from the witness interviews but from documents contained in Mr. Rogers' ill-gotten psychological records.

The government appears to tacitly admit that the best memorialization of Mr. Peterson's interviews is contained in the original memorandum to the Attorney General. In arguing that it has not suppressed favorable information, the government asserts:

> Mr. Peterson memorialized any substantive statements in a supplemental memorandum sent to the Attorney General and shared with his colleagues – obviating any claim that he ever denied any aspect of his contact with the witnesses. He likewise made available correspondence that identified any documents provided to the witnesses[.]

(Doc. 99 at 8.)

While Mr. Rogers does not concede that the original memorandum or the email correspondence Mr. Peterson discusses either exists or that their production would satisfy the government's *Brady* obligations, their production would be an awfully good place to start. Instead, the government refuses and provides only "*a version* of [Mr. Peterson's] supplemental memorandum . . . ." (Doc. 99 at 8 (emphasis added).)

Additionally, although Mr. Peterson says he interviewed 12 witnesses, the substance of only four of those interviews is referenced in the memorandum. Surely, Dr. Schmitt at least had something of substance to say in response to Dr. Eckert's accusations. Nor is there any indication of what documents were shown to the witnesses in an attempt to refresh their recollections though it appears that at least some witnesses were shown something.

Mr. Peterson's declaration raises other questions about what information the government has destroyed or is not disclosing. Mr. Peterson claims on the one hand that the only notes of his interviews with BOP personnel were contemporaneously recorded "in a word processing document that became a supplemental memorandum for the Attorney General" (Doc. 99-1 at ¶ 14); but on the other hand, he states that he did not take or retain "*significant* handwritten notes." (Doc. 99-1 at ¶ 23 (emphasis added).) Handwritten notes are handwritten notes. Either he took none, or he took some. If he took some, where are they? And as a general matter, notes are notes, whether taken by hand or on a computer.

While the August 2017 memorandum states that Mr. Peterson interviewed Dr. Stacie Kalvels and quotes a report completed by Dr. Kalvels (Doc. 100-2 at 3), the memorandum contains no indication of what Dr. Kalvels said during the interview.

Notably, the manner in which Dr. Kalvels' report is quoted in the memorandum gives the impression that mental health staff felt no need to provide additional treatment for Mr. Rogers following the homicide in this case. But Mr. Peterson's memorandum is grossly misleading because only five days later mental health staff determined that Mr. Rogers may benefit from antidepressant medication (which he had been requesting for months). One can only hope that the information provided to the Attorney General to make this life-or-death decision was not so misleading.

Additionally, Mr. Peterson's declaration claims that he "misunderstood" Ms. Haines straightforward request for "any files on the case from [his] interviews" to be about something other than the *12 interviews* he conducted. (Doc. 99-1 at ¶¶ 20-21.) Notably, while Mr. Peterson selectively quotes purported emails in his declaration, the government has not disclosed any of these, which could provide some insight into whether Mr. Peterson is telling the truth.[3]

Additionally, it appears that, in furtherance of persuading the Attorney General to authorize the death penalty, Mr. Peterson obtained and misused Mr. Rogers' privileged mental health information. *See generally Estelle v. Smith*, 451 U.S. 454, 467-68, 470-71 (1981) (reversing death sentence where statements made in pretrial competency examination were used at sentencing proceeding). In his declaration, Mr. Peterson suggests that these records had been previously obtained by Mr. Rogers' counsel and attached to the mitigation submission. (Doc. 99-1 at ¶ 11.) But Mr. Peterson's August

---

[3] As discussed in Mr. Rogers' Reply in Support of his First Supplemental Motion for Specific Discovery, by disclosing portions of these emails, the government has waived any claims of confidentiality or privilege in these materials. *E.g., Matter of Cont'l Illinois Sec. Litig.*, 732 F.2d 1302, 1315 n.20 (7th Cir. 1984); *Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 533 (N.D. Ill. 2003).

11

2017 memorandum repeatedly quotes a mental health evaluation created months *after* the mitigation submission. (Doc. 100-2 at 1-2, 3-4.) Furthermore, whether confidential records had been obtained by *defense counsel* has no bearing on whether it was proper for a prosecutor to obtain them and then use them to obtain approval to seek execution of the defendant.

The government also argues that there can be no prejudice because it claims the information at issue has now all been disclosed. (Doc. 99 at 9.) This argument presupposes that the government has actually complied with its *Brady* obligations. That is a significant question that cannot be resolved on the declaration of Mr. Peterson and a vague memorandum created almost two years after the witness interviews at issue. Nor can the Court merely accept the government's assertion that "Mr. Peterson did not destroy any documentation of his interviews." (Doc. 99 at 12.) That is certainly inconsistent with the sworn statement of Ms. Haines. Additionally, once favorable information has been destroyed, the due process violation is complete. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015).

Counsel for Mr. Rogers will not be so presumptuous as to ask the Court to determine from affidavits alone that Ms. Haines is more credible than Mr. Peterson. Counsel expect, however, that the Court will do so following an evidentiary hearing.

    **III.    Mr. Rogers was entitled to due process during the death penalty review process.**

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be

heard at a meaningful time and in a meaningful manner." *Id*. at 333 (quotation marks omitted). Thus, the question becomes what process is due in the death penalty authorization process.

The Department of Justice has answered that question by laying out specific procedures including the right for a defendant to be heard through counsel. Those procedures include an initial referral from the local U.S. Attorney's Office, U.S.A.M. § 9-10.080, consideration by and a recommendation from the Capital Review Committee, U.S.A.M. § 9-10.130, the ability for the local U.S. Attorney's Office to voice any opposition to that recommendation, U.S.A.M. § 9-10.130, and the final decision by the Attorney General, U.S.A.M. § 9-10.130.

The procedures required do not allow for what occurred here. CCS's role was complete once the Capital Review Committee's memorandum was submitted to the Attorney General. The government completely fails to explain why the CCS Chief would order another CCS attorney to himself play the role of agent and conduct 12 additional witness interviews and then submit the results of that investigation to the Attorney General long after the Committee made its recommendation. The government also fails to explain why that attorney would allegedly make minimal documentation of the substance of those interviews (or would not preserve that documentation).

The procedures further do not contemplate CCS obtaining and using a privileged psychological evaluation, which includes unwarned statements, to advocate for the death penalty authorization. *See Estelle*, 451 U.S. at 463-67 (use of statements during competency examination to establish future dangerousness violated Fifth Amendment).

13

The government misleadingly asserts that "[d]uring the capital review process, defense counsel are *sometimes* afforded an opportunity to meet with the Committee and present evidence and argument in mitigation." (Doc. 99 at 5 (emphasis added).) To the contrary, in a situation such as here, the Committee is *required* to hear from defense counsel:

> In any case in which (1) the United States Attorney or Assistant Attorney General recommends that the Attorney General authorize seeking the death penalty, or (2) a member of the Capital Review Committee requests a Committee conference, a Capital Case Section attorney will confer with representatives of the United States Attorney's Office or Department component to establish a date and time for the Capital Review Committee to meet with defense counsel and representatives of the United States Attorney's Office or Department component to consider the case. A request by a Committee member for a conference removes a case from the "expedited decision" process (see USAM 9-10.070), and the submitting office may seek an indictment before the review is completed. No final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation.

U.S.A.M. § 9-10.130.

This Court should find that Mr. Rogers did have due-process rights, including the right to counsel during the authorization process. *See United States vs. Pena-Gonzalez*, 62 F.Supp.2d 358, 363-64 (D.P.R. 1999) (finding that defendant had due process right to counsel during authorization process). The Court should also find that the government interfered with that right by making an end-run around the Committee process and presenting information to the Attorney General when Mr. Rogers' counsel had no opportunity to respond or to present the complete picture. Nevertheless, the Court does not need to go that far to grant the relief requested. After an evidentiary hearing, the Court will see that the government interfered with Mr. Rogers' ability to defend this case at a penalty phase before a jury by destroying and failing to produce

14

favorable information.  More than four years after the homicide, and in response to being outed by the defense, the government has produced an incomplete summary of a few of the dozen interviews Mr. Peterson conducted by himself.  The summary of one reveals a contradiction regarding crucial information about the mental health treatment Mr. Rogers received.  But there is no resolution to the contradiction, nor even a note about the interview with the doctor who purportedly fabricated information in her reports.

## IV. All is not well in the Capital Case Section.

The government accuses Mr. Rogers of "a speculative parting fillip" by asserting that CCS Chief Carwile "'promoted and condoned a hostile work environment' where 'sexual harassment was rampant.'" (Doc. 99 at 13 (quoting Doc. 92 at 5).)  That the government makes this argument calls into question the credibility of all its arguments.  There was nothing speculative about Mr. Rogers' assertion.  In fact, it was not even his assertion.  Rather, it was the sworn statement of a long-time DOJ lawyer who served several years in the CCS.  It was Ms. Haines, not Mr. Rogers, who swore that Mr. Carwile promoted such an environment.  And Ms. Haines is not the only former CCS employee making similar claims under oath in the Rodriguez-Coss litigation.

Notably, in his reply to Ms. Rodriguez-Coss's summary judgment response in the civil case that first raised the CCS misconduct, the Attorney General does not challenge any of Ms. Haines' assertions.  Rather, the Attorney General merely makes a procedural argument that the court should disregard any factual statements averred by Ms. Rodriguez-Coss.  *See* Reply Memorandum of Law in Further Support of the Defendant's Motion for Summary Judgment, *Rodriguez-Coss v. Sessions*, No. 3:16-cv-00633, Doc. 48 (D. Conn. Jan. 19, 2018).

If discovery should bear out an indication that the gender of Mr. Rogers' counsel played a role in the decision to authorize this case for the death penalty, there cannot be a serious question that an equal-protection or selective-prosecution claim would lie. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[T]he decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification[.]").

## V. Conclusion

Marcellus's feeling about the governing of Denmark after seeing the ghost of Hamlet's father was right. There indeed was something rotting Denmark from its head. Like Marcellus, this Court and the defense have gotten only a glimpse of a ghost of what occurred in this case. That ghost, however, portends something rotten that has occurred and that persists. It is time that the truth come out. The only way to find that truth is for the Court to hold an evidentiary hearing following appropriate discovery. Mr. Peterson's declaration and the brief, long-after-the-fact memorandum that the government has now produced do not carry the day.

DATED this 5th day of March 2018.

Respectfully submitted,

*S/Nathan D. Chambers*
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-2222
Facsimile: (303) 825-4010
nchambers@nathanchamberslaw.com

*S/Monica Foster*
Monica Foster
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

*S/Patrick J. Burke*
Patrick J. Burke
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-3050
Facsimile: (303) 825-2992
Patrick-J-Burke@msn.com

*S/Gwendolyn M. Beitz*
Gwendolyn M. Beitz
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Gwendolyn_Beitz@fd.org

**CERTIFICATE OF SERVICE**

I certify a copy of the foregoing **DEFENDANT ANDREW ROGERS' REPLY IN SUPPORT OF HIS MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY (Doc. 13) FOR THE GOVERNMENT'S INTENTIONAL WITHHOLDING AND DESTRUCTION OF BRADY INFORMATION (Doc. 92)** was filed electronically this 5th day of March 2018. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*S/Jennifer Feldman*
Jennifer Feldman