**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:16-cr-0018-WTL-CMM |
| | ) | |
| ANDREW N. ROGERS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT ANDREW ROGERS' MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY AND FOR OTHER MISCELLANEOUS RELIEF**

---

Defendant Andrew Rogers, by and through undersigned counsel, and pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, respectfully moves the Court for the following relief:

1. An order striking the Notice of Intent to Seek the Death Penalty because the federal death penalty operates in an arbitrary, capricious, irrational, and invidious manner and is, therefore, unconstitutional.

2. An order striking the Notice of Intent to Seek the Death Penalty because the Federal Death Penalty Act fails to provide a structure which permits jurors to make a reasoned choice between execution and a sentence of life in prison without the possibility of release.

3. An order striking the Notice of Intent to Seek the Death Penalty because the evolving standards of decency that mark the progress of a maturing society render the federal death penalty unconstitutional.

4.      An order striking the Notice of Intent to Seek the Death Penalty because the process of selecting a "death-qualified" jury violates the rights of both Mr. Rogers and prospective jurors.

5.      An order striking the Notice of Intent to Seek the Death Penalty because the federal death penalty creates an unacceptable risk of executing the innocent.

6.      An order striking the Notice of Intent to Seek the Death Penalty because the Supreme Court's decision in *Ring v. Arizona* has rendered the Federal Death Penalty Act of 1994 ("FDPA") inoperative.

7.      An order striking the Notice of Intent to Seek the Death Penalty because even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "notice of special findings" in the Indictment should be stricken and dismissal of the death notice is required because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.

8.      An order requiring the government to file an informative outline followed by a hearing, to determine the reliability of evidence and information to be presented in support of the aggravating factors.

# TABLE OF CONTENTS

I.    Factual background.................................................................................1

II.   Introduction to the argument ...............................................................3

   A.    Background of the federal death penalty .........................................3

      1.    Death is different. .........................................................................6

      2.    A constitutional death-penalty scheme must provide for meaningful appellate review.........................................................................................8

      3.    A constitutional death-penalty scheme may not employ aggravating circumstances that are vague, duplicative, overly broad, or which do not justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder. ....................................9

      4.    No unreasonable limitation may be placed on the right of the accused to present relevant mitigating evidence during the penalty trial........................11

   B.    The modern federal death penalty....................................................14

III.  The federal death penalty is imposed and carried out in an arbitrary and capricious manner...................................................................................18

   A.    Evidence demonstrates that the federal death penalty is imposed and carried out in an arbitrary and capricious manner......................................19

   B.    This Court has the authority and the duty to determine whether the federal death penalty as now administered passes constitutional muster. ................21

   C.    The federal death penalty as actually sought and imposed. ...........................21

   D.    The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional........................................................23

   E.    The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of a demonstrated race/gender-of-victim effect. ..............................................................................................24

      1.    Introduction ................................................................................24

      2.    The 2000 DOJ Study......................................................................26

      3.    The persistent capricious circumstance of region. .......................29

4.    The continuing and unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and  the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty. ...............................31

F.    The FDPA cannot be applied in a manner that is not arbitrary and capricious. .............................................................................................................32

IV.    The FDPA fails to provide a structure that permits jurors to determine those individuals who deserve a sentence of death instead of a sentence of life in prison... ................................................................................................33

V.    "The evolving standards of decency that mark the progress of a maturing society" have rendered the federal death penalty invalid as both cruel and unusual in violation of the United States Constitution............................................39

VI.    The process of selecting a "death-qualified" jury violates the rights of both Mr. Rogers and the prospective jurors, as well as 18 U.S.C. § 3592(a). ...................48

A.    The selection of a death-qualified jury results in a jury that is not drawn from a fair cross-section of the community.................................................49

B.    The process of selecting a "death-qualified" jury results in juries that are biased in favor of the prosecution. ...................................................51

C.    The process of death qualification excludes jurors based on religion in violation of the First Amendment and the Religious Freedom Restoration Act. .............................................................................................................53

VII.    The Court should declare the federal death penalty unconstitutional in light of the overwhelming evidence that continued enforcement of the FDPA will lead to the execution of a meaningful number of innocent people........................................54

A.    The *Quinones* Decision...................................................................55

B.    The Unacceptable Risk of Executing the Innocent..........................................56

C.    The real question: How many innocent people is it acceptable to execute so that the government may execute others who are undoubtedly guilty? ..........59

VIII.    The Supreme Court's *Ring* decision has rendered the Federal Death Penalty unconstitutional, and the Act may not be saved by judicial construction that creates a new criminal offense whose elements and intertwined procedures have neither been considered, nor enacted into law, by Congress.............................60

A.    The Seventh Circuit's *Mikos* decision .............................................60

B.    Introduction and Summary of the Argument. ...................................................61

iv

C.    Aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt. ..........................................................................65

D.    The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor.......................69

E.    *Jackson* and the separation-of-powers doctrine demonstrate that the FDPA cannot be amended by the government or the courts to permit presentation of aggravating factors to a grand jury, because it is the legislature's exclusive province to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA. ...............................................................................71

    1.    Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct. .......71

    2.    *Jackson* provides a direct and "all-fours" analogy to the circumstances present here, and compels invalidation of the FDPA. ...................................73

    3.    The non-delegation doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action........78

    4.    The grand jury lacks any authority to issue "special findings." ....................80

F.    Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.............................81

    1.    The decisions by the courts of appeals have been wrongly decided...........81

    2.    The post-*Apprendi* drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury..................................................84

    3.    Severability analysis cannot save the FDPA from unconstitutionality. .........86

    4.    The doctrine of "constitutional avoidance" is inapplicable. ...........................87

IX.  Even if the FDPA can be rendered constitutional by a grand jury finding of the gateway and statutory aggravating factors, the statutory and non-statutory aggravating factors alleged in the Indictment and in the Notice Of Intent should be dismissed or stricken because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment.................................90

A.    The constitutional and statutory limits on statutory and non-statutory aggravating factors. ......................................................................................90

B.      The grand jury was not given the choice of holding Mr. Rogers to answer for a capital crime because it was unaware of the consequences of its "Special Findings." ........................................................................................94

C.      The non-statutory aggravating factor of future dangerousness should be stricken because it was not presented to the grand jury, and the Notice of Intent should be stricken in its entirety because the grand jury was not required to engage in the weighing process necessary to determine if a death sentence is justified........................................................................................99

D.      The statutory factor of "substantial planning and premeditation" should be stricken as unduly vague and unsupported by the facts of this case. ...........102

E.      The "future dangerousness" aggravating factor should be stricken. .............103

    1.      Congress did not intend the "future dangerousness" factor to be considered separately. ...................................................................................104

    2.      Future dangerousness is an unreliable aggravating factor that will fail to genuinely narrow the class of persons eligible for the death penalty or reasonably justify the imposition of a more severe sentence on Mr. Rogers compared to others found guilty of murder................................................105

    3.      The only possible issue is danger while incarcerated. ...............................108

    4.      The future dangerousness aggravating factor should be stricken because the government put a thumb on death's side of the scale by holding Mr. Rogers in segregation for more than four years following the homicide.....108

X.      The Court should require a detailed offer of proof and schedule a hearing on the relevance, reliability, and admissibility of the government's aggravating factors evidence........................................................................................116

A.      Introduction: the notice of aggravating factors. .............................................116

B.      A detailed proffer of aggravating factors is required. ....................................117

C.      The Notice of Intent is factually inadequate. ..................................................119

    1.      The notice of statutory aggravating factors is insufficient...........................119

    2.      The notice of the non-statutory aggravating factor is insufficient. ..............121

XI.      Conclusion ........................................................................................121

I.    FACTUAL BACKGROUND

In 2013, 28-year-old Andrew Rogers was sent to the United States Penitentiary at Terre Haute (USP Terre Haute) to serve a 27-year sentence for a $220 robbery of a Subway sandwich shop.  At USP Terre Haute, Mr. Rogers was introduced to the violent environment that our United States penitentiaries represent.

Within a month and a half of his arrival, Mr. Rogers attempted suicide, ingesting a bottle of Tegretol pills that belonged to his cellmate.  At the prison medical unit, Mr. Rogers told prison authorities that he feared for his safety because of his refusal to participate in violent acts at the behest of a white supremacist prison gang.  Mr. Rogers explained that he "didn't want to hurt anybody."  Mr. Rogers stated, "I'm not a violent person, I don't want to hurt anyone."  The prison investigated and determined Mr. Rogers' fear to be valid and placed him in protective custody.

As the Court knows, protective custody meant that Mr. Rogers was placed in the Special Housing Unit (SHU), where he was treated the same as someone serving a disciplinary sanction.  This meant he was locked down for 23 hours a day in almost complete isolation.  He was housed with one other man in a small cell that contained not only their beds but also the two men's toilet, sink, and shower.  The difference was that, unlike a disciplinary sanction, there was no end in sight for Mr. Rogers' indefinite SHU placement.

Mr. Rogers remained in the SHU for months despite an order to transfer him out of USP Terre Haute in October 2013.  For a reason still unknown to the defense, the Bureau of Prisons (BOP) failed to transfer Mr. Rogers, instead allowing him to languish in the SHU.

While in the SHU, Mr. Rogers experienced persistent mental health issues,

including severe depression.  *Prior to the homicide* charged in this case, Mr. Rogers repeatedly informed medical staff that he was "very depressed" and repeatedly requested medication to address his depression.  But neither treatment nor medication were forthcoming.  In the early morning hours of December 26, 2013, Mr. Rogers' cellmate was discovered dead.  Mr. Rogers claimed responsibility.

As the Court is aware, the government has recently disclosed that the chief psychologist for FCC Terre Haute previously admitted "that the BOP was not as responsive to Roger's mental health issues as it could have been and that certain additional intervention could have occurred prior to the murder."  (Dkt. 141-1.)

Two and a half years after the homicide, on May 17, 2016, an indictment was filed, charging Mr. Rogers with Murder in the First Degree in violation of 18 U.S.C. § 1111.  (Dkt. 1.)  The Indictment sets forth notice of special findings pursuant to 18 U.S.C. §§ 3591 & 3592(c) that render Mr. Rogers eligible for the death penalty if he is found guilty of the offense charged.  (Dkt. 1 at 2-3.)  The notice of special findings includes the "gateway" factors of age and all four mental states under 18 U.S.C. § 3591(a)(2). (Dkt. 1 at 2.) The notice of special findings also lists the following statutory aggravating factors:

1. ANDREW N. ROGERS has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm against another person. [18 U.S.C. § 3592(c)(2)];

2. ANDREW N. ROGERS committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Thomas W. Sim. [18 U.S.C. § 3592(c)(6)];

3. ANDREW N. ROGERS committed the offense after substantial planning and premeditation to cause the death of Thomas W. Sim. [18 U.S.C. §3592(c)(9)

(Dkt. 1 at 3.)  The Indictment does not allege any non-statutory aggravating factors.

On May 31, 2016, the United States filed its Notice of Intent to Seek the Death Penalty.  (Dkt. 13.)  In addition to alleging the "gateway" age and mental-state factors, the Notice of Intent alleges the same statutory aggravating factors included in the Indictment.  (Dkt. 13 at 2.)  The Notice of Intent also alleges a single non-statutory aggravating factor:

> 1. Future Dangerousness: ANDREW N. ROGERS is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by his pattern of criminal behavior, his record of institutional misconduct, his issuance of threats to kill others, his low rehabilitative potential, and his lack of remorse for murdering Thomas W. Sim.

(Dkt. 13 at 3.)  The Notice of Intent gives no specific information regarding what the government intends to prove at a penalty phase.

Despite Mr. Rogers' offer to plead guilty in exchange for a sentence of life without parole, the government persists in seeking the death penalty in this case.

## II.    INTRODUCTION TO THE ARGUMENT

### A.  Background of the federal death penalty

In 1972, the United States Supreme Court, unwilling to tolerate the arbitrary and capricious imposition of capital punishment, struck down all the existing death-penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution.  *Furman v. Georgia*, 408 U.S. 238 (1972).  Each of the five justices who concurred in the *Furman* Court's one paragraph per curium opinion advanced separate reasoning.  In the last 40 years, it has become apparent that the comparison drawn by Justice Stewart in *Furman* between receiving a sentence of death and being struck by lightning is the very essence of *Furman*:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of

> rapes and murders . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Stewart, J., concurring; citations and footnotes omitted).

Members of the *Furman* Court also took note that the death penalty was often sought

selectively, "feeding prejudices against the accused if he is poor and despised, and

lacking political clout or if he is a member of a suspect or unpopular minority . . . ."

*Furman*, 408 U.S. at 255 (Douglas, J., concurring).

Justice White, also concurring in the result, cited the infrequent utilization of the

death penalty as an important factor contributing to his vote to strike down capital

punishment:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring).

Reacting to *Furman*, many states with a long history of capital punishment and *de*

*jure* segregation—primarily those in the deep South—rushed to enact new capital

punishment schemes. Four years after *Furman*, the issue of capital punishment

returned to the Court, this time in the cases of five men who had been prosecuted and

sentenced to death—all in the South—under newly enacted post-*Furman* statutes. On

July 2, 1976, the Court issued opinions in those five cases. In three of the cases, the

Court concluded that the states had successfully met the constitutional concerns raised

4

in the *Furman* opinion.  *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976).  The other two state schemes were struck down, principally because they required automatic imposition of a sentence of death in particular classes of murder without allowing for the "particularized consideration of all relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death."  *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (Opinion of Justices Stewart, Powell and Stevens); *Roberts v. Louisiana*, 428 U.S. 325 (1976).[1]

In the four decades since *Gregg*, the United States Supreme Court has decided well in excess of 100 death-penalty cases and has thereby created (and continues to create) a substantial and complex body of death-penalty law.  From that body of law, however, four core principles of death-penalty jurisprudence emerge: (1) death is a different kind of punishment and, therefore, every stage of a capital case must be marked by heightened standards of reliability, review, and scrutiny; (2) a constitutional death-penalty scheme must provide for meaningful appellate review; (3) vague, duplicative, or all-encompassing aggravating factors are constitutionally invalid since such factors do not genuinely narrow the class of murders for which the death penalty is appropriate, or otherwise justify the imposition of a death sentence on one defendant as compared to others found guilty of murder; and (4) no limitation may be placed on a defendant's right to present relevant evidence in mitigation of a sentence of death.

A discussion of each of these principles follows.

---

[1] For a comprehensive discussion of the four decisions on July 2, 1976, see the concurring opinion of Delaware Supreme Court Chief Justice Strine in *Rauf v. State*, 145 A.3d 430, 446-48 (Del. 2016) (Strine, C.J., concurring).

1.  <u>Death is different.</u>

The bedrock principle of capital jurisprudence is that "death is different."  This view of capital cases informs and guides the entire body of capital jurisprudence and capital-case litigation.  Simply stated, death penalty cases are not the same as other cases and cannot be treated the same as other cases.[2]  Commencing with the 1976 quintet of cases that mark the beginning of post-*Furman* death-penalty jurisprudence, the Supreme Court has taken numerous opportunities to emphasize its recognition of the difference between death as a punishment and all others.  In *Woodson*, for example, striking down North Carolina's initial post-*Furman* death-penalty scheme, the Court observed: "The penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."  428 U.S. at 305.  The following year, in *Gardner v. Florida*, 430 U.S. 339, 357-58 (1977), the proposition was reiterated:

> [D]eath is a different kind of punishment from any other which may be imposed in this country.  From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

The notion that "death is different" is not simply the dramatic recitation of an obvious truth.  Rather, the principle triggers sharply increased levels of judicial attention

---

[2] Justice Stevens, citing seven separate decisions, notes, "Our opinions have repeatedly emphasized that death is a fundamentally different kind of penalty from any other that society may impose."  *Harris v. Alabama*, 513 U.S. 504, 516 n.1 (1995) (Stevens, J., dissenting).

to every step of the process through which the irrevocable sanction of death is sought and carried out.  The post-*Furman* Supreme Court has described capital jurisprudence as mandating a "heightened standard of reliability" for the entire process through which a government marshals the legal and moral authority to terminate a life.  The need for heightened reliability is "the natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."  *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).  As the Court stated in *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985), "[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."  *See also Monge v. California*, 524 U.S. 721, 731 (1998) (reiterating the "acute need for reliability in capital sentencing proceedings").

In practice, the death penalty should be reserved for the worst of the worst.  *See Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" (*quoting Atkins v. Virginia*, 536 U.S. 304, 319 (2002)).  In *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008), the Court reiterated the principle that, "Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule."  Otherwise, "[w]hen the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  *Id*. at 420.

2.  <u>A constitutional death-penalty scheme must provide for meaningful appellate review.</u>

It is a fair summary of the overall thrust of the *Gregg-Jurek-Proffitt* trilogy that capital sentencing schemes will successfully withstand constitutional challenge only to the extent that the particular scheme (1) genuinely narrows the class of murderers for whom the ultimate penalty is available; and (2) provides the heightened procedural safeguards that avoid the evils identified in *Furman,* principally the arbitrary, capricious and/or discriminatory imposition of the death penalty. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 890 (1983).

One additional, vitally important procedural safeguard, emphasized by the Supreme Court from the earliest post-*Furman* cases forward, is the availability of "meaningful appellate review." *Pulley v. Harris*, 465 U.S. 37, 55 (1984) (Stevens, J., concurring). While *Pulley* ultimately held that a specialized form of capital appellate scrutiny known as "proportionality review" was not required by the Eighth and Fourteenth Amendments,[3] the Court has been steadfast in its view that meaningful appellate review is an essential component of a constitutional death penalty scheme. In *Zant*, for example, the Court explained its approval of Georgia's capital sentencing procedure in *Gregg* as:

> rest[ing] primarily on two features of the scheme: That the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing, and that the State Supreme Court reviewed the record of every death penalty proceeding to determine whether the sentence was arbitrary or disproportionate.

---

[3] In *Pulley*, the Court defined capital proportionality review as an inquiry to determine whether a sentence of death in a particular case is disproportionate to the penalties imposed in similar cases. *Pulley*, 465 U.S. at 43, 44.

8

*Zant*, 462 U.S. at 876.  In *Godfrey v. Georgia*, 446 U.S. 420 (1979), the Court discussed three independent criteria as indispensable to a finding that a particular capital scheme effectively and constitutionally channeled the sentencing authority's discretion.  Among these was the availability of rational appellate review of the "process for imposing a sentence of death." *Godfrey*, 446 U.S. at 428.  In *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Court re-visited and re-affirmed the importance of meaningful appellate review in determining the constitutionality of a death-penalty scheme: "We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."

3. <u>A constitutional death-penalty scheme may not employ aggravating circumstances that are vague, duplicative, overly broad, or which do not justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder.</u>

The FDPA requires a penalty-phase jury to decide, initially, whether or not certain "particularly relevant" aggravating factors have been unanimously established beyond a reasonable doubt, and then to weigh any aggravating factors against any mitigating factors.  18 U.S.C. § 3593(e).  It is the "weighing" process which leads the jury to decide whether or not the sentence should be death.  As noted in *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988), however, "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."  The Supreme Court has been consistent in recognizing the principle that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877.  At the most fundamental level, aggravating circumstances must

9

rationally distinguish "those who deserve capital punishment from those who do not." *Arave v. Creech*, 507 U.S. 463, 474 (1993).

In light of the critical narrowing function performed by aggravating factors, it follows that if a particular factor is vague to the point of defying definition or, alternatively, could be interpreted by a particular sentencing authority as applicable to any, and therefore *all*, murders, that factor fails to perform a constitutional narrowing function and is invalid. In *Godfrey v. Georgia,* for example, the defendant was sentenced to death upon a finding that the murder was "outrageously or wantonly vile, horrible or inhuman." 446 U.S. at 422. In striking down this aggravating circumstance and vacating the sentence of death, Justice Stewart's opinion for the plurality reasoned that the language of this particular aggravating circumstance failed to provide "inherent restraint on the arbitrary and capricious infliction of the death sentence," since virtually every murder could be said to meet those criteria. *Id*. at 428-29. Concluding that the facts and circumstances of the murder in *Godfrey* did not stand out from other murders, the Court held there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many in which it was not." *Id*. at 433. In *Tuilaepa v. California*, 512 U.S. 967, 972 (1994), the Court reiterated the two constitutional tests which aggravating factors must satisfy: (1) a valid aggravating factor may not apply to every defendant convicted of murder, but only to a rationally-selected sub-class of murderers; and (2) the circumstances must be defined with clarity.

The constitutionality of aggravating factors that are quite similar in language may rise or fall on how that language is construed, limited and/or otherwise presented to the sentencing authority. In *Proffitt*, for example, a death sentence imposed in Florida under

an aggravating factor defined as "especially heinous, atrocious, or cruel" was held to be constitutional because, as construed and narrowed by the Florida Supreme Court, its inherent vagueness and overbreadth were corrected.  By contrast, in *Maynard v. Cartwright*, 486 U.S. 356 (1988), an Oklahoma aggravating circumstance virtually identical in language to the one upheld in *Proffitt* was struck down as overly-broad and unconstitutionally vague since its potential reach had not been effectively narrowed through judicial construction or jury instructions.  *See also Shell v. Mississippi*, 498 U.S. 1 (1990) (trial judge's attempt to limit the reach of Mississippi's *"*especially heinous, atrocious, or cruel" aggravating factor was constitutionally insufficient).

Aggravating factors, therefore, serve a vital function in death-penalty jurisprudence.  *See generally* Christian D. Marr, *Criminal Law: An Evolutionary Analysis of the Role of Statutory Aggravating Factors in Contemporary Death Penalty Jurisprudence--from* Furman *to* Blystone, 32 Washburn L.J. 77 (1992).  In *Gregg*, the Court stated:

> Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

428 U.S. at 189.

4.  <u>No unreasonable limitation may be placed on the right of the accused to present relevant mitigating evidence during the penalty trial.</u>

A fourth and final aspect of a constitutional death-penalty scheme is that virtually no limitation may be placed on the right of the accused to present for the sentencer's consideration all relevant mitigating evidence.  This established tenet of capital jurisprudence is rooted in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), where, two years after *Gregg*, a plurality of the Court held that "in all but the rarest kind of capital cases," a

11

sentencing authority could not "be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *See also Skipper v. North Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). In *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987), the Court held that a constitutional death-penalty scheme "cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *See also Green v. Georgia*, 442 U.S. 95 (1979) (evidence rules may not be invoked to bar otherwise relevant mitigating evidence). In *Williams v. Taylor*, 529 U.S. 362, 398 (2000), the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case."

The unbroken line of cases supporting liberal admission of mitigating evidence was extended by *Tennard v. Dretke*, 542 U.S. 274 (2004), where the Court rejected the notion, originating with the Texas Court of Criminal Appeals and repeatedly endorsed by the Fifth Circuit, that evidence is not mitigating unless there is a nexus between the evidence and the crime. In *Tennard*, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized that court's longstanding practice of imposing a restrictive standard of relevance for mitigating evidence at the penalty-phase of Texas capital cases. *Tennard* reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina*, 494 U.S.

433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms.  We established that the "meaning of relevance is no different in the context of litigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard — "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"– applies.  *Id.*, at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 345, 83 L.14 Ed. 2d 720, 105 S. Ct. 733 (1985)).  We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'"  494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (quoting *State v. McKoy*, 323 N.C. 1, 55-56, 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C. J.)).  Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.

Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence.  *Boyde v. California*, 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (citing *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Penry* [*v. Lynaugh*], 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); *see also Payne v. Tennessee*, 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S.Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (quoting *Eddings*, *supra*, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

*Id.* at 284-85.  In *Smith v. Texas*, 543 U.S. 37, 45 (2004), decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement, stating,  "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ."  More recently, the Court reaffirmed this point in an opinion authored by Justice Alito:

[O]ur cases have firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also Ayers v. Belmontes*, 549

U.S. 7, 21 (2006) (describing a jury's penalty-phase task as weighing "the finite

aggravating factors against the *potentially infinite mitigators*" (emphasis added)).

### B.  The modern federal death penalty.

In the wake of *Furman*, and in the absence of corrective congressional action, it

was widely assumed that the capital aspects of existing federal criminal statutes were

not constitutional and, in fact, all federal capital prosecutions ceased.  Matters remained

that way until, on November 18, 1988, Congress enacted the first post-*Furman* federal

death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital

punishment for murders occurring in the context of drug trafficking.  21 U.S.C. § 848(e).

The reach of the federal death penalty was greatly expanded on September 13, 1994,

when President Clinton signed into law the Federal Death Penalty Act of 1994, 18 U.S.C.

§ 3591 *et seq*.  In March, 2006, the separate procedural provisions of the ADAA, 21

U.S.C. §§ 848(g)-(r), were repealed.

The FDPA permits the death penalty to be considered in the following

circumstances:

§ 3591.  **Sentence of death** – (a) A defendant who has been found guilty
of – (2) any . . . offense for which a sentence of death is provided, if the
defendant as determined beyond a reasonable doubt at the hearing under
section 3593 –

intentionally killed the victim;

intentionally inflicted serious bodily injury that resulted in the death of the
victim;

intentionally participated in an act, contemplating that the life of a person
would be taken or intending that lethal force would be used in connection
with a person, other than one of the participants in the offense, and the
victim died as a direct result of the act; or

intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act, . . .

In order to set into motion what Justice Blackmun called "the machinery of death,"[4] the government must serve and file a pretrial notice that the death penalty will be sought and specify in that notice those aggravating factors which the government will seek to prove if the case goes to a penalty trial. 18 U.S.C. § 3593(a). Additionally, the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), requires grand jury findings on at least the state-of-mind elements and statutory aggravating factors and, as argued, *infra*, the balancing of aggravating and mitigating factors. If a defendant is found guilty of an offense of the kind enumerated in § 3591, a separate sentencing hearing must be conducted. The death penalty hearing may take place before the trial judge or before a jury. A defendant may waive jury-sentencing, however, only if the government consents. 18 U.S.C. § 3593(b)(3). A trial court may convene a separate penalty jury where the original jury has been discharged "for good cause." 18 U.S.C. § 3593(b)(2)(C).

The penalty hearing is, for all intents and purposes, a separate trial at which both sides may call witnesses and present "information." The statute first requires the government to establish that the defendant is "eligible" for the death penalty. To do so, the government must convince the jury, unanimously and beyond a reasonable doubt, that one of the "intent" findings set forth in § 3591(a)(2)(A) - (D) exists. If the jury so

---

[4] *See Callins v. Collins*, 10 510 U.S. 1141, 1145 (1994) ("From this day forward, I no longer shall tinker with the machinery of death.") (Blackmun, J., dissenting from the denial of *certiorari* in a Texas capital case and announcing his view that the death penalty is, as applied and administered, unconstitutional.)

finds, it must next unanimously find beyond a reasonable doubt that at least one of the statutory aggravating factors set forth in § 3592(c)(1) through (16) also exists.  18 U.S.C. § 3593(c).  If the jury does not unanimously find, in sequence, that, beyond a reasonable doubt, both statutory requirements have been met, the penalty trial is over and the court must impose a sentence other than death.  If, however, the government successfully carries its burden of proof in establishing both the existence of an intent factor under § 3591, and one or more of the "(c)" aggravating factors, the jury may also consider whether the government has established beyond a reasonable doubt any non-statutory aggravating factor for which pre-trial notice was provided pursuant to 18 U.S.C.§ 3593.

In attempting to provide guidance as to what a jury may consider at a penalty trial, Congress spoke, as noted, in terms of "information," not "evidence."  Information" may be presented to the jury, by either side, "regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Thus, judges continue their role as evidentiary gatekeepers and retain their discretion to exclude unreliable, confusing, time-wasting, or unfairly prejudicial evidence.

If the government meets its threshold burdens, the jury is required to consider mitigating factors.  The statute provides seven specific mitigating factors and one *Lockett*-derived "catch-all" provision, *viz*. that  "other factors in the defendant's background, record or character or any other circumstance of the offense mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(1)-(8).  The existence of a mitigating factor must be established by the defendant by a preponderance of the

16

evidence.  18 U.S.C. § 3593(c).  Findings with respect to mitigating factors need not be unanimous, and any member of the jury who finds the existence of a mitigating factor may consider it in the final weighing process set out in subsection§ 3593(e), regardless of the number of other jurors who concur that the factor has been established.  *See* 18 U.S.C. § 3593(d) (giving effect to *Mills v. Maryland*, 486 U.S. 367 (1988)).  By contrast, findings with respect to aggravating factors must be unanimous.  18 U.S.C. § 3593(d).

Once the jury has completed these threshold tasks, it next decides whether the aggravating factor or factors in fact outweigh the mitigating factors and, if so, whether the balance of aggravating factors over the mitigating factors is "sufficient to justify a sentence of death, or in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C. § 3593(e). In other words, a jury's finding that the aggravating factors outweigh the mitigating factors would not be enough to return a capital verdict absent a subsequent finding that the degree of the outweighing is such that it requires the imposition of a sentence of death.

Thus, the FDPA is a weighing procedure that requires a penalty phase jury to decide, initially, whether certain aggravating factors have been unanimously established beyond a reasonable doubt and, if so, to weigh those aggravating factors against any mitigating factors.  18 U.S.C. § 3593(e).  It is, once again, the weighing process which leads to the jury's ultimate decision whether the defendant should be sentenced to death.

After considering all issues, the jury votes and returns its findings.  Unless the jury unanimously recommends death or life without the possibility of release, the Court must impose a sentence of less than death, up to life without possibility of release.  A jury

unable to agree on a unanimous death verdict spares the defendant's life. *(Louis) Jones v. United States*, 527 U.S. 373 (1999). Whether the jury "recommends" a verdict of life or death, that decision is binding on the court. 18 U.S.C. § 3594. The FDPA does not provide for judicial override of the jury's capital sentencing decision. *Id*.

No matter how the deliberations turn out, each juror is required to sign a certificate that his or her decision was not influenced by the "race, color, religious beliefs, national origin or sex of the defendant or of any victim. . . . ." 18 U.S.C. § 3593(f).

In the event of a death sentence, the defendant has a right of appellate review, 18 U.S.C. § 3595, under which the reviewing court is permitted to grant relief from a sentence of death if: (1) the death sentence was "imposed under the influence of passion, prejudice, or any other arbitrary factor," (2) "the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor," or (3) "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure." 18 U.S.C. § 3595(c)(2).

## III.    THE FEDERAL DEATH PENALTY IS IMPOSED AND CARRIED OUT IN AN ARBITRARY AND CAPRICIOUS MANNER.

The federal death penalty has existed in its current form for more than 20 years. As of December 31, 2016—the most recent date for which official data is available—there were 57 men and one woman under an active federal sentence of death. *See* U.S. Department of Justice Bureau of Justice Statistics, *Capital Punishment, 2016*, at 4, 7 (April 2018), available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6246 (attached as Exhibit 1). Since *Gregg*, the federal government has carried out only three executions.

It can now be said, with assurance, that the federal death penalty experiment has failed.  As it has played out in federal courtrooms around this country, the FDPA has been exposed as arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, fundamentally incapable of answering in a rational and predictable way the profound and fundamental question of who should live and who should die.  This Court should strike it down.

> ## A. Evidence demonstrates that the federal death penalty is imposed and carried out in an arbitrary and capricious manner.

In 1972, Justice Stewart pointed out that the arbitrariness and capriciousness of the death penalty made being selected for the sentence like being struck by lightning. *Furman*, 408 U.S. at 309-10 (Stewart, J., concurring).  The years since then have demonstrated that nothing has changed.

In *Glossip v. Gross*, Justices Breyer and Ginsburg issued a call for reconsideration of the constitutionality of the death penalty, aligning themselves with several other justices who have expressed similar views in the four decades since the Court reversed its earlier decision that capital punishment violates the Eighth Amendment.  135 S. Ct. 2726, 2755-80 (2015) (Breyer, J., dissenting); *see also Brooks v. Alabama*, 136 S. Ct. 708 (2016) (Mem.) (Breyer, J., dissenting from denial of certiorari) (addressing "the need to reconsider the validity of capital punishment under the Eighth Amendment").  Justices Breyer and Ginsburg recognized that the decades of evidence since *Gregg* demonstrate that the death penalty cannot be carried out in a manner that is consistent with the Eighth Amendment:

> In 1976, the Court thought that the constitutional infirmities in the death penalty could be healed; the Court in effect delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems.  Almost 40 years of studies,

19

surveys, and experience strongly indicate, however, that this effort has failed.  Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use.  I shall describe each of these considerations, emphasizing changes that have occurred during the past four decades.  For it is those changes, taken together with my own 20 years of experience on this Court, that lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited "cruel and unusual punishmen[t]."  U.S. Const., Amdt. 8.

*Glossip*, 135 S.Ct. at 2755-56 (Breyer, J., dissenting) (alteration in original).

In *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016), Chief Judge Geoffrey W. Crawford of the United States District Court for the District of Vermont followed up on the *Glossip* dissent and held two weeks of evidentiary hearings on the question of whether the constitutional requirements for a death penalty statute set out in *Gregg* have been met in practice, and he made detailed factual findings.[5]  After considering the testimony, exhibits, and argument, Judge Crawford concluded, "The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence."  *Id*. at 345; *see also id*. a 358 ("The record of arbitrary imposition of the death penalty through the FDPA is clear . . . .").  Judge Crawford highlighted that, contrary to *Gregg*, the federal death penalty continues to operate in an arbitrary manner:

As the court's findings indicate, the Federal Death Penalty Act, 18 U.S.C. §§ 3591 et seq. ("FDPA"), falls short of the standard required in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and in *Gregg* for identifying defendants who meet objective criteria for imposition of the death penalty.  Like the state statutes enacted

---

[5] The transcripts of the hearings in *Fell* accompany this motion as Exhibit 2, and Mr. Rogers asks that this Court incorporate those transcripts.  Exhibit 2 is a single PDF file comprising many days of transcripts.  For ease of the Court's reference, citations will be to the PDF page number, not the page number of individual transcripts.

after *Furman*, the FDPA operates in an arbitrary manner in which chance and bias play leading roles.

*Id*. at 329.

**B.  This Court has the authority and the duty to determine whether the federal death penalty as now administered passes constitutional muster.**

In *Fell*, Judge Crawford determined that the federal death penalty is administered in an arbitrary and capricious manner; nevertheless, he determined that he was powerless to do anything about it.  Judge Crawford ruled that only the Supreme Court had the authority to act.  *Fell*, 224 F. Supp. 3d at 357-58.

This Court should not follow that aspect of the *Fell* ruling.  This Court should determine that it has the authority to find the federal death penalty unconstitutional and rule accordingly.  There is nothing in *Gregg* or any other Supreme Court case precluding this Court from deciding the issue.  Rather, as recognized by Judge Wolf in *United States v. Sampson*, No. CR 01-10384-MLW, 2015 WL 7962394, at *4 (D. Mass. Dec. 2, 2015), if there has been a material change in facts relevant to the Eighth Amendment analysis, "an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute."  *Id*.

**C.  The federal death penalty as actually sought and imposed.**

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied."  *Furman*, 408 U.S. at 294 (Brennan, J., concurring).  Justice Brennan continued, "When the punishment of death is inflicted in a trivial number of the

cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." *Id*.

Today the population of the United States is almost 328 million people. U.S. Census Bureau, U.S and World Population Clock, https://www.census.gov/popclock/ (last visited June 13, 2018). In 2017, only 23 executions were carried out nationwide. *Capital Punishment* at 8. Two states, Texas and Arkansas, accounted for nearly half those executions. *Id*. Only three federal prisoners have been executed since *Gregg*, and none has been executed since 2003. *See* Death Penalty Information Center, *Federal Executions 1927-Present*, https://deathpenaltyinfo.org/federal-executions-1927-2003 (last visited June 13, 2018).

The federal death penalty today suffers from the same vice as in 1972 in that only a handful of federal defendants who are potentially eligible for capital punishment are ever targeted. And those who are targeted are rarely sentenced to death and even more rarely are they executed. As two commentators noted in 2010, "The infrequency of the federal death penalty—with 67 federal death sentences in the face of over 150,000 murders—makes death by lightning-strike look positively routine. Indeed, a federal death sentence is akin to winning (or in this instance losing) the lottery." G. Ben Cohen & Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASH. L. REV. 425, 431 (2010) (footnote omitted). Between 1988 and 2016, 3,470 federal defendants were eligible for the death penalty and had their cases decided. (Exhibit 2 at 1120.) Of those 3,470, 62 were on death row or had been executed—approximately two percent of eligible defendants. (Exhibit 2 at 1120.) When considering only the actual use of the federal death penalty, "the rate of actual using the death penalty is less

22

than one tenth of one percent of the pool of potential defendants." (Exhibit 2 at 1121.) This "extreme rarity of the imposition of the death penalty and actual executions has been present since enactment of the FDPA." *Fell*, 224 F. Supp. 3d at 340.

Thus, utilizing an analysis that was persuasive to the Supreme Court in *Furman*, the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf., Roper*, 543 U.S. at 567 (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books."); *Atkins*, 536 U.S. at 316 (execution of intellectually disabled individuals violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon").

Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in a deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the Court should strike it down.

**D. The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious. In *Eddings*, the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." 455 U.S. at 112. More recently in *Kennedy v. Louisiana,* the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 554 U.S. at 420. For that reason, the Court wrote, "[C]apital

23

punishment must 'be limited to those offenders who commit "a narrow category of the
most serious crimes'" and whose extreme culpability makes them 'the most deserving of
execution.'" *Id.* The FDPA has failed to meet this constitutional standard and operates in
an arbitrary and irrational manner.

An examination of the federal death penalty in practice shows that there is little
consistency or predictability in the manner in which federal juries have imposed, or not,
the federal death penalty or, indeed, which cases are allowed to plead out to life terms or
less and which proceed to trial. After extensive evidentiary hearings, Judge Crawford
determined in *Fell* that:

> the decision to imposes death is subjective, multi-factorial, unreproducible,
> and, for these reasons, *irremediably arbitrary*. . . . It is undeniable that
> there is no principled way to distinguish the few cases in which death is
> the result from the many equally abhorrent cases in which it is not.

*Fell*, 224 F. Supp. 2d at 341 (emphasis added).

On its surface the FDPA may support an assumption that it provides a principled
basis for distinguishing between those defendants who deserve to die and those who do
not. But a look at how the FDPA works in practice belies such an assumption.
Because the FDPA does not provide a principled basis for distinguishing between cases
where the death penalty is imposed and those where it is not, the Court should strike
down the FDPA as violative of the Eighth Amendment.

### E. The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of a demonstrated race/gender-of-victim effect.

1. Introduction

From the earliest days of the government's efforts to enforce a nation-wide death
penalty, patterns of uneven and apparently discriminatory application appeared. From

the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions.  Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

By 1994—barely six years after the return of a "modern" federal death penalty— obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases.  In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

> Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87 per cent) were black or Hispanic.  *Id*.

Earlier evidence of the potential race-effect of the death penalty had also been provided by the agency formerly known as the General Accounting Office (now the Government Accountability Office).  At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty.  21 U.S.C. § 848(o)(2) (Repealed).  The GAO in fact undertook that study in 1990 and concluded as follows:

Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.

In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and low quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities"

(GAO/GGD-90-57, Feb. 1990) at p. 5.  In a 1999 law review article, Professor Rory

Little, writing with the perspective of one who had actually served on Attorney General

Reno's Capital Case Review Committee, noted that serious questions about regional

and racial disparities had not been ameliorated by the administrative process within the

Justice Department. R.K. Little, 26 FORDHAM URBAN L.J. 347 (1999) at 450-90.

Thus, from the very beginning of the modern federal death penalty, the

government has been on notice that its targeting and enforcement patterns are

problematic.

2.    The 2000 DOJ Study.

In a press conference that took place on June 28, 2000, President Clinton was

asked about a highly-publicized execution that had taken place the previous week in

Texas and whether he believed it was time "for the American people to stop and

reassess where we stand on implementation of the death penalty."  In response, the

President said the following about the application of the federal death penalty,

acknowledging concerns about race and regional practices:

The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which

26

> raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime.  I've got a review underway of both those issues at this time.

Transcript of the President's 6/28/2000 press conference, available at

http://www.presidency.ucsb.edu/ws/index.php?pid=1666 (last visited June 13, 2018).

On September 12, 2000, the Department of Justice released the comprehensive study alluded to by President Clinton in his remarks.  The study detailed how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[6]  The essence of the 2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  The Study reported that federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic, and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time of the DOJ Study had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.

In terms of which defendants actually faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%). *See* Table

---

[6] The Department filed a supplemental report on June 6, 2001 after the change in administration.  Additionally, on June 7, 2007, the Justice Department transmitted statistics and more recent findings on the administration of the federal death penalty to Senator Feingold in preparation for oversight hearings.

1A at p. T-2 of DOJ Study.  Thus, as of the summer of 2000, more than 70% of the

federal defendants targeted for the death penalty had been non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study

found a regional bias in the enforcement of the federal death penalty.  The DOJ Study

revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only

  49 had ever submitted a case recommending capital prosecution.  DOJ Study at

  14.

- Twenty-two federal districts had never submitted a case for review at all.16   DOJ

  Study at T-59.

- Twenty-one federal districts, although submitting one or more cases for review,

  had never sought permission to seek the death penalty in any case.[7]  *Id*.

The release of the report drew the following public comment from officials at the

Justice Department and the White House: "Saying she was 'sorely troubled' by stark

racial disparities in the federal death penalty, Attorney General Janet Reno today

ordered United States attorneys to help explain why capital punishment is not applied

uniformly across ethnic groups."  M. Lacey and R. Bonner, *Reno Troubled by Death*

---

[7] The recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (DOJ Study at 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id*.  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-protocol" period—November 1988 through January 27, 1995— the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization.  The approval rate for those cases was 90%. (DOJ Study at 10.)

*Penalty Statistics*, N.Y. Times, September 13, 2000,

https://www.nytimes.com/2000/09/13/us/reno-troubled-by-death-penalty-statistics.html.

The Times also reported the reaction of then Deputy Attorney General Eric Holder, who

was, at the time, the highest-ranking African American at the Justice Department:

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

*Id*. CNN reported that Attorney General Reno wanted "a broader analysis." During his

confirmation hearings the year following the Study's release, Attorney General Ashcroft

also noted that evidence of racial disparity in the federal death penalty "troubled [him]

deeply." *United States v. Bass*, 266 F.3d 532, 538 n. 1 (6th Cir. 2001), *reversed*, 532

U.S. 1035 (2002) (per curium).

"Troubled" and "disturbed" public officials, however, do not cure constitutional

violations or remedy arbitrary and invidious practices. As this discussion continues, it

will be seen that almost two decades later, nothing has changed.

> 3. <u>The persistent capricious circumstance of region.</u>

As to the regional bias of federal capital prosecutions, the FDPA remains a

largely Southern phenomenon. As Judge Crawford found:

> In the same way that state death sentences are concentrated in a handful of southern and southwestern states, federal death penalty sentences are primarily imposed in seven states. Out of a total of 81 federal death sentences (including sentences later overturned) imposed between 1989 and 2016, three states (Texas with 14; Missouri with 10; and Virginia with 8) account for 32 and in company with four more (N. Carolina with 4; Louisiana with 5; and Oklahoma and Georgia with 3 each) account for 47 or more than half. Twenty states had none. The rest had one or two. The imposition of the death penalty depends greatly upon geography.

*Fell*, 224 F. Supp. 3d at 344 (citation omitted).

Regional bias is inimical to a national penalty that is, theoretically at least, sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in a given case. As the data cited in *Fell* demonstrates, the Department has failed miserably at this.

The "ideal" of a national standard aside, the federal death penalty continues to be a Southern phenomenon and federal districts from the South predictably lead the charge in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts. In July 2016, Federal Death Penalty Resource Counsel Project Director Kevin McNally testified that 67 percent of federal death sentences have come from the traditional, southern "death belt" states, mirroring state practice. (Exhibit 2 at 1138.) In a study of this issue published in 2010, the authors note:

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASHINGTON LAW REV. 425, 429-430 (2010). The reality is there has been no appreciable change since the 2000 DOJ Study, and the federal death penalty remains a disproportionately Southern phenomenon. It thus appears—whether one takes a micro

or macro view—that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed.  This is the essence of arbitrariness and caprice.

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment.  *See Bush v. Gore*, 531 U.S. 98, 106 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another.  This is not a process with sufficient guarantees of equal treatment.")

4. The continuing and unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and  the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty.

It is undeniable and clear that the patterns of race and region that disturbed and troubled government officials in 2000 persist today.  It seems undeniable that these problems are intractable and part of the DNA of capital punishment, including the federal version.

The decedent in this case is white.  In their *Glossip* dissent, Justices Breyer and Ginsburg noted, "Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty." 135 S.Ct. at 2760 (Breyer, J., dissenting).  And Judge Crawford determined in *Fell* that the evidence presented in the hearings demonstrated that "cases with white victims are significantly more likely to be authorized for the death penalty . . . ."  224 F. Supp. 3d at 343.

Furthermore, the federal death penalty continues to be disproportionately targeted at minority defendants. As of December 31, 2016, only 30 of 58 prisoners under federal death sentences were white. *Capital Punishment* at 4.

This is an unacceptable state of affairs and, bluntly, one that should be a source of intense concern to the Justice Department. The impact of race on the federal death penalty demonstrates an unacceptable level of arbitrariness that invalidates its use. Accordingly, this Court should find that the existence of a "white-victim" effect renders any death sentence in this case presumptively unconstitutional and/or in violation of 18 U.S.C. §§3593(f).

**F.  The FDPA cannot be applied in a manner that is not arbitrary and capricious.**

Today's federal death penalty suffers from the same flaws identified in *Furman*. The imposition of the penalty is both arbitrary and capricious. There is no consistent basis for deciding who receives this ultimate punishment and the chances are like being struck by lightning. This Court should agree with the finding of Judge Crawford: "The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence." *Fell*, 224 F. Supp. 3d at 345. Unlike Judge Crawford, however, this Court should rule that it has the authority to do something about it. The Court should rule that the FDPA is unconstitutional and should accordingly strike the Notice of Intent in this case.

**IV.    THE FDPA FAILS TO PROVIDE A STRUCTURE THAT PERMITS JURORS TO DETERMINE
THOSE INDIVIDUALS WHO DESERVE A SENTENCE OF DEATH INSTEAD OF A SENTENCE OF
LIFE IN PRISON.**

When the Supreme Court reinstated the death penalty in 1976, it did so subject

to the requirement that "where discretion is afforded a sentencing body on a matter so

grave as the determination of whether a human life should be taken or spared, that

discretion must be suitably directed and limited so as to minimize the risk of wholly

arbitrary and capricious action." *Gregg*, 428 U.S. at 189.  That pronouncement followed

from *Furman*, which had held that "as a result of giving the sentencer unguided

discretion to impose or not to impose the death penalty for murder, the penalty was

being imposed discriminatorily, wantonly and freakishly, and so infrequently that any

given death sentence was cruel and unusual."  *Id*. at 220-21 (footnote omitted).

The essential components of the new "guided discretion" scheme—under which

the American death penalty system still operates—were that the pool of death eligible

defendants would be narrowed in an objective way, and that every eligible defendant

would then be entitled to individualized sentencing in which his or her character and

background were put into evidence and the jury given unfettered discretion to exercise

mercy.  As more thoroughly discussed in Justice Breyer's dissent in *Glossip*, and as

demonstrated at the evidentiary hearing in *Fell*, this delicate balance of discretion and

objective reliability has proved unattainable.

Members of the Supreme Court identified the legal tension in this balancing act

more than twenty years ago, and have struggled with it since.  Arguing that *Furman* and

*Lockett* "cannot be reconciled," Justice Scalia announced in 1990 that he would no

longer enforce the requirement of individualized sentencing.  *Walton v. Arizona*, 497

U.S. 639, 664 (1990) (Scalia, J., concurring).  Justice Thomas took a similar position in

1993.  *See Graham v. Collins*, 506 U.S. 461, 479 (1993) (Thomas, J., concurring).  And

Justice O'Connor also expressed concern with the difficulty of achieving consistency

while allowing the consideration of individual characteristics.  *See California v. Brown*,

479 U.S. 538, 544-45 (1987) (O'Connor, J., concurring).

Most famously, in 1994, Justice Blackmun announced that "[f]rom this day

forward, I no longer shall tinker with the machinery of death."  *Callins*, 510 U.S. at 1145

(Blackmun, J., dissenting from denial of certiorari).  He explained:

> For more than 20 years I have endeavored-indeed, I have struggled-along
> with a majority of this Court, to develop procedural and substantive rules
> that would lend more than the mere appearance of fairness to the death
> penalty endeavor.  Rather than continue to coddle the Court's delusion
> that the desired level of fairness has been achieved and the need for
> regulation eviscerated, I feel morally and intellectually obligated to
> concede that the death penalty experiment has failed.

*Id*.  Justice Blackmun noted that "discretion could not be eliminated from capital

sentencing without threatening the fundamental fairness due a defendant when life is at

stake," because "evolving standards of decency required due consideration of the

uniqueness of each individual defendant when imposing society's ultimate penalty."  *Id*.

at 1147-49.  Instead, "[e]xperience has shown that the consistency and rationality

promised in *Furman* are inversely related to the fairness owed the individual when

considering a sentence of death.  A step towards consistency is a step away from

fairness."  *Id*.

If the inherently conflicting commands that the "sentencer's discretion to impose

death must be closely confined, but the sentencer's discretion not to impose death (to

extend mercy) must be unlimited," have confounded the Justices who developed them,

it should not be surprising that they have proven impossible for jurors to follow.  The

most comprehensive study to date on the actual process by which death sentences are

meted out is by the Capital Jury Project, a research program by a consortium of universities on how people who served on actual capital juries made the life and death decisions in those cases.[8]  Those findings demonstrate jurors' multiple difficulties with the guided discretion scheme, including:

- the jurors' disturbing propensity (more than 50% of the time) to decide the penalty issues before the penalty phase begins, thereby effectively excluding mitigation from the sentencing calculus;

- a lack of juror understanding of what constitutes mitigation, and how it relates to the jurors' sentencing function;

- a widespread lack of understanding of the instructions given by the judge; and

- evidence that the jury decision-making process in death penalty cases is so flawed as to violate constitutional principles.

The CJP specifically identified "seven deadly sins" of capital juries and jury selection procedure that unfairly increase the likelihood of a death verdict:

1. premature decision-making;[9]

2. death bias;[10]

---

[8] More information on the Capital Jury Project, which interviewed nearly 2000 jurors from more than 350 trials in over a dozen states, is available at http://www.albany.edu/scj/13189.php (last visited June 13, 2018).

[9] The CJP found that 30.3% of jurors had decided to vote for death before the penalty phase had even begun.  *See* William J. Bowers, Wanda J. Foglia, *Still Singularly Agonizing*, 39 Crim. Law Bulletin 51, 57 (2003), available at https://www.albany.edu/scj/documents/Singularly.pdf.

[10] Many of the jurors who survived death-qualification and decided capital cases probably should have been excluded as jurors who would automatically vote for the death penalty.  *Id*. at 62.  "Over half of the CJP jurors indicated that death was the only punishment they considered acceptable for murder committed by someone previously

3.  mitigation impairment;[11]

4.  a widespread belief that death is mandatory in some cases;[12]

5.  evasion of responsibility for sentencing decisions;[13]

6.  the persistence of race as a factor in sentencing decisions;[14] and

7.  the belief that life sentences will not result in lengthy incarcerations.[15]

See Fell, 224 F. Supp. 3d at 335-37 (discussing CJP findings).

Worse, studies also show that jury instructions do little to ameliorate these
concerns.  See C. Haney, L. Sontag, and S. Constanzo, Deciding to Take a Life: Capital
Juries, Sentencing Instructions, and the Jurisprudence of Death, 50 JOURNAL OF SOCIAL
ISSUES 49 (1994).  The authors of the Haney study interviewed 57 capital jurors from
nineteen death penalty trials conducted under a California statute very similar to the

---

convicted of murder (71.6%); a planned or premeditated murder (57.1%); or a murder in
which more than one victim is killed (53.7%)."  Id.  Furthermore, about 10% of the CJP
jurors admitted that the questions during voir dire designed to ferret out these prejudices
made them more likely to think the defendant "must be" or "probably was" guilty and
deserved to be sentenced to die.  Id. at 65.

[11] "[A] great many people who actually served as capital jurors did not understand the
instructions they were supposed to be following."  Id. at 65.  For example, 49.2% of CJP
jurors thought that mitigating evidence had to be proven beyond a reasonable doubt.
Id. at 69.

[12] Half of the CJP jurors erroneously believed that the death penalty was required if the
evidence showed that the crime was "heinous, vile, or deprived" or that the defendant
would be "dangerous in the future."  Id. at 72.

[13] For example, only 29.8% of CJP jurors believed that the jury was strictly responsible
in the 10 states where a jury's decision is binding on the trial judge.  Id. at 75.

[14] In the 70 cases studied where there was a black defendant and a white victim, "the
percentage of death sentences was 30% when there were less than five white male
jurors, but rose to 70.7% when there were five or more white male jurors on the jury."
Id. at 77.

[15] "Many of the CJP jurors volunteered that they believed they had to vote for death to
ensure that the defendant would not get back on the streets."  Id. at 83.  "But even more
troublesome is the evidence that some jurors do not believe judges when they are told
there is no parole from a life sentence."  Id. at 84.

FDPA.  Contrary to the bromide that jurors are presumed to follow instructions, *e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), the authors found that, in this context, jurors either failed to apply or misapplied the instructions:

- one third of the jurors sampled focused on the nature of the crime in a way that essentially created a legally spurious presumption for death;

- for many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- the jurors misused the instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate them from the impact of their decision;

- many of the jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the instructions, thereby indicating a failure to understand what constituted mitigating evidence;

- 80% of the jurors refused to consider mitigation evidence because it did not directly reduce the defendant's responsibility for the crime;

- 60% of the jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

- less than one third of the jurors demonstrated a workable understanding of what constituted mitigation evidence; and

- 80% of the juries that returned death verdicts did so believing that life imprisonment without the possibility of parole did not mean life without parole.

Other research has demonstrated similarly widespread misunderstandings of the sentencing function in general, and of mitigation in particular, among jurors deciding death penalty cases. *See*, *e.g.*, C. Haney and M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, LAW AND HUMAN BEHAVIOR, Vol. 18, No. 4, pp. 411–36 (1994); Peter M. Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, UTAH L. REV. 1, 10-43 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances*, 16 LAW AND HUMAN BEHAVIOR 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda*, 16 LAW AND HUMAN BEHAVIOR 185 (1992). These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and that instructions rarely cure these misunderstandings. *See* Bowers & Foglia, *Still Singularly Agonizing*, at 68–69.

Because death is different from other forms of punishment, courts have long recognized the greater need for the reliability of the process by which the jury arrives at a sentence. *See Woodson*, 428 U.S. at 303-05 (Opinion of Stewart, Powell & Stevens, JJ.). A death penalty sentencing scheme that presents an unreasonable likelihood that the jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *Cf. Simmons v. South Carolina*, 512 U.S.

154 (1994) (establishing entitlement under Due Process Clause to instruction that "life" sentence means life without parole); *Godfrey*, 446 U.S. at 427 (holding that Eighth Amendment requires specificity and clarity in guiding juror discretion).  Jurors must be provided an environment that permits a reasoned, informed decision about the appropriate sentence.  *Cf. Boyde*, 494 U.S. at 380 (holding that reversal is required when there is a "reasonable likelihood" that jury misunderstood instruction so as to improperly limit consideration of mitigating evidence).

The Capital Jury Project's findings, like those in *Fell*, demonstrate that although the FDPA may have been designed with as much care as possible under the circumstances, the capital sentencing process that the statute provides is constitutionally inadequate in practice.  The evidence presented in *Fell* led to the inescapable conclusion that the FDPA presents "a legal regime which orders that one person should live and another should die based upon a selection process which is demonstrably flawed at the level of jury decision-making."  224 F. Supp. 3d at 358.  The results of jurors' good-faith grappling with the law—arbitrary, biased, and erroneous death verdicts—are intolerable as a matter of due process and proportional punishment.

V.    "THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY" HAVE RENDERED THE FEDERAL DEATH PENALTY INVALID AS BOTH CRUEL AND UNUSUAL IN VIOLATION OF THE UNITED STATES CONSTITUTION.

The Supreme Court, in a series of cases, most prominently in *Atkins*, 536 U.S. 304 (death penalty for intellectually disabled persons violates Eighth Amendment), followed by *Roper*, 543 U.S. 551 (death penalty for juveniles violates Eighth Amendment), *Kennedy*, 554 U.S. 407 (death penalty for non-homicide crimes violates Eighth Amendment), *Graham v. Florida*, 560 U.S. 48 (2010) (life without parole for juveniles convicted of non-homicide crimes violates the Eighth Amendment), and *Hall v.*

*Florida*, 134 S. Ct. 1986 (2014) (national consensus that strict IQ cutoff for death eligibility inhumane), has laid out the constitutional framework for adjudicating a challenge to a punishment as cruel and unusual.  These cases derive their core from the long-standing principal that the Eighth Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).  As the Court explained some thirty years later: "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change.'"  *Kennedy*, 554 U.S. at 419 (quoting *Furman*, 408 U.S. at 382 (Burger, C. J., dissenting)).  Consequently, in these five cases, the Court assessed whether the evolving standards of decency in the opening years of a new century dictate that the death penalty is excessive in those contexts.  *See*, *e.g.*, *Hall*, 134 S. Ct. at 1996; *Roper*, 543 U.S. at 563.

The "evolving standards of decency that mark the progress of a maturing society" have now reached that point where the federal death penalty is out of place with current societal values.  In assessing the extent to which society's standards evolve, it is the direction in which the trend is moving rather than arrival at a final destination that matters.  In deciding whether the death penalty could be applied to those under the age of 18, as with deciding whether the death penalty could be applied to the intellectually disabled, the Supreme Court noted that "[i]t is not so much the number of States [abolishing the practice], but the consistency of the direction of change."  *Roper*, 543 U.S. at 565-66 (first alteration in original) (quoting *Atkins*, 536 U.S. at 315); *see also Atkins*, 536 U.S. at 342 (Scalia, J., dissenting) (observing that less than half of the 38

states that permit capital punishment had enacted legislation barring execution of the intellectually disabled).

It is undeniable that the direction of the change is consistently away from use of or support for the death penalty. On a nationwide basis, as documented in the *Glossip* dissent, there has been a sharp decline in the numbers of death sentences returned by juries and death sentences carried out by the states. 135 S.Ct. at 2772-75. From a high of 98 executions in 1999, the number of executions in the post-*Furman* era has declined steadily to 20 executions in 2016.[16]

---

[16] The advance count of executions for 2017, showed a slight uptick to 23. *Capital Punishment* at 8. Again, Texas and Arkansas accounted for nearly half. *Id*. Arkansas notably sought to execute a large number of death-row inmates in 2017, scheduling eight executions in 11 days and carrying out four in eight days. *See* Mark Berman, *Fourth Arkansas execution in eight days prompts questions about inmate's movements*, Washington Post, April 28, 2017, https://www.washingtonpost.com/news/post-nation/wp/2017/04/27/arkansas-readies-to-carry-out-last-planned-execution-before-drugs-expire/?noredirect=on&utm_term=.6f7bae83d48b.



**FIGURE 3**

**Number of prisoners executed under civil authority in the United States, 1930-2016**

Note: Excludes 160 executions carried out by military authorities from 1930 to 1961. See appendix table 6 for counts.
Source: Bureau of Justice Statistics, National Prisoner Statistics program (NPS-8), 1930–2016.

*Capital Punishment* at 6.

In the federal system, there have only been three executions since *Gregg*. There have been none since 2003.

In terms of nation-wide death sentences, "[i]n 2016, the number of prisoners under sentence of death decreased for the sixteenth consecutive year." *Capital Punishment* at 2.

**FIGURE 1**

**Number of prisoners under sentence of death, 1953–2016**



Note: See appendix table 4 for counts.
Source: Bureau of Justice Statistics, National Prisoner Statistics program (NPS-8), 1953–2016.

While only 32 prisoners were received under a sentence of death in 2016, 70 were removed from under a sentence of death by means other than execution.  *Id*. at 2, 4.

43



**FIGURE 2**
**Admissions to and removals from sentence of death, 1973–2016**

Note: Removals can be due to any cause including execution, other death, or appeal. See appendix table 5 for counts.
Source: Bureau of Justice Statistics, National Prisoner Statistics program (NPS-8), 1973–2016.

In terms of the regional nature of the death penalty nationwide, that point has been made earlier in this motion that both the death penalty in general and the federal death penalty in particular are largely unknown outside the south.



**FIGURE 5**
**Advance count of executions, January 1–December 31, 2017**

Source: Bureau of Justice Statistics, National Prisoner Statistics program (NPS-8), 2016.

*Capital Punishment* at 8.

Additionally, the United States' imposition and use of the death penalty renders it increasingly isolated "within the world community."  *See Atkins*, 536 U.S. at 316 n. 21. We are one of the only countries in the developed world to use the death penalty.



Oliver Smith, *Mapped: The 58 countries that still have the death penalty*, The Telegraph, Sept. 1, 2016, https://www.telegraph.co.uk/travel/maps-and-graphics/countries-that-still-have-the-death-penalty/.

The United States finds itself even more isolated in nations that carry out executions:



Amnesty International, *Death Sentences and Executions 2017* (2018), https://www.amnesty.org/download/Documents/ACT5079552018ENGLISH.PDF.

In 2017, however, the United States did drop to eighth in documented executions and eleventh in death sentences imposed (based on data that does not include China or Vietnam). Death Penalty Information Center, *The Death Penalty: An International*

*Perspective*, https://deathpenaltyinfo.org/death-penalty-international-perspective (last visited June 14, 2018).

Additionally, within the United States public support for the use of the death penalty continues to fall.  Evidence relating to community consensus is entitled to great weight, but is not itself determinative of whether a punishment is cruel and unusual. *Graham*, 500 U.S. at 67.  It is the courts who have the ultimate responsibility for interpreting the Eighth Amendment.  *Id*.

According to a 2016 Pew Research Center poll, just 49 percent of Americans said they supported capital punishment.  *See*, Baxter Oliphant, *Support for death penalty lowest in more than four decades*, Pew Research Center, Sept. 29, 2016, http://www.pewresearch.org/fact-tank/2016/09/29/support-for-death-penalty-lowest-in-more-than-four-decades/ (attached as Exhibit 3.)  This "represents a seven-point decline in about a year and a half."  Niraj Chokshi, *Death Penalty Loses Majority Support for First Time in 45 Years*, N.Y. Times, Oct. 3, 2016, https://www.nytimes.com/2016/10/04/us/death-penalty-loses-majority-support-for-first-time-in-45-years.html (attached as Exhibit 4.)  The New York Times editorial board interpreted this poll data to mean "[t]he signs of capital punishment's impending demise are all around."  Editorial Board, *The Death Penalty, Nearing Its End*, N.Y.Times, Oct. 24, 2016, https://www.nytimes.com/2016/10/24/opinion/the-death-penalty-nearing-its-end.html (attached as Exhibit 5.)  In view of the public opinion polling, the reduced use of the death penalty, the results of elections revolving around capital punishment, and opinions from multiple Supreme Court justices, the editorial concluded: "The death penalty has escaped abolition before, but there are no longer any excuses: The nation

has evolved past it, and it is long past time for the court to send this morally abhorrent practice to its oblivion." *Id*.

Our standards of decency have evolved to the point that the federal death penalty no longer serves a valid governmental purpose and lacks a penological justification or rationale.  This Court should strike it down.

## VI.   THE PROCESS OF SELECTING A "DEATH-QUALIFIED" JURY VIOLATES THE RIGHTS OF BOTH MR. ROGERS AND THE PROSPECTIVE JURORS, AS WELL AS 18 U.S.C. § 3592(A).

The Supreme Court has issued several opinions defining the qualification standard for what opinions about the death penalty exclude a potential juror from serving where death is a possible sentence.  *See Lockhart v. McCree*, 476 U.S. 162 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  This motion raises several issues that arise from the removal of jurors based on their opposition to the death penalty as well as from the *process* of determining whether a "juror's views [regarding the death penalty] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainright*, 469 U.S. at 424.  Those issues are:

A.  The removal of jurors based upon their opposition to the death penalty results in a jury that is not drawn from a fair cross-section of the community.

B.  The process of selecting a "death-qualified" jury results in juries that are biased in favor of the prosecution.

C.  The exclusion of potential jurors who are not death-qualified tends to exclude individuals based on religious beliefs in violation of the First Amendment and the Religious Freedom Restoration Act.

48

### A. The selection of a death-qualified jury results in a jury that is not drawn from a fair cross-section of the community.

The Supreme Court "has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). In federal court, the law provides for an expansive opportunity (and obligation) to serve on a jury:

> It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861.

The removal of jurors based upon their opposition to the death penalty results in a jury that is not drawn from a fair cross-section of the community. It is well understood that, due to death-qualification, "capital juries are more likely to be white, older, predominantly male, Protestant, and less educated than other criminal juries, than the society from which they were picked." Richard Salgado, Note, *Tribunals Organized To Convict: Searching for a Lesser Evil in the Capital Juror Death-Qualification Process in United States v. Green*, 2005 B.Y.U. L. Rᴇᴠ. 519, 520, 529-30 (2005) (discussing studies).

In his concurring opinion in *Baze v. Rees*, 553 U.S. 35 (2008), Justice Stevens explained that these conviction and punishment biases call death penalty verdicts into question:

> Of special concern to me are rules that deprive the defendant of a trial by jurors representing a fair cross section of the community. Litigation involving both challenges for cause and peremptory challenges has persuaded me that the process of obtaining a "death qualified jury" is really a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction. The prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should

be viewed as objective evidence supporting the conclusion that the penalty is excessive.

553 U.S. at 84 (Stevens, J., concurring); *see also Uttecht v. Brown*, 551 U.S. 1, 35 (2007) (Stevens, J., dissenting) (explaining that "[m]illions of Americans oppose the death penalty," and that "[a] cross section of virtually every community in the country includes citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve as jurors in capital cases").  In *Lockhart*, 476 U.S. at 165, however, the Court concluded that death-qualification did not violate the fair cross-section requirement for a jury because the process of excluding a group defined exclusively by their death penalty attitudes did not involve the systematic exclusion of a distinctive group in the community.

More than thirty years later, empirical evidence unavailable at the time of *Lockhart* demonstrates that excluding people who do not believe in the death penalty means that members of protected classes—women and racial minorities—are excluded. *See* Emily Hughes, *The Empathic Divide in Capital Trials: Possibilities for Social Neuroscientific Research*, 2011 MICH. ST. L. REV. 541, 559 (2011) (noting, since *Lockhart*, development of a "rich body of social science evidence augmenting and complicating the intersection of bias and capital juror decision making."); *see also* Mona Lynch, *Institutionalizing Bias: The Death Penalty, Federal Drug Prosecutions, and Mechanisms of Disparate Punishment*, 41 AM. J. CRIM. L. 91, 121 (2013) (identifying same problems in the federal system).  As a result, courts have begun to recognize that the legal calculus must change, to insure the inclusion of jurors from all backgrounds. *See United States v. Green*, 343 F. Supp. 2d 23, 33 (D. Mass. 2004), *supplemented*, 348 F. Supp. 2d 1 (D. Mass. 2004), *mandamus granted, opinion vacated by United*

*States v. Green*, 407 F.3d 434 (1st Cir. 2005); *State v. Ramseur*, 524 A.2d 188, 252

n. 54 (N.J. 1987).  Reviewing the empirical data in the last 30-plus years, Judge

Crawford determined in *Fell*:

> With respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society.

224 F. Supp. 3d at 333.

**B.  The process of selecting a "death-qualified" jury results in juries that are biased in favor of the prosecution.**

Every defendant has the right to a fair and unbiased jury that can apply the

presumption of innocence, not prejudge a verdict, understand and follow the court's

instructions, and hold the prosecution to its burden and standard of proof.  But the

process of selecting a death-qualified jury has been demonstrably shown to result in

juries that fail in each of these areas.

The *Fell* court heard extensive testimony on the problems with death qualification

and concluded:

> [T]he court finds that the evidence introduced at the hearing supports a finding that the procedures for conducting jury trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and jury deliberations.  The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty.  When surveyed, jurors who actually served in capital cases had great difficulty in following the trial courts' instructions.  It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary.  The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA—like the very similar state death penalty statutes enacted after *Furman*—remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

51

*Fell*, 224 F. Supp. 3d at 339-40; *see also id*. at 338 ("In considering testimony about the level of inherent bias generated by the process of jury selection, the court finds that the social science studies conducted since 1980 have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*. The exclusion of many people opposed to the death penalty on religious or moral grounds and the implicit process of persuasion at voir dire that death is the likely outcome create jury populations which stack the deck against defendants. This suspicion originally expressed by Justice Stewart has been shown to be true. The most telling evidence is the absence of contrary research results. The studies brought to the court's attention supported the position of the defense that jury selection since *Gregg* is not the solution to inherent jury bias but rather a substantial part of the problem.").

Particular findings are especially problematic in a case like the one before this Court:

- "In the case of 'future dangerousness,' one-third of jurors believed that death was mandatory." *Id*. at 336.

- "[W]hite defendants who killed white victims were more likely to receive the death penalty than defendants of either race who killed black victims." *Id*. at 337.

- "[J]urors frequently did not understand or believe that defendants sentenced to life without parole would not be released in the future." *Id*.

Jurors who refuse to consider mitigation, or who would always impose the death penalty, frustrate a defendant's right to an impartial jury. *See Morgan v. Illinois*, 504

U.S. 719, 727 (1992).  Because the practice of death qualifying a jury has no

constitutional or statutory underpinnings, distorts the jury function, introduces

arbitrariness into capital sentencing and increases the influence of racism and sexism

on the death determination, there is no justification for maintaining it.

### C. The process of death qualification excludes jurors based on religion in violation of the First Amendment and the Religious Freedom Restoration Act.

Exclusion of prospective jurors on the basis of their death-penalty views often

reflects jurors' religious convictions—whether they favor the government ("eye for an

eye") or the defendant (religious beliefs that do not permit a juror to vote for execution).

Excluding those jurors violates the First Amendment's Free Exercise and Establishment

Clauses as well as the Religious Freedom Restoration Act (RFRA), 42 U.S.C.

§ 2000bb-1.

For example, if a potential juror is Catholic, Quaker, or any sect of any other

religion, and adamantly opposed to the death penalty, "death qualification" effectively

discriminates against that juror's religion.  No rule (e.g., "conscientious scruples" against

death) should be used to sanction religious discrimination.  *See Church of the Lukumi*

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ("At a minimum, the protections

of the Free Exercise Clause pertain if the law at issue discriminates against some or all

religious beliefs or regulates or prohibits conduct because it is undertaken for religious

reasons.").  The Supreme Court has recently stressed that the government cannot

impose regulations hostile to someone's religious beliefs:

> [T]he government, if it is to respect the Constitution's guarantee of free
> exercise, cannot impose regulations that are hostile to the religious beliefs
> of affected citizens and cannot act in a manner that passes judgment upon
> or presupposes the illegitimacy of religious beliefs and practices.  The

Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion.

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, No. 16-111, 2018 WL 2465172, at *12 (U.S. June 4, 2018) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 534.

RFRA provides religious protection even broader in scope than the First Amendment:

> RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." § 2000bb-1(a).  If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb-1(b).

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014) (footnote omitted).

Excluding someone from a capital jury based on his or her religious beliefs violates both the First Amendment and RFRA.  Because the process of selecting a death-qualified jury has the effect of doing so, the Court should strike the Notice of Intent.  In the alternative, the Court should preclude the government from removing jurors with a religious basis for opposing the death penalty.

## VII.    THE COURT SHOULD DECLARE THE FEDERAL DEATH PENALTY UNCONSTITUTIONAL IN LIGHT OF THE OVERWHELMING EVIDENCE THAT CONTINUED ENFORCEMENT OF THE FDPA WILL LEAD TO THE EXECUTION OF A MEANINGFUL NUMBER OF INNOCENT PEOPLE.

The dead can never be exonerated.  The issue posed is whether our constitution can tolerate the appreciable risks of executing the innocent.  As of April 2018, there have been 163 death-row exonerations.  Death Penalty Information Center, *The Innocence List*, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (last

visited June 14, 2018).  And, as recognized by the dissent in *Glossip*, it is certain that innocent people have been executed.  135 S.Ct. at 2756.

The Hon. Michael Ponsor, U.S.D.J., presided over the first post-*Gregg* federal death penalty case brought in the District of Massachusetts, *United States v. Gilbert*, 120 F. Supp.2d 147 (D. Mass. 2000).  Writing about that experience on the op-ed page of *The Boston Globe* on July 8, 2001, Judge Ponsor said the following:

> The experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably execute innocent people—not too often, one hopes, but undoubtedly sometimes.  Mistakes will be made because it is simply not possible to do something this difficult perfectly, all the time.  Any honest proponent of capital punishment must face this fact.

## A.  The *Quinones* Decision.

On July 1, 2002, the Hon. Jed S. Rakoff of the Southern District of New York issued an opinion finding that the risk of executing the innocent was of sufficient constitutional magnitude that the federal death penalty could not be enforced.  *United States v. Quinones (Quinones II)*, 205 F. Supp.2d 256 (S.D.N.Y. 2002).[17]  Summarizing his findings in *Quinones II*, Judge Rakoff wrote:

> [T]he best available evidence indicates that, on the one hand, innocent people are sentenced to death with materially greater frequency than was previously supposed and that, on the other hand, convincing proof of their innocence often does not emerge until long after their convictions.  It is therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove their innocence.  It follows that implementation of the Federal Death Penalty Act not only deprives innocent people of a significant opportunity to prove their innocence, and thereby violates

---

[17] In an earlier opinion in the same case, Judge Rakoff had announced his tentative findings on this issue and permitted the government a further opportunity to be heard on the issue.  *United States v. Quinones (Quinones I)*, 196 F. Supp.2d 416, 420 (S.D.N.Y. 2002).

procedural due process, but also creates an undue risk of executing innocent people and thereby violates substantive due process.

*Id.* at 257.[18]

Although Judge Rakoff's decision was eventually reversed by the Second Circuit,[19] this Court is urged to determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people as the *Glossip* dissent suggested.[20]

### B. The Unacceptable Risk of Executing the Innocent.

Only the most naive would take the position that the American system of justice is free from the possibility of error. It would be the height of arrogance to presume the federal system immune from these problems.[21] There were significant doubts about the innocence of David Ronald Chandler, the very first federal defendant to have been sentenced to death in the era of the "modern" (post-1988) death penalty. Mr. Chandler

---

[18] There is an additional reason, not discussed in Judge Rakoff's opinions, for concern over the time between sentence and execution in the federal system as that time period bears on the opportunity to establish innocence. In the state systems, condemned prisoners may resort to direct and collateral state court review of their convictions and sentences of death—a process that may consume many years—before entering the federal system via habeas corpus, as provided by 28 U.S.C. § 2254. In the federal system, there is one round of direct appeal and one round of post-conviction challenge, as allowed by 28 U.S.C. § 2255, and that is all.

[19] *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) (reversing, on government's appeal, district court's order declaring the FDPA unconstitutional); opinion on panel rehearing, 317 F.3d 86 (2d Cir. 2003).

[20] *See United States v. Sampson*, 275 F. Supp. 2d 49, 56-57 (D. Mass. 2003).

[21] In J. Dwyer, P. Neufeld, and B. Scheck, *Actual Innocence* (Doubleday 2000), the authors tracked the cases of numerous innocent people convicted of crime and identified the following eight factors most commonly involved where the innocent are convicted: (1) mistaken eyewitness testimony; (2) false confessions; (3) falsified scientific testing; (4) "snitch" witnesses who lied for advantage; (5) junk science; (6) police and prosecutorial misconduct; (7) lackluster or impaired performance by defense counsel; and (8), systemic racial bias. It may hardly be said that the federal system is free from any of these factors.

was originally sentenced to death in 1991.  In 1999, the Eleventh Circuit vacated his

death sentence on grounds of ineffective assistance of counsel at the penalty phase.

*Chandler v. United States*, 193 F.3d 1297 (11th Cir. 1999).  That opinion was itself

vacated, however, by a 6-5 vote of the court sitting *en banc*, and the sentence of death

was re-affirmed.  *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc).

After the Supreme Court denied *certiorari* review, and citing Attorney General Reno's

serious concerns about whether Mr. Chandler was actually innocent of the crime for

which he had been prosecuted and condemned to death, President Clinton, on January

20, 2001, commuted Mr. Chandler's death sentence to one of life imprisonment, noting

that "the defendant's principal accuser later changed his testimony, casting doubt on the

defendant's guilt."  W.J. Clinton, *My Reasons for the Pardons*, N.Y. Times, February 18,

2001.

    Moreover, it is not simply that the system of capital punishment in this country is

fraught with factual error, it is also fraught with legal error.  Professor James Liebman of

Columbia University, who led a team of researchers, studied the rate of error in state

and federal capital cases and found that in an astonishing 68% of cases, death penalty

prosecutions were subject to outcome-determinative legal error.  J.S. Liebman, et al., *A

Broken System: Error Rates in Capital Cases, 1973-1995* (2000); *see also*, J.S.

Liebman, et al., *A Broken System, Part II: Why There Is So Much Error In Capital

Cases, And What Can Be Done* (2002).[22]  In the federal system, eight death sentences

have been set aside on post-trial motion, appeal or on post-conviction challenge.

---

[22] In *Quinones II*, Judge Rakoff described the Liebman study as "the most careful and
comprehensive study in this area, and one based, moreover, almost exclusively on
public records and court decisions," 205 F. Supp. 2d at 268, and also noted that the

In *Quinones II*, Judge Rakoff reached the logically unassailable conclusion that

the number of DNA exonerations—*i.e.,* cases where scientific evidence was available to

establish innocence conclusively—means that there is more than an appreciable risk

that the innocent will be executed (and have been) "given what DNA testing has

exposed about the unreliability of the primary techniques developed by our system for

the ascertainment of guilt. . . ."  205 F. Supp.2d at 264-65.  Responding earlier to the

government's argument that the availability of pre-trial DNA testing had magically

"solved" the problem of the wrongfully-convicted defendants, Judge Rakoff stated:

> This completely misses the point.  What DNA testing has proved, beyond
> cavil, is the remarkable degree of fallibility in the basic fact-finding
> processes on which we rely in criminal cases.  In each of the 12 cases of
> DNA-exoneration of death row inmates referenced in *Quinones*, the
> defendant had been found guilty by a unanimous jury that concluded there
> was proof of his guilt beyond a reasonable doubt; and in each of the 12
> cases the conviction had been affirmed on appeal, and collateral
> challenges rejected, by numerous courts that had carefully scrutinized the
> evidence and the manner of conviction.  Yet, for all this alleged "due
> process," the result in each and every one of these cases, was the
> conviction of an innocent person who, because of the death penalty,
> would shortly have been executed (—some came within days of being
> so—) were it not for the fortuitous development of a new scientific
> technique that happened to be applicable to their particular cases.

*Id.* at 264.

As conclusively demonstrated in *Quinones I* and *Quinones II*, the actual holding

of the Court in *Herrara v. Collins*, 506 U.S. 390 (1993), does not bar either the

substantive or procedural due process bases of the *Quinones* opinion.  *See Quinones*

*II*, 205 F. Supp. 2d at 261-64; *see also Sampson,* 275 F. Supp. at 49.

---

Liebman study had been cited by Justice Breyer in his concurring opinion in *Ring*, who
described the study as one that has generally been favorably received by scholars.  *Id.*
at n. 16.

## C. The real question: How many innocent people is it acceptable to execute so that the government may execute others who are undoubtedly guilty?

This is really the crux of this issue. No one looking at the studies and cases regarding the numbers of demonstrably innocent people convicted and sentenced to death can argue that it is anything but overwhelmingly probable that some of the 1,476 people executed in this country since 1976, and some of the 2,817 who wait on our death rows,[23] and some of the thousands executed prior to 1976, were overwhelmingly likely to be wholly innocent of wrongdoing. The real question is whether that is a price worth paying to have a system of capital punishment. Mr. Rogers' counsel respectfully suggest that executing the occasional innocent person is, by an order of magnitude, too great a price to pay for the ability to execute capriciously-selected truly guilty individuals.

In the *Glossip* dissent, Justices Breyer and Ginsburg cited these disturbing numbers and discussed several individual cases making the point that, at a fundamental level, the death penalty is unreliable and has in the past and inevitably will in the future yield the execution of the innocent. Justice Breyer cited "convincing evidence" that "in the past three decades, innocent people have been executed," 135 S.Ct. at 2756, and cited evidence that "about [four per cent] of those sentenced to death are actually innocent." *Id*. at 2758. The *Glossip* dissenters concluded:

> [These figures and research] suggest that there are too many instances in which courts sentence defendants to death without complying with the necessary procedures; and they suggest that, in a significant number of cases, the death sentence is imposed on a person who did not commit the crime.

*Id*. at 2758.

---

[23] Death Penalty Information Center, *Facts about the Death Penalty*, https://deathpenaltyinfo.org/documents/FactSheet.pdf (last visited June 14, 2018).

The former Attorney General of Virginia, Mark Earley, presided over 31 executions.  In 2015 he announced, in a law review essay, why he no longer supported capital punishment.  Earley, *A Pink Cadillac, An IQ of 63, and a Fourteen Year-Old from South Carolina: Why I Can No Longer Support the Death Penalty*, 49 U. RICH. L. REV. 811 (2015).  Mr. Earley wrote: "I have come to the conclusion that the death penalty is based on a false utopian premise.  That false premise is that we have had, do have, and will have 100% accuracy in death penalty convictions and executions." *Id*. at 813.

Concluding his op-ed piece, Judge Ponsor stated:

I love our system, and I am proud to serve in it.  As I believe this trial demonstrated, no structure of law anywhere or at any time, has tried so earnestly to protect the rights of those involved in it.  But I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.

The simple question – not for me as a judge, but for all of us as citizens – is: Is the penalty worth the price?

To allow the machinery of death to grind inexorably onwards, in the face of incontrovertible proof that our system convicts and condemns to death the innocent, is unacceptable in a society of evolving standards of decency. On this basis, this Court should strike down the FDPA.

**VIII.  THE SUPREME COURT'S *RING* DECISION HAS RENDERED THE FEDERAL DEATH PENALTY UNCONSTITUTIONAL, AND THE ACT MAY NOT BE SAVED BY JUDICIAL CONSTRUCTION THAT CREATES A NEW CRIMINAL OFFENSE WHOSE ELEMENTS AND INTERTWINED PROCEDURES HAVE NEITHER BEEN CONSIDERED, NOR ENACTED INTO LAW, BY CONGRESS.**

### A.  The Seventh Circuit's *Mikos* decision

Mr. Rogers begins by acknowledging that the Seventh Circuit has rejected this argument in *United States v. Mikos*, 539 F.3d 706, 715-16 (7th Cir. 2008).  Mr. Rogers

understands that decision is binding on this Court, but he includes the argument herein to preserve it for potential appellate review.

### B. Introduction and Summary of the Argument.

*"It is the legislature, not the court, which is to define a crime and ordain its punishment."*

- *United States v. Wiltberger*, 18 U.S. 76, 93 (1820 (Marshall, C.J.).

In enacting the FDPA in 1994, and its predecessor ADDA scheme in 1988, Congress granted to prosecutors the exclusive statutory authority to allege aggravating factors. If that aspect of the FDPA is not operative, the statute lacks any congressionally-approved method of alleging aggravating factors. But that is exactly the case. In the wake of *Ring v. Arizona*, the FDPA[24] lacks any legislatively-selected method of initiating a capital prosecution. While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, chose another route. And it is up to Congress to make the necessary corrections. Thus, the Federal Death Penalty is presently unconstitutional and this court should resist and reject the government's efforts to invent a "*Ring* fix."

It is fundamental to our system of government that "[i]t is the legislature . . . which is to define a crime and ordain its punishment." *Wiltberger*, 18 U.S. at 93. In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of

---

[24] For the purposes of this argument, the abbreviation FDPA will be utilized to refer to both the 1988 and 1994 federal death penalty schemes. Although the procedural provisions of the ADAA have been repealed, both statutes are relevant to demonstrate Congressional intent that the prosecution has exclusive authority concerning aggravating factors.

61

a greater offense'. . . ."  536 U.S. at 585 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)).[25]  Earlier, in *(Nathaniel) Jones v. United States*, 526 U.S. 227, 251-52 (1999), the Court held that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt."  *See also Harris v. United States*, 536 U.S. 545 (2002) ("those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis").

The combined holdings of *Ring* and *(Nathaniel) Jones* in effect rendered the FDPA unconstitutional because under *Ring* the statute's aggravating factors that, like the factors at issue in the Arizona statute, are necessary for a death sentence are elements of the capital offense, and must be charged in the indictment and proved to a jury beyond a reasonable doubt.[26]  Under the FDPA, and for the purposes of this discussion only, therefore, the "elements" of capital murder are *at least*[27] murder, plus intent, plus one or more statutory aggravating factors.

---

[25] The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's—and the set of relevant facts—eligibility for a capital sentence.  *See, e.g.,* 18 U.S.C. §§ 924(j), 1959(a)(1), and 21 U.S.C. § 848(e).  As in the Arizona system addressed and invalidated in *Ring*, under the FDPA the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence.  It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, what constitute the new elements of "federal capital murder," a crime that presently exists only by judicial fiat.

[26] *Ring* did not discuss the grand jury issue since the case arose in the context of a state statute to which the Fifth Amendment's Indictment Clause does not apply.  *Hurtado v. California*, 110 U.S. 516 (1884).

[27] Elsewhere in this motion, counsel argue that the elements of capital murder include decisions reached by the jury right up to and including the point where it makes a fact finding that the aggravating circumstances outweigh the mitigating circumstances.  In truth, the "selection" or ultimate sentencing decision is not made until the jury reaches

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury.  But neither is the statute silent on the issue of how such factors are to be alleged.  On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor.  This Court must not allow the government to re-write the FDPA to its own liking.  Instead, the FDPA must be declared unconstitutional pending further congressional action.

In a closely analogous circumstance, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue, i.e., where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality.  In that case, the court declined to do so. As a result, the Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

> It is unnecessary to decide here whether this conclusion [the Government's proposed "fix" of the death-penalty aspects of the federal kidnapping statute] would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted.

390 U.S. at 573.

The principles which flow logically and inexorably to the conclusion that the FDPA cannot survive Ring will be presented below in the following order:

(1)    In *Ring* and related cases such as *(Nathaniel) Jones* and *Harris*, the Supreme Court held that aggravating factors necessary to a capital verdict

---

the final decision point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death . . . ."  18 U.S.C. § 3593(e) (emphasis added).  A simple "outweighing" is insufficient.  Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors.  That is precisely why the legislature needs to amend this statute, not the courts or the Department of Justice.

are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt;

(2)    The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor;

(3)    The FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because, as the Supreme Court held in *Jackson*, and consistent with centuries of constitutional jurisprudence and statutory construction, it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute, and the presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA; and

(4)    Contrary decisions from Courts of Appeals, including the Seventh Circuit's decision in *Mikos*, have been wrongly decided because they have failed either to (a) address *Jackson* and the fundamental separation of powers principles incorporated therein; and/or (b) acknowledge, much less reconcile, the explicit allocation of authority to the prosecutor to determine the propriety of aggravating factors.  Neither does severability analysis or the post-*Apprendi* drug cases, or the principle of "constitutional avoidance" save the FDPA; indeed, those doctrines and the cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, U.S. 542 U.S. 296 (2004),

establish that a judicially imposed solution cannot redefine or reconfigure

a federal criminal statute to do what Congress has not intended.

**C. Aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.**

In *Ring*, in which the Supreme Court overruled *Walton v. Arizona*, and in

subsequent cases, the Court established beyond dispute that aggravating factors

necessary to imposition of the death penalty under the FDPA must be charged in the

indictment, and proved to the satisfaction of a jury beyond a reasonable doubt.  As

noted earlier, the Supreme Court explained in both *Ring* and *Harris* that facts which

increase the maximum penalty faced by the defendant create new, different, and

"greater offense[s]."  *Ring*, 536 U.S. at 609.  In *Harris*, the Court noted repeatedly that

any "fact" that increases the maximum possible penalty beyond that authorized by the

findings implicit in the jury's verdict of guilt is an element of an offense:

> Read together, *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis.

536 U.S. at 567.  Concurring in *Ring*, Justice Scalia famously observed: "[All] facts

essential to imposition of the level of punishment that the defendant receives—whether

the statute calls them elements of the offense, sentencing factors, or Mary Jane—must

be found by the jury beyond a reasonable doubt."  *Ring*, 436 U.S. at 610 (Scalia, J.,

concurring).

Similarly, in *Apprendi*, the Court had observed that;

> The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury.  Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense.

65

530 U.S. at 483, n.10; *see also Harris*, 536 U.S. at 560 (stating that the principle "by which history determined what facts were elements . . . defined elements as 'fact[s] legally essential to the punishment to be inflicted'") (quoting *United States v. Reese*, 92 U.S. 214, 232 (1876) (Clifford, J., dissenting)).

In *(Nathaniel) Jones*, the Court presaged what has since occurred by holding that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." 526 U.S. at 227; *see also United States v. Cotton*, 535 U.S. 625 (2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment").

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged in the "Special Findings" section of the Indictment in this case constitute elements of an offense, since they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed . . . ," i.e., the death penalty. That conclusion is further confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker*, in which first state and then federal sentencing guidelines factors, respectively, were held to constitute the functional equivalent of elements that required proof to a jury beyond a reasonable doubt. 542 U.S. at 303; 543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein. For example, in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Court considered whether double jeopardy was a bar to the second prosecution of a capital case when the state again sought (and received) a sentence of death after a divided jury at the first trial had spared the defendant's life and the defendant then succeeded in having the underlying conviction set aside on appeal. The Court ruled 5-4 that double jeopardy did not bar a

second opportunity to seek a death sentence, and Justice Scalia—joined by the Chief Justice and Justice Thomas—discussed the implications of the Court's decision in *Ring*:

> In *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense*.'" *Id*., at 609 (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

537 U.S. at 111 (parallel citations omitted, emphasis in original).

The three justices who joined that portion (Part III) of the main opinion[28] concluded that there could be no principled reason to distinguish between what constitutes an offense for purposes of the Sixth Amendment and an "offence" for purposes of the Double Jeopardy Clause of the Fifth Amendment. *Id*.[29]

Yet even the four dissenting justices agreed with Justice Scalia's proposition with respect to capital murder constituting a greater offense based on the additional elements—the aggravating factors—needed to prove that offense:

> This Court has determined . . . that for the purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses*, not mere sentencing proceedings. *See*, *ante*, at [537 U.S. at 736-738,

---

[28] There were three separate opinions in *Sattazahn*. The majority opinion was authored by Justice Scalia and joined *in toto* by the Chief Justice and Justices Thomas and, with the exception of Part III of the opinion, by Justices Kennedy and O'Connor. Justice O'Connor filed a separate concurrence. Justice Ginsberg filed a dissenting opinion joined by Justices Stevens, Souter, and Breyer.

[29] Justice Kennedy, without explaining his position, did not join Part III of the opinion. Justice O'Connor concurred, stating she did "not join Part III, which would further extend the reach of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because [she] continue[d] to believe that case was wrongly decided[.]" 537 U.S. at 116-17 (citing her dissent in *Ring*).

739-740]; *Ring v. Arizona*, 536 U.S. 584 (2002); *Bullington v. Missouri*, 451 U.S. 430 (1981).

537 U.S. at 126 n.6 (Ginsburg, J., dissenting).

Thus, at least seven justices are in agreement that, under the principles set forth in *Ring*, capital sentencing schemes that employ aggravating factors create, from a constitutional perspective, new offenses, greater than ordinary willful homicide, that are distinguished by the additional elements those aggravating factors represent. Pursuant to *(Nathaniel) Jones* and *Cotton*, when those greater offenses are prosecuted under federal law in federal court, it is equally beyond question that they must not only be proved to a jury beyond a reasonable doubt, but that they must first be presented to a grand jury and included within the indictment.

Certainly the structure of the FDPA conforms with that conclusion. As with the Arizona scheme at issue in *Ring*, a jury's verdict finding a federal defendant guilty of murder cannot support a sentence of death without additional fact finding. For example, although a guilty verdict in a case of first degree murder carries with it an authorized potential death sentence, such a defendant is not actually exposed to a death sentence unless and until the jury (or the judge, where a jury has been waived) makes determinations, unanimously and beyond a reasonable doubt, that the crime was committed with one of the four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A)-(D), and that there is present in the case at least one of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)(1)-(16). In addition, arguably, a defendant may not be sentenced to death unless it is also established that the attorney for the government thinks executing the defendant is a good idea, 18 U.S.C. § 3593(a), that the defendant was not less than 18-years old at the time of the offense, 18 U.S.C. § 3591(a), and that

68

he is not intellectually disabled, *Atkins*, 536 U.S. 304.  Mr. Rogers also argues here that the ultimate decision on whether aggravating factors substantially outweigh mitigating factors is itself an element of capital murder.

It thus follows that the aggravating factors the government has alleged in the Indictment in this case are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that requires the proof of those elements before a death sentence can be imposed.

### D. The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor.

With respect to federal capital offenses prosecuted in federal court, it is clear that *Ring* and the Fifth Amendment's Indictment Clause require that aggravating factors necessary to a death sentence be presented to a grand jury and included in the indictment.[30]  The FDPA neither contemplates affording, nor permits, the grand jury any role in determining which aggravating factors are to be alleged in a federal capital prosecution.  Under the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified . . . ."  18 U.S.C. § 3593(a).  If the "attorney for the government" believes death is warranted, the next step in the legislatively selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*,

---

[30] The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury[,]" including those accused of felony offenses.  *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[t]he crime charged here is a felony and the Fifth Amendment requires that prosecution be begun by indictment").

that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death; . . . ."  18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof—and allegation in the notice by government attorneys—of one or more of four "gateway" state-of-mind factors.  18 U.S.C. § 3591(2).  The notice, in addition, is required to set forth the aggravating factors—statutory and non-statutory—the government proposes to prove if the defendant is convicted, which may include victim-impact evidence.  18 U.S.C. § 3593(a).  The ADAA scheme was similar.  *See* 21 U.S.C. § 848(h) (repealed).  Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else—not grand juries, not a court, and not any other individual or entity.  Nonetheless, the government seeks to establish a substitute method for introducing aggravating factors now that *Ring* rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid.  Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties; . . . ."  *Ford v. Wainwright*, 477 U.S. at 411.

**E.** ***Jackson* and the separation-of-powers doctrine demonstrate that the FDPA cannot be amended by the government or the courts to permit presentation of aggravating factors to a grand jury, because it is the legislature's exclusive province to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA.**

This is not an instance in which congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation.  Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring*, a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

1. Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

Centuries of federal criminal jurisprudence establish the fundamental principle that it is up to Congress, and Congress alone, to define federal criminal offenses and their punishment.  Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor.  11 U.S. 32 (Marshall, C.J.) ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department"); *see also Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute" (citation omitted));

71

*Wiltberger*, 18 U.S. at 93, ("It is the legislature, not the court, which is to define a crime and ordain its punishment."); *Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *United States v. Worrall*, 2 U.S. 384, 393-94 (1798).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 267-68 n.6 (1997) ("[f]ederal crimes are defined by Congress, not the courts, . . . ."); *Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States").

Applying these principles in *Bouie v. City of Columbia*, 378 U.S. 347 (1964), in which the state courts of South Carolina, in a naked effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger*. *See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability"). Likewise here, only Congress has the constitutional power to legislate the death penalty crimes at issue.

2. *Jackson* provides a direct and "all-fours" analogy to the circumstances present here, and compels invalidation of the FDPA.

It is in this context that the Supreme Court's decision in *United States v. Jackson* provides precedent directly and specifically applicable to capital statutes, and to improper attempts to cure them by judicial fiat rather than by legislative action. As stated earlier, this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional muster. 390 U.S. at 583. In *Jackson*, the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it—thereby making the death penalty possible only for those defendants who exercised their right to trial by jury. *Id*. at 570-72. In an effort to salvage the death penalty provision, however, the government proposed a number of alternative "constructions" of the statute and cited ad hoc procedures developed by other district courts as "cures" for the constitutional problems. *Id*. at 572-73. However, the Court, after finding the statute unconstitutional, rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government because those proposals represented judicial, rather than legislative action. *Id*. at 572–81.[31]

---

[31] For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to

73

In analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, the *Jackson* Court pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty." *Id*. at 571.  Thus, the Court declined to read into the statute congressional authority for the courts to develop such a procedure.  *Id*. at 584. The Court was concerned principally with overreaching its authority by imposing the alternate sentencing scheme.  *Id*. at 584-85.  According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy[,]"absent "the slightest indication that Congress contemplated any such scheme."  *Id*. at 578, 579.

Applying *Jackson*'s analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. *See id*. at 571.  Indeed, as the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands."  *Id*. at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecutor's] hands" the responsibility for alleging aggravating factors under the FDPA. Consequently, in this case, "construing" the FDPA to allow the grand jury to assume

---

recommend the death penalty."  *Id*. at 572.  The government also suggested that the Court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing judge. *Id.* at 575.  The Court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process.  *See id*. at 578.  Presented with the option, Congress, in light of the change of law from *Walton* to *Ring*, might very well enact a comprehensive death penalty scheme that allocates a role to the grand jury. Congress might also choose to enact a wholly new and different scheme, one which fully defines the new offense of "capital murder," specifies its elements, and sets forth comprehensive procedures for trial of those offenses.[32]

*Jackson*, however, proscribes a court from implementing what Congress might do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute; instead, Jackson requires that courts, under such circumstances, invalidate, and not legislate: "It is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted."  390 U.S. at 573 (emphasis added).

Also, the Court in *Jackson* recognized that the government's proposal "would be fraught with the gravest difficulties."  *Id*. at 579.  As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality."  *Id*. at 580; *see*

---

[32] Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDPA despite the obvious defect in the method of alleging aggravating factors.  For example, in *United States v. (Richard) Jackson*, 327 F.3d 273, 284-87 (4th Cir. 2003), the Fourth Circuit held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of *several* statutory aggravating factors not so included.

*also Blount v. Rizzi*, 400 U.S. 410, 429 (1971) (statute that permitted the Postmaster General to determine that material was obscene struck down by the Court which, in the process of rejecting the government's suggestion that Congress's plain language could be "construed" to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute.").

The very same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *Booker*. In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find by a preponderance of the evidence facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (SRA), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been dubbed the "remedy opinion," *Booker*, 543 U.S. at 245-46) severed the offending section—that which made the guidelines mandatory—but retained the essential character of the remainder of the SRA. *Id*. at 257.[33]

Indeed, in *Blakely*, *Booker*'s predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. 542 U.S. at 334-35 (Breyer, J., dissenting). Justice Breyer's admonition about the practical implications of presenting sentencing factors to a jury absent any legislative or

---

[33] Here, as discussed *infra*, severance of the invalid section of the FDPA does not save the statute because it cannot function as a capital statute without a mechanism for alleging aggravating factors.

procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA—none of which the government recognizes or addresses.  For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two phases of the trial.

Here, the government's position, by implication, is that prosecutors can fashion their own remedy independent of both Congress' intent and clear and limiting legislative language.  This view, however, mirrors the position taken by the government, and rejected by the Supreme Court, in *Booker*:

> Severing the requirement that judges, not juries, apply the Guidelines would require courts to make the legal and policy decisions necessary to resolve all of those questions.  There is no indication that Congress delegated that role to the courts.  It is one thing to recharacterize a single factor that increases a statutory maximum and treat it as an element of the crime.  It is quite another to take an entire system expressly designed to channel sentencing discretion and treat it as if Congress was attempting to rewrite the criminal code.

Brief for the United States, *United States v. Booker*, 2004 WL 1967056, at *63 (U.S. 2004).

Accordingly, *Jackson* is precisely on point and controls this case.  In enacting the FDPA, Congress, relying on *Walton*, created a scheme in which the prosecutor was granted the exclusive authority to make the threshold determination whether to seek the death penalty, and, once a decision was made to pursue death, which aggravating factors to allege.  18 U.S.C. § 3593(a).  Allowing the Government to seek indictment of what Congress unambiguously defined as sentencing factors would give "to the [grand

jury] the ultimate duty that Congress deliberately placed in other hands," *Jackson*, 390 U.S. at 576, i.e., those of the government attorney—precisely the kind of end-run that *Jackson* forbids.[34]

As a result, if the FDPA's treatment of aggravating factors is unconstitutional after *Ring*, then it is undeniable under *Jackson* and the doctrine of separation of powers that only Congress can cure the problem, and only by enacting—should it choose to do so in light of the changed constitutional landscape augured by *Ring*—a new death penalty scheme.

3. The non-delegation doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action.

A corollary to the separation of powers problems posed by the prosecution's proposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's  preclusion of either Executive or the Judiciary action, whether separately or in tandem, substituting judgment of either for that of Congress in relation to prescribing the elements and the procedures for application of the federal death penalty.  As Justice Scalia stated in his dissent in *Mistretta v. United States*:

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.
>
> . . .

---

[34] Conversely, if aggravating factors (and other aspects of the FDPA, such as the required "gateway" findings and the age of the defendant) are not elements of the offense, the grand jury has no business investigating or finding them, since the authority of the grand jury is limited to determining "if there is probable cause to believe that a crime has been committed . . . .," *Branzburg v. Hayes*, 408 U.S. 665, 686 (1972), and "whether criminal proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S. 338, 343-33 (1974).

> That Congress cannot delegate legislative power to the President is a
> principle universally recognized as vital to the integrity and maintenance of
> the system of Government ordained by the Constitution.

488 U.S. 361, 415 (1989) (Scalia, J., dissenting).  The majority in *Mistretta* ultimately

found that the non-delegation doctrine had not been violated by creation of the United

States Sentencing Commission and the guidelines it promulgated because, in

constituting the Commission, Congress had "[laid] down by legislative act an intelligible

principle to which the [Sentencing Commission] is directed to conform, . . ."  *Id*. at 372

(quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of

the system of Government ordained by the Constitution's mandate that Congress

generally cannot delegate its legislative power to another Branch."  *Id*. at 371-72

(quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing

factors within the limits of a legislatively determined "intelligible principle."  It did not

include the authority to determine the very elements of an offense, as would be the case

under a hypothetical post-*Ring* FDPA.[35]  Plainly, Congress must have the opportunity to

determine, in light of *Ring*, the precise elements of federal capital murder and how *Ring*

has affected the legislative balancing which produced the FDPA in the first place.

---

[35] In *Touby v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress'
delegation to the Attorney General of the authority to *temporarily* classify a drug as a
controlled substance in order to bring its use and/or distribution within reach of criminal
prosecution.  This delegation of authority was based on the advent of "designer drugs"
which were only marginally different in chemical composition from drugs that were
already controlled.  The Court held that the intelligible Congressional principle at issue
not only meaningfully constrained the Attorney General's discretion to define criminal
conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the
Attorney General's discretion to define criminal conduct, . . ."  *Id*. at 167.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress but rendered constitutionally infirm by the *Ring-(Nathaniel) Jones-Apprendi* trilogy.  *See generally United States v. Green*, 372 F. Supp. 2d 168, 174-75 (D. Mass. 2005).

### 4.  The grand jury lacks any authority to issue "special findings."

In this case, the Indictment contains a section labeled, "Notice of Special Findings – Andrew Rogers."  (Dkt. 1 at 2-3.)  Grand juries are not, however, permitted to return anything denominated as "Special Findings."  The Federal Rules of Criminal Procedure provide that an indictment "must be a plain, concise and definite written statement of the essential facts constituting *the offense charged* . . . ."  Fed. R. Crim. P. 7(c)(1) (emphasis added).  In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment.  *See* Fed. R. Crim. P. 7, Notes on 1972 Amendments; Notes on 2009 Amendments (noting that forfeiture portion obsolete after repeated in Rule 32.2(a)).  Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348, 354-55 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, that does not place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government.  Rather, the principles established in

80

*Jackson* continue to apply, and the express language of the statute remains controlling and dispositive. Consequently, the government's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

> **F. Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.**

> 1. <u>The decisions by the courts of appeals have been wrongly decided.</u>

While various courts of appeals, including the Seventh Circuit, have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case has been fatally flawed for two principal reasons:

> (a) the decisions all fail to address *Jackson*, or to distinguish its clearly applicable holding and principles; and

> (b) the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *Mikos*, the Seventh Circuit did not mention *Jackson* at all. 539 F.3d at 715-16. *Mikos* also applied the rationale of other circuits in holding that the FDPA "does not *forbid* aggravating factors in an indictment." *Id*. at 715. Central to the court's holding was its reliance on *United States v. Brough*, 243 F.3d 1078 (7th Cir. 2001). *Mikos*, 539 F.3d at 715. *Brough* held that 21 U.S.C. § 841 did not contain any provision requiring judges to make the findings necessary for determining a sentence. 243 F.3d at 1079-80. Fatal to the *Mikos* court's rationale, however, is the *Brough* court's holding that "[i]f Congress had specified that only judges may make the findings

81

required by § 841(b), or that these findings must be made by a preponderance of the evidence, then § 841 would create a constitutional problem." *Id*. at 1079.  As discussed, *supra* § VII.D., the FDPA is very different because it explicitly states that it is *the government* who is to make the determination of whether a sentence of death is justified and file a notice of that determination.  18 U.S.C. § 3593(a).

The decisions of other circuits suffer from similar shortcomings.  In *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit failed to mention *Jackson* at all and joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, . . . there is nothing in that law inhibiting such a charge.'"  441 F.3d at 1367 (quoting *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004));[36] *see also United States v. LeCroy*, 441 F.3d 914, 921 (11th Cir. 2006) ("[t]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury.  Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury."); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) ("[w]hile it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment"); *United*

---

[36] In *Brown*, the court also stated the defendant's argument in a manner different than what Mr. Rogers presents here.  In *Brown*, according to the court, the defendant "argue[d] that the FDPA is facially unconstitutional [] because it does not *require* [aggravating] factors to be alleged in the indictment."  441 F.3d at 1367.  Here, Mr. Rogers argues the converse: that the FDPA is unconstitutional because it requires that aggravating factors be alleged *exclusively in a manner that precludes presentation to the grand jury.*

*States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004), *vacated by* 546 U.S. 803 (2005) ("[a] review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent.").[37]

The First Circuit's attempt to distinguish *Jackson* is likewise flawed in that the reasoning requires that the plain language of the statute, which ordains a procedure completely at odds with presentment to a grand jury, be ignored. *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007). That contention is wrong on two counts. First, the FDPA not only does not "require" prosecutors to present aggravating factors to the grand jury, but rather prescribes a precise and exclusive method for alleging aggravating factors: the prosecutor's exclusive discretion and judgment. 18 U.S.C. § 3593(a). Second, the assertion that "nothing in the [FDPA] inhibit[s]" presentation of aggravating factors to the grand jury ignores the explicit and exclusive statutory delegation to the prosecutor, the rules of statutory construction, and the clear and controlling precedent provided by *Jackson*.[38]

Again, this is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury." *LeCroy*, 441 F.3d at 921. Rather, the FDPA expressly and comprehensively provides for another, exclusive

---

[37] In both *Allen* and *Barnette*, the defendant's principal (and unsuccessful) argument was that the indictment *failed* to allege an aggravating factor. 406 F.3d at 940; 390 F.3d at 775. In both cases, the courts found any error to be harmless, and in *Barnette* the court also held that the language of the indictment did, in fact, adequately allege an aggravating factor. *Id.*

[38] Significantly, neither *Allen*, nor *Robinson*, nor *Barnette*, nor *LeCroy*, nor *Brown* discuss or even cite *Jackson*. Thus, none of those decisions can be deemed to have considered the issue sufficiently, or comprehensively. *Contra United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

method for alleging aggravating factors.  18 U.S.C. § 3593(a).  Thus, the decisions upholding the validity of the FDPA in this context were wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional as applied to Mr. Rogers.

### 2. The post-*Apprendi* drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

Nor can the FDPA find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt.  *See*, *e.g.*, *Brough*, 243 F.3d at 1079-80; *see also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive.  Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug.[39]  For those statutes, though, Congress was completely silent on whether drug quantities were elements of the offense or sentencing

---

[39] *Compare, e.g.,* 21 U.S.C. § 841(b)(1)(A) (possession of 1,000 kilograms or more of marijuana exposes a defendant to a sentence of 10 years to life), *with* 21 U.S.C. § 841(b)(1)(D) (possession of less than 50 grams of marijuana exposes a defendant to a sentence of not more than 5 years).

factors.  Thus, requiring drug quantities to be alleged by indictment did not alter the

structure of the drug laws, or offend Congressional intent.[40]

      In fundamental contrast, however, Congress clearly never intended the

aggravating factors in the FDPA to constitute elements of the offense.  Rather,

Congress, relying on *Walton*, which permitted such aggravating factors to be treated as

sentencing factors, patently described them as such, and directed that they be

determined and identified in each case not by a grand jury (or any other body or

institution), but by the prosecutor alone.  18 U.S.C. § 3593(a).

      Moreover, when the Supreme Court has been required to determine whether a

statute sets forth elements of an offense, as distinct from sentencing factors, it has

looked to Congressional intent.  Accordingly, in *Castillo v. United States*, 530 U.S. 120,

123 (2000), the Court explained that "[t]he question before us is whether Congress

intended the statutory references . . . to define a separate crime or simply to authorize

an enhanced penalty."  (emphasis added); *see also (Nathaniel) Jones*, 526 U.S. at 232–

39; *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *Harris*, 536 U.S. at

582.

      In both *Harris* and *Almendarez-Torres*, the Court held the aspects at issue to be

sentencing factors; in *Castillo* and *(Nathaniel) Jones*, they were held to be offense

elements.  In both sets of cases, the Court proceeded by the same exhaustive statutory,

---

[40] The same is true of the federal carjacking statute at issue in *(Nathaniel) Jones*.  526
U.S. at 239, 251-252.  The statute, 18 U.S.C. § 2119, did not make any distinction with
respect to whether serious bodily injury was an element or a sentencing factor.  Thus,
including that factor in an indictment did not involve the redrafting of a statute as is
proposed by the government in this case with respect to the FDPA's aggravating
factors.

not constitutional, analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does not afford the courts authority to recast statutes so that they fit within those limits.

For example, in *Harris*, the Court comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence." 536 U.S. at 549. The Court reaffirmed that the threshold question of statutory construction is whether Congress intended relevant facts to be offense elements or sentencing factors. *Id*. at 551. The Court further explained that the distinction is significant because "*[l]egislatures define crimes in terms of the facts that are their essential elements*, and constitutional guarantees attach to these facts." *Id*. at 549 (emphasis added).

Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor. As a result, the government is not empowered to subvert Congressional intent and, in effect, create by prosecutorial fiat, a brand new criminal statute.

3.  Severability analysis cannot save the FDPA from unconstitutionality.

Additionally, the severability cases also undercut any analogy to the drug cases discussed earlier. Under those cases, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently.[41] For

---

[41] *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane L.*, 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987).

example, in *Booker*, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the sentencing guidelines' mandatory nature because that preserved the character of the SRA, and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death. 390 U.S. at 572.

Here, deciding what Congress intended with regard to the FDPA is an easy task—it is obvious from the FDPA that Congress, relying on *Walton*, believed it was creating sentencing factors. It is equally clear that after *Ring*, aggravating factors constitute elements of an offense. Accordingly, the statute may not be construed; it must be voided.

### 4. The doctrine of "constitutional avoidance" is inapplicable.

The doctrine of constitutional avoidance applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408

(1909). Here, since the FDPA is, for the reasons set forth, *supra*, plainly not "susceptible of two constructions[,]" the simple answer is that the doctrine of constitutional avoidance does not apply.

In *Harris*, for example, the Court found the doctrine of constitutional avoidance inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the minimum punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan* provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan*'s continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's analysis, and the Court, in accord with Congress' intent, concluded that "brandishing" was a sentencing factor. *See id*. Here, too, Congress relied on the state of the law existing at the time it enacted the FDPA—in *Walton*, 497 U.S. at 649, the Court had permitted a judge to decide sentencing factors in capital cases—and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors. Reconstructing the FDPA based on *Ring*'s precedence over *Walton* would

constitute the type of "dynamic" statutory interpretation that was precluded by *Harris*, and would vitiate Congress's clear intent.

Consequently, the doctrine of constitutional avoidance is as inapplicable here as it was in *Harris*. As with § 924(c), with the FDPA there is no ambiguity about Congress's choice. As stated in *Miller v. French*, "[w]here Congress has made its intent clear, we must give effect to that intent." 530 U.S. 327, 341 (2000) (quotations omitted).

Similarly, in *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833(1986), the Court stated:

> Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. Where such serious doubts arise, a court should determine whether a construction of the statute is fairly possible by which the constitutional question can be avoided. *It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute* . . . or judicially rewriting it.

478 U.S. at 841 (citations and internal quotations omitted; emphasis added).

Here, Congress made its intent clear in the FDPA—the allegation of aggravating factors is the province solely of government attorneys. The *Apprendi-(Nathaniel) Jones-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation.

Accordingly, Mr. Rogers respectfully submits that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury. Further, because those aggravating factors are elements per *Ring*, the FDPA is unconstitutional as applied to Mr. Rogers. The capital aspects of this case should be dismissed.

**IX.** **EVEN IF THE FDPA CAN BE RENDERED CONSTITUTIONAL BY A GRAND JURY FINDING OF THE GATEWAY AND STATUTORY AGGRAVATING FACTORS, THE STATUTORY AND NON-STATUTORY AGGRAVATING FACTORS ALLEGED IN THE INDICTMENT AND IN THE NOTICE OF INTENT SHOULD BE DISMISSED OR STRICKEN BECAUSE THE GOVERNMENT HAS NOT OBTAINED AN INDICTMENT CONSISTENT WITH THE REQUIREMENTS OF THE FIFTH AMENDMENT.**

### A. The constitutional and statutory limits on statutory and non-statutory aggravating factors.

The Federal Death Penalty Act allows the government to use both statutory and non-statutory aggravating factors as the basis for imposing the death penalty.  The Act includes no specific guidance as to what constitutes an appropriate non-statutory aggravating factor.  The Seventh Circuit has not ruled on the appropriate breadth of non-statutory aggravating factors, but Mr. Rogers urges the Court to follow the Tenth Circuit, which has held that "[t]he established notion of 'aggravating factors', coupled with the principle of individualized sentencing and notice, provides an 'intelligible principle' to which the executive branch must conform its exercise of the delegated power."  *United States v. McCullah*, 76 F.3d 1087, 1106 (10th Cir. 1996).  Furthermore, as discussed, *infra*, the Act does place restrictions on what can be used as aggravating factors and gives the Court significant discretion to exclude information if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  18 U.S.C. § 3593(c).

Nowhere does the Act expressly permit the non-statutory aggravating factor included in the government's NOI.  Rather, the provision that enumerates statutory aggravating circumstances only states in an unnumbered paragraph, "The jury . . . may consider whether any other aggravating factor for which notice has been given exists."  18 U.S.C. § 3592(c).  Although the government is required to give notice of its proposed aggravating factors pursuant to 18 U.S.C. § 3593(a), that statute does not identify what

constitutes non-statutory aggravating circumstances other than to mention the admissibility of victim impact evidence.  Under 18 U.S.C. § 3593(c), the jury is allowed to hear "information" as to "any matter relevant to the sentence, including any mitigating or aggravating factor," and the government may present "any information relevant to an aggravating factor...."  The statute provides that information may be admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials.  *Id*.  Still, this Court retains the power to exclude even relevant information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  *Id*.

The Supreme Court has been consistent in recognition of the principle that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Zant*, 462 U.S. at 877.  At the most fundamental level, aggravating circumstances must rationally distinguish "those who deserve capital punishment from those who do not."  *Arave*, 507 U.S. at 474.  Critically, an aggravating factor cannot be vague:

> A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion.  A vague aggravating factor used in the weighing process is in a sense worse, for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance.

*Stringer v. Black*, 503 U.S. 222, 235 (1992), *holding modified by Brown v. Sanders*, 546 U.S. 212 (2006).

In *Tuilaepa v. California*, the Court reiterated the two constitutional tests which aggravating factors must satisfy: (1) a valid aggravating factor may not apply to every

defendant convicted of murder, but only to a rationally-selected sub-class of murderers; and (2) the circumstances must be defined with clarity. 512 U.S. at 972.

As the Second Circuit has emphasized, "'heightened reliability' is essential to the process of imposing a death sentence." *United States v. Fell*, 360 F.3d 135, 143 (2d. Cir. 2004). Because of the need for heightened reliability, the test for admissibility under the FDPA is more stringent than the test under the Federal Rules of Evidence, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FRE 403 (emphasis added). Thus, the presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE. Under the stringent FDPA standard, "'judges continue their role as evidentiary gatekeepers and[, pursuant to the balancing test set forth in 3593(c),] retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair.'" *Fell*, 360 F.3d at 145 (alterations in original). These principles impose substantial responsibility on the trial court to decide the admissibility of non-statutory aggravating circumstances. *See United States v. Davis*, 912 F.Supp. 938, 944 (E.D. La. 1996) (*Davis II*) ("All of the above mandates that judicial discretion be exercised and the nonstatutory factors be carefully screened.").

Non-statutory aggravating factors play a specialized role in the jury's decision-making process. The first decision a jury must make as it moves toward a death verdict is whether any of the preliminary intent factors set out at § 3591(a)(2) are present in the case. If the government fails to prove beyond a reasonable doubt that one or more of the § 3591(a)(2) intent factors are present, the jury goes no further and the death

penalty may not be imposed. If however, the government succeeds in establishing a § 3591(a)(2) intent factor the jury in theory proceeds to its second decision-point, namely whether one or more of the specific statutory aggravating factors set out in § 3592(c)(1) through (16) has been established to the jury's unanimous satisfaction. Only if the government establishes, in sequence, both the existence of a § 3591(a)(2) intent factor and one or more of the § 3592(c) aggravating factors may the jury then consider any non-statutory aggravating factors for which notice has been given.

In practice, however, this model breaks down because the jury is asked to decide all these questions in one proceeding which is not constrained by the rules of evidence. As explained in *United States v. Davis*, 904 F.Supp. 554, 559 (E.D. La. 1995) (*Davis I*):

> The federal statute at issue here likewise uses the statutory aggravating factors as the threshold to find an offender death eligible. However, the federal procedure also calls on the jury to consider any nonstatutory aggravating factors and mitigating factors and ultimately decide whether the aggravating factors "sufficiently outweigh" the mitigating factors to justify a death sentence. 18 U.S.C. § 3593(e). Thus, while the statutory factors provide the threshold for death penalty consideration, they ultimately become indistinguishable from nonstatutory factors in the final weighing by the jury. In the same pot with the carefully crafted factors enunciated by Congress go the potential hodge-podge of other factors drawn up by the individual government prosecutors.

Because statutory factors "ultimately become indistinguishable from nonstatutory factors in the final weighing by the jury" they are subject to the same stringent requirements set forth below.

To be valid, an aggravating factor must: (1) adequately channel the sentencer's discretion by narrowing the category of convicted defendants eligible to receive the death penalty, and minimizing the risk of arbitrary and capricious action; (2) be "particularly relevant to the sentencing decision;" (3) meet the "heightened standard of reliability" the Supreme Court has required in death penalty cases; and (4) not be

93

vague, duplicative, or overbroad, or confuse, prejudice, or mislead the jury.  *United States v. Barnes*, 532 F.Supp.2d 625, 642 (S.D.N.Y. 2008); *see also United States v. Concepcion Sablan*, 555 F.Supp.2d 1205, 1214-16 (D. Colo. 2007) (discussing requirements for admissibility).

The "concept of heightened reliability plays an independently significant role" when the court is assessing a non-statutory aggravating factor "which, by definition, lacks the stamp of approval that Congress has bestowed upon the statutory aggravating factors." *United States v. Friend*, 92 F.Supp.2d 534, 542 (E.D.Va.2000).  "That is because heightened reliability drives the individualized determination that is fundamental to a constitutionally valid death penalty scheme."  *Id*.  "And, in ascertaining whether a proposed factor passes the necessarily high bar set for aggravating factors, heightened reliability is the key to a constitutionally defensible determination that death is the appropriate punishment in a specific case."  *Id*.  (quotation omitted); *see also id*. at 541-42 ("The need for heightened reliability in making that decision is driven by the fact that the death sentence is qualitatively different from any other sentence.").

### B. The grand jury was not given the choice of holding Mr. Rogers to answer for a capital crime because it was unaware of the consequences of its "Special Findings."[42]

The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process.
> The Fifth Amendment requires the Federal Government to use a grand
> jury to initiate a prosecution. . . .  The grand jury, like the petit jury, 'acts as

---

[42] This argument is based in part on a law review article on the topic: K.  Bren and Tomer, Ring *Around the Grand Jury: Informing Grand Jurors of the  Capital Consequences of Aggravating Factors*, 17 CAP. DEF. J. 61 (2004).

> a vital check against the wrongful exercise of power by the State and its prosecutors.'  It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime.

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998); *see also Vasquez v. Hillary*, 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death.  In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws.  Laws that authorized the death penalty mandated it; they left no other sentencing option.  *See generally* R.K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORDHAM URBAN L.J. 347, 450-90 (1999).[43]  This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses."  *Woodson*, 428 U.S. at 289.  Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which defendants would receive a sentence of death upon conviction.

The grand jury's historical role in choosing which defendant would receive a death sentence upon conviction is well documented.  *See* LaFave, W.R., et al., 1 CRIMINAL PROCEDURE 1.5(b) (2d Ed.) (noting that grand juries played a critical role in

---

[43] An example of one such law provided that "such person or persons on being thereof convicted [of willful murder] shall suffer death."  An Act for the Punishment of Certain Crimes against the United States, ch. 9, § 3, 1 Stat. 112, 113 (1790).

reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, THE RISE OF THE PENITENTIARY (1992) ("[a]t the indictment stage, grand juries often refused to charge person with capital crimes. They simply downgraded indictments to non-capital charges of their own devising . . ."). The Supreme Court has acknowledged this historical role, writing in *Vasquez*, 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. *In the hands of a grand jury lies the power to charge a greater or lesser offense*; numerous counts or a single count; and perhaps the most significant of all, *a capital offense or a noncapital offense*. . . . " (emphases added).

In this case, the government presented to the grand jury some of the elements of capital murder so as to make Mr. Rogers "death-eligible" for Eighth Amendment purposes—the intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). The government did not, however, inform the grand jury of the consequences of those special findings, i.e., that by returning the indictment, Mr. Rogers would be held to answer to an offense punishable by death. Certainly nothing on the face of the indictment shows that the grand jury was aware that it was being asked to determine if Mr. Rogers should be held to answer for a capital offense. The model grand jury charge of the Administrative Office of the United States Courts indicates that the jury would not have been told that Mr. Rogers would face the death penalty upon conviction. That charge expressly instructs the jury: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment."

See Tomer, *Ring Around the Grand Jury*.  Presumably, the grand jury that returned the

indictment against Mr. Rogers was given this instruction.[44]  By not informing the jury that

it was returning an indictment charging a capital offense, and misinforming the grand

jury about who determines punishment in a federal capital case, the government turned

the proceeding into one that gave only the appearance of complying with the Fifth

Amendment, but that deprived Mr. Rogers of his constitutional and statutory rights.

The Supreme Court, in a related context, has refused to countenance such

disregard for the Fifth Amendment.  In *Smith v. United States*, 360 U.S. 1, 9 (1959), the

Court reversed a kidnapping conviction initiated by information even though it was a

capital offense.  The Court stated:

> The Fifth Amendment made the [grand jury indictment] rule mandatory in
> federal prosecutions in recognition of the fact that the intervention of a
> grand jury was a substantial safeguard against oppressive and arbitrary
> proceedings. . . .  [T]o permit the use of informations where . . . the charge
> states a capital offense, would . . . make vulnerable to summary treatment
> those accused of . . . our most serious crimes.

*Id*. (citations omitted).  Similarly, to permit the government to obtain from a grand jury

an indictment alleging the elements of a capital offense but not inform the grand jury

that by finding those elements it was holding the defendant to answer to a capital crime,

makes vulnerable those accused of the most serious crimes.  If the grand jury is not

informed of the capital nature of the offense, it cannot express the conscience of the

community or perform its constitutionally assigned role as a "barrier . . . between the

---

[44] The government has not yet disclosed written instructions provided to the grand jury.
The Court imposed a June 12 deadline for the government to comply with its order
regarding the disclosure of grand jury materials.  (Dkt. 155.)  It has not done so, and Mr.
Rogers anticipates filing a motion for an order to show cause why the government
should not be held in contempt.

liberties of the people and the prerogative of the [government]).” *Harris*, 536 U.S. at 564
(grand and petit juries “form a ‘strong and two-fold barrier’”).

The grand jury's constitutional and historical role in deciding whether a defendant
should face the death penalty is perhaps more critical now than ever.  Few checks exist
on the federal government's power to pursue the ultimate punishment against one of its
citizens and fewer opportunities exist for the local community to express its desires
about the appropriateness of the death penalty in any given case.  Prosecutorial
decision making in capital cases is centralized at the Department of Justice in
Washington, D.C.  And, as this Court has seen, the section overseeing authorization
decisions is deeply plagued by corruption and mismanagement.

Nor is the petit jury in a capital case a meaningful barrier between “the liberties of
the people and the prerogative of the [government].” *Harris*, 536 U.S. at 564.  This is
because petit jurors, to date, have been “death-qualified.”  Individuals with disqualifying
scruples against the death penalty, no matter how many exist in a given community,
have not been permitted to sit in judgment in a capital case.  Instead, capital juries
consist exclusively of individuals who believe that the death penalty is an appropriate
punishment and who express a willingness to impose it.  As discussed, *supra* § VI,
empirical evidence shows that such “death-qualified” jurors do not represent a fair cross
section of the community and are more conviction prone.  The death-qualifying process
also tends to exclude women and African-Americans from jury service.  The net effect of
death qualification is that capital jurors do not represent the conscience of the local
community or its rich diversity; at best, they represent only those members of the
community who share similar views on the death penalty.  Jurors that represent such a

small segment of the community are ill-equipped to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will. *See Fell*, 224 F. Supp. 3d at 333 ("With respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society.").

Thus, the Constitution and the Bill of Rights set up a carefully crafted system of checks and balance. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell v. Louisiana*, 523 U.S. at 399 (citations omitted). Unless the grand jury is aware of its capital charging power and the consequences of returning an indictment with "special findings" like those in this case, it cannot perform its constitutionally assigned function and make "the important decision to charge a capital crime." *Id.* at 399. Because the grand jury did not perform its constitutionally assigned role of deciding whether Mr. Rogers should be held to answer for a capital crime, the death notice should be dismissed and the indictment's "special findings" stricken.

**C. The non-statutory aggravating factor of future dangerousness should be stricken because it was not presented to the grand jury, and the Notice of Intent should be stricken in its entirety because the grand jury was not required to engage in the weighing process necessary to determine if a death sentence is justified.**

Even if the grand jury had been aware that it its "special findings" would hold Mr. Rogers to answer for a capital crime, the Special Findings should be dismissed because

the government did not present further necessary elements necessary for the grand jury to make the decision as to whether Mr. Rogers should be subject to the death penalty, i.e., whether (1) the non-statutory factor existed, (2) the aggravating factors outweigh the mitigating factors, and (3) whether they outweighed the mitigating factors sufficiently to justify a sentence of death.

In *United States v. Mikos*, 539 F.3d 706, 715 (7th Cir. 2008), the Seventh Circuit relied on the Second Circuit's decision in *United States v. Fell*, 531 F.3d 197, 238 (2d Cir. 2008), for the proposition that there is a distinction between factors that make someone death eligible and those that are considered in a later balancing procedure, with only the former needing to be included in an indictment.  This holding has been called into question, though, by the Supreme Court's recent decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016).

In *Hurst*, the Supreme Court held that, under *Apprendi* and *Ring*, sentencing procedures that Florida had used for more than forty years violated the Sixth Amendment right to jury trial.  *Hurst* made clear that any factual determination "necessary" for the imposition of a death sentence must be made by a jury.  *Id*. at 619, 624.  And the *Hurst* Court was clear that the "facts" improperly left to a judge under Florida's statute included "'[t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances.'"  *Id*. at 622 (alterations in original).  Under *Apprendi*, any such factual determination by a jury must be made beyond a reasonable doubt.  530 U.S. at 494.

In light of *Hurst*, the Supreme Court of Delaware recently held that the Sixth Amendment requires that a capital jury must make any finding that aggravating

100

circumstances outweigh mitigating circumstances and must do so beyond a reasonable doubt. *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016) (per curiam); *see also id.* at 436 (Strine, C.J., concurring) ("I am unable to discern in the Sixth Amendment any dividing line between the decision that someone is eligible for death and the decision that he should in fact die.").  In his lengthy and comprehensive concurrence, Delaware Chief Justice Strine, joined by two other justices, explained why the Sixth Amendment requires that the weighing determination be made by the jury and be made beyond a reasonable doubt:

> Consistent with this reasoning, I also conclude that the Delaware death penalty statute is inconsistent with the Sixth Amendment to the extent that it does not require a unanimous jury to make the key discretionary findings necessary to impose a death sentence by employing a beyond a reasonable doubt standard.  From the inception of our Republic, the unanimity requirement and the beyond a reasonable doubt standard have been integral to the jury's role in ensuring that no defendant should suffer death unless a cross section of the community unanimously determines that should be the case, under a standard that requires them to have a high degree of confidence that execution is the just result.

*Id.* at 437 (Strine, C.J., concurring); *see also id.* at 487 (Holland, J., concurring) (stating that the "jury must determine the relative weight of aggravating and mitigating circumstances").

It follows from *Hurst*, and the reality that weighing is fact-finding, that the grand jury must make the following decisions:

(1) each aggravating factor exists;

(2) the aggravating factors outweigh the mitigating factors; and

(3) the aggravating factors outweigh the mitigating factors to a degree to justify a sentence of death.

In light of the Supreme Court's decision in *Hurst*, this Court should not feel bound to follow *Mikos* and should rule that non-statutory aggravating factors, like statutory aggravating factors, must be presented to and passed on by a grand jury. The Court should also rule that the grand jury must weigh the aggravating and mitigating factors to determine whether the aggravators outweigh the mitigators and, if so, whether they outweigh the mitigators to a degree that justifies a sentence of death.

### D. The statutory factor of "substantial planning and premeditation" should be stricken as unduly vague and unsupported by the facts of this case.

The vice of this statutory aggravating factor and element of capital murder, 18 U.S.C. § 3592(c)(9), is that it requires jurors to fix the illusive and highly subjective point at which "planning and premeditation" crosses an imaginary dividing line and becomes "*substantial* planning and premeditation." The former may not be used to support a sentence of death; the latter may. This is a concept of such slippery and nuanced vagueness that the factor should be stricken.

To prove this factor, the government "must prove both substantial planning and substantial premeditation." *United States v. Roman*, 371 F. Supp. 2d 36, 46 (D.P.R. 2005). "Courts have consistently construed 'substantial' to mean a 'large' or 'considerable' amount of planning." *Id*. (citing *McCullah*, 76 F.3d at 1110); *United States v. Matthews*, 246 F.Supp.2d 137, 148 (N.D.N.Y.2002)). Thus, "[t]here must be a showing of substantial or elaborate planning before the defendant sets out for the crime scene." *Id*. at 47.[45]

---

[45] From a recently disclosed transcript of grand jury proceedings, it appears that government counsel mis-instructed the grand jury regarding the definition of "premeditation" and thus mis-instructed that grand jury on this aggravating factor, which is defined in reference to the definition of premeditation. Because, contrary to this

In *Mikos*, the Seventh Circuit issued a holding that appears on its face to be a broad-sweeping rejection of vagueness challenges to aggravating factors. 539 F.3d at 715. But in *Mikos* the defendant challenged only the aggravating factors of vulnerable victim and lack of remorse. *Id*. at 717. Thus, *Mikos* appropriately relied on *(Louis) Jones v. United States*, 527 U.S. 373 (1999). 539 F.3d at 715. It is worth noting, however, that the *(Louis) Jones* Court did assume that the use of "loosely drafted factors" was erroneous, just harmless. 527 U.S. at 402. The *Mikos* court's reliance on the Fifth Circuit's decision in *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998), is more questionable in its applicability. 539 F.3d at 715. The cited portion of *Webster* was restricted to holding that "the 'especially heinous, cruel or depraved manner' aggravating factor is not impermissibly vague, at least where the vagueness is cured by the statutory limitation that the offense involve torture or serious physical abuse and by further limitation in the jury instructions." 162 F.3d at 354.[46]

### E. The "future dangerousness" aggravating factor should be stricken.[47]

The Notice of Intent asserts the non-statutory aggravating factor of "Future Dangerousness" based on four allegations: (a) pattern of criminal behavior, (b) record of institutional misconduct, (c) issuance of threats to kill others, (d) low rehabilitative

---

Court's order, the government has not yet disclosed the written instructions to the grand jury, Mr. Rogers reserves the right to supplement this motion or file a separate motion challenging the aggravating factors upon the government's full compliance with the Court's order.

[46] In a footnote, *Webster* also held that a challenge to the "substantial planning and premeditation" factor was foreclosed by Fifth Circuit precedent. 162 F.3d at 354 n.70 (citing *United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995)). That aspect of *Webster* was neither specifically cited nor at issue in *Mikos*.

[47] Neither *Mikos*, nor *Jones*, nor *Webster* addressed the future-dangerousness factor.

potential, and (e) lack of remorse.  (Dkt. 13 at 3.)  This notoriously vague and wishy-washy non-statutory aggravating factor is invalid for a number of compelling reasons.

The concept of "future dangerousness" is a broad, generic concept that, as alleged in this case, is too vague and general to satisfy the requirements of a valid non-statutory aggravating factor.  *See Stringer*, 503 U.S. at 235 (discussing dangers of vague aggravating factor).

### 1. Congress did not intend the "future dangerousness" factor to be considered separately.

Many death penalty sentencing schemes provide that evidence of a defendant's future dangerousness may be admitted in aggravation.  *See*, *e.g.*, *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976) (upholding use of future dangerousness provision in Texas statute).  Because Congress chose not to include such a "future dangerousness" provision within the enumerated aggravating factors, Congress intended that this general factor not be considered as a separate aggravating factor.  *Cf. In re Globe Bldg. Materials, Inc.*, 463 F.3d 631, 635 (7th Cir. 2006) (discussing "concept expressio unius est exlusio alterius, 'to express or include the one thing implies the exclusion of the other'").

Instead of adopting a general "future dangerousness" provision, Congress chose to set forth several specific statutory aggravating factors regarding a defendant's past conduct the Congress found to be correlated with a defendant's likelihood of committing violent crimes in the future.  Three specific statutory factors have been alleged against Mr. Rogers: (1) a prior felony conviction involving use or attempted or threatened use of a firearm under § 3592(c)(2); (2) committing the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the decedent

104

under § 3592(c)(6); and (3) committing the offense after substantial planning and premeditation under § 3592(c)(9). (Dkt. 13 at 2.)

Congress has demonstrated that it will make future dangerousness an explicit factor where it intends for it to be considered as part of a sentencing procedure. *See* U.S.S.G. Chapter 4 -- Part A, Introductory Commentary (criminal history factors are "consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior"). Since Congress was doubtless concerned with the future dangerousness of violent offenders, and since it adopted several aggravating factors directly related to this notion but refrained from promulgating the defendant's "continuing danger" as a factor to be weighed separately, it clearly did not intend that a non-statutory factor of the defendant's "future dangerousness" be permissible, especially where there are specific statutorily-authorized factors indicating future dangerousness.

To add this vague and poorly-defined non-statutory aggravating factor of "future dangerousness" is merely piling on. Congress implicitly rejected the use of such a broad aggravating factor and it cannot be adopted now by the government.

      2.  <u>Future dangerousness is an unreliable aggravating factor that will fail to genuinely narrow the class of persons eligible for the death penalty or reasonably justify the imposition of a more severe sentence on Mr. Rogers compared to others found guilty of murder.</u>

"[A]n aggravating circumstance must genuinely narrow the class of persons eligible for death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877. But the aggravating factor of future dangerousness does not do so in any meaningful way. Rather, it is something the federal government includes in

*seventy-three percent* of capital prosecutions.  According to the declaration of Kevin McNally:

> The Attorney General has authorized a federal capital prosecution against 514 defendants to date.  Of these, at least 355 defendants have faced an allegation of a non-statutory aggravating circumstance of future danger. The Government did not allege the aggravating circumstance of future danger against another 132 defendants.  We are uncertain regarding whether future danger was alleged as to 9 of the 514 defendants, because we have not yet been able to obtain a copy of any notice of aggravating circumstances.  According to the clerks of the various district courts, no notices of aggravating circumstances were ever filed against another 18 defendants.  So, the Department of Justice has alleged the future danger allegation against 355 of 487 or 73%.

Declaration of Kevin McNally Regarding Allegations of Future Danger, ¶ 4, June 11, 2018 (attached as Exhibit 6).

Doubts about the reliability of future-dangerousness predictions in capital cases have persisted and grown.  One Fifth Circuit judge, surveying the literature in 2000, noted that there was virtual consensus in the scientific community that even psychiatrists cannot reliably predict dangerousness.  *Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir. 2000) (Garza, J., concurring).

There is more recent empirical evidence that predictions of dangerousness in a correctional setting—including in federal capital cases—are unreliable.  A 2007 study—the first of federal prisoners convicted of capital crimes and sentenced to life imprisonment—found that there were no statistically significant differences in rates of violence between (1) capital life inmates against whom the government had formally alleged future dangerousness as an aggravating factor and (2) those without such an allegation.  See Mark D. Cunningham, Thomas J. Reidy, and Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law and Hum. Behav.

46 (2008).[48]  *In other words, the government's predictions of future dangerousness were utterly unreliable*.  The rates of violence were quite low among those inmates against whom the government had alleged future dangerousness, just as they were for the larger group of all capital life inmates.  For example, only 9.6% of the "future danger" life inmates had been cited for a "serious assault."  This classification included attempted assaults and incidents in which no injury or only minor injury was sustained.

Federal jurors fair no better than prosecutors at predicting future dangerousness. Another study of 72 federal inmates who had been capitally tried and either sentenced to life imprisonment or death over two decades, compared rates of serious prison violence against jury findings on this aggravating factor.  It found that more than 90 percent of the defendants whom jurors had judged dangerous had, in fact, not engaged in any serious violence in prison in the ensuing years.  *See* Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychology, Public Policy & Law 223, 239-40 & Table 4 (2009).  In the *Fell* evidentiary hearings, Judge Crawford found that Dr. Thomas Reidy "testified credibly that forensic opinions of future dangerousness have an impact on a lay jury which greatly exceeds their real predictive value.  Empirical testing of conduct in prison reveals little difference between capital defendants and those convicted of lesser offenses."  224 F. Supp. 3d at 339; (*see* Exhibit 2 at 262-370 (testimony of Dr. Reidy)).

---

[48] The authors used information from the Bureau of Prisons about 145 capital murderers who had entered prison under a life sentence between 1991 and 2005.

3.  <u>The only possible issue is danger while incarcerated.</u>

Even if "future dangerousness" constituted a relevant, authorized non-statutory

aggravating circumstance, the factor can satisfy the Fifth and Eighth Amendments only

if it is interpreted to permit evidence that the defendant poses a continuing danger to the

lives and safety of others while serving a sentence of life imprisonment without release.

*See United States v. Fields*, 516 F.3d 923, 942-944 (10th Cir. 2008) (jury was informed

defendant would not be eligible for parole, and thus understood it was limited to a prison

setting).  "District courts appear to have uniformly held that the government is limited to

presenting evidence on future dangerousness in the context of life imprisonment."

*United States v. Rodriquez*, 2006 WL 487117, at \*5 (D.N.D. 2006) (citing *United States

v. Plaza*, 179 F.Supp.2d 464, 488 (E.D.Pa.2001)).  Thus, "'future dangerousness'

evidence would be irrelevant" if the jury convicted Mr. Rogers " because the jury could

only sentence [him] to life in prison or the death penalty."  *United States v. O'Reilly*, 545

F. Supp. 2d 630, 638-39 (E.D. Mich. 2008).

Accordingly, this factor must be limited to whether Mr. Rogers poses a danger in

prison.  Because the present Notice of Intent contains no such limitation, this factor

should be stricken.

4.  <u>The future dangerousness aggravating factor should be stricken because
the government put a thumb on death's side of the scale by holding Mr.
Rogers in segregation for more than four years following the homicide.</u>

Since the inception of this case, the government has imposed conditions on Mr.

Rogers that not only are cruel and inhumane but also falsely produce a situation that is

beneficial to the government's litigation position and detrimental to Mr. Rogers' efforts to

save his own life.  The government manufactured this situation by continuously

detaining Mr. Rogers in the Segregated Housing Unit (SHU) at either USP Terre Haute or FCI Terre Haute for more than four years.

At the time of the alleged offense, Mr. Rogers was housed in the SHU at USP Terre Haute.  He had been placed there, not for disciplinary reasons, but for protective custody in September 2013.  The BOP then held Mr. Rogers in the SHU for more than four years, until he was moved to the Administrative Maximum facility at USP Florence. After December 26, 2013, Mr. Rogers was no longer in the SHU under protective custody.  He was not there serving a disciplinary sanction.  Rather, according to BOP documents, he was a "long term hold in SHU" pending prosecution in this case.

During those four-plus years in the SHU, Mr. Rogers was subjected to incredibly harsh and punitive conditions.  Despite the fact that Mr. Rogers was not in the SHU serving a disciplinary sanction, he was treated the same as, or even worse than, those who are.  *See generally* CNA, *Federal Bureau of Prisons: Special Housing Unit Review and Assessment*, Dec. 2014, at 82, 219 (describing fact that all inmates in SHU are treated the same regardless of status), available at https://www.bop.gov/resources/news/pdfs/CNA-SHUReportFinal_123014_2.pdf [hereinafter "CNA Audit"].  Mr. Rogers was housed separately from all other SHU inmates except two who also may be facing a potential death sentence.  He was confined to his cell at least 23 hours every day.  In that cell, he was inundated with bright lights that cannot be turned off or dimmed.  He lived under different, tougher rules, with punitive sanctions for any violation.

Mr. Rogers also had access to a far more restricted commissary list than those in general population.  This despite the fact that 28 C.F.R. § 541.31(h) states that inmates

in administrative segregation status "are ordinarily allowed . . . reasonable access to commissary."  *See* BOP Program Statement 5270.11, available at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query.  But Mr. Rogers could not even order food.

Also, unlike inmates in general population, Mr. Rogers could not order thermal underwear.  Yet he was forced to live in a cell with terrible temperature control where he was often subjected to extreme cold.

In contrast to inmates in general population, Mr. Rogers also did not have access to television, radio, or books sent from authorized outside providers like Amazon. Ironically, psychological staff recommended coping mechanisms for Mr. Rogers' mental illness that include "reading, music, and meditation."  But Mr. Rogers' reading material was limited because USP Terre Haute staff would not let him receive outside books. Mr. Rogers once had a radio, which allowed him to listen to music, but the warden ordered all radios taken away from SHU inmates.  The warden did so despite the BOP's presumption that inmates in administrative detention in the SHU will ordinarily be allowed a radio with ear plugs.  28 C.F.R. § 541.31(h)(3).

Whenever Mr. Rogers was moved from his cell, he was placed in chains with black box handcuffs, which are affixed to a "belly chain" around his waist, which is also affixed to leg shackles.  When Mr. Rogers would have contact visits with members of his legal team, he remained chained in this manner the entire time.  Legal visits with capitally charged clients necessarily are extensive, usually lasting two to six hours.  By chaining Mr. Rogers in this manner, the BOP ensured that he could not raise his hands above his waist.  Additionally, because of the rigidity of the black box, extended time in

110

these restraints would cause serious pain to Mr. Rogers' wrists and hands, regardless of movement.

During his extensive time in the SHU, Mr. Rogers' mental health predictably deteriorated.  It is well recognized, even by the government, that Mr. "Rogers' SHU housing and his potential transfer to ADX both involve a degree of isolation that could impact his mental health."  (Dkt. 53 at 6 (citing *United States v. Lopez*, 327 F. Supp. 2d 138, 143-44 (D.P.R. 2004).)  The government also acknowledges that even the "BOP recognizes that restrictive housing can adversely affect inmates' psychological functioning."  (*Id*. (citing Office of the Inspector General U.S. Department of Justice, Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, July 2017, at 1, available at https://oig.justice.gov/reports/2017/e1705.pdf [hereinafter "OIG Report"]).)

The impact of isolation in such a placement has been frequently documented.  "Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances." *Lopez*, 327 F. Supp. 2d at 143-44 (quoting *Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D.Cal.1995)); *see also* S. Grassian, *Psychatric Effects of Solitary Confinement*, 22 Wash. U.J.L & Pol'y 325 (2006).  Studies demonstrate that solitary confinement can cause "anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations," among many other symptoms.  *See* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax"Confinement*, 49 Crime & Delinquency 124, 130 (2003).  "[E]ven a few days of solitary confinement will predictably shift the [brain's]

111

electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." Grassian, *supra*, at 331. These harms are widely acknowledged by federal courts. *See Lopez*, 327 F.Supp. 2d at 144 (citing cases).

> The impact of solitary confinement has also been recognized globally:

> The global community also has recognized the threat that solitary confinement poses to the health of inmates—and taken decisive measures to curtail its use. In fact, in September, 2015, the United Nations General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners to state that "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review." The practice of solitary confinement has already been largely eliminated in Europe. In Germany, for example, solitary confinement is rarely imposed and generally does not exceed a few days—four weeks, in extreme cases. There are more prisoners in solitary confinement in the state of Maine than there are in the entire United Kingdom.

*Peoples v. Annucci*, 180 F. Supp. 3d 294, 299-300 (S.D.N.Y. 2016) (footnotes omitted).

A recent audit of BOP SHUs confirmed that mental health treatment for prisoners in SHUs was lacking in three important areas: "1) proper mental health diagnoses; 2) more effective treatment; and 3) providing sufficient psychiatric staffing." CNA Audit at iv. The SHU restrictions—which limited Mr. Rogers' visits, outdoor recreation, and access to phones, and also eliminated his access to email and television—exacerbated the effects of isolation. *See Lopez*, 327 F. Supp. 2d at 143 ("the effect that continued administrative segregation has on Defendant's psyche affects his ability to aid in his defense".)

The Bureau of Prisons itself and the Department of Justice Office of Inspector General have also recognized that restrictive housing, such as SHU placement, can cause psychological harm and significant adverse effects on inmates' mental health. *See* Office of the Inspector General U.S. Department of Justice, *Review of the Federal*

*Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, July 2017, at 1, available at https://oig.justice.gov/reports/2017/e1705.pdf [hereinafter "OIG Report"] (citing, *e.g.*, BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 1, 2014), 16). The BOP SHU audit specifically recommended that "[a]ny inmates who are found to be decompensating from the effects of restrictive housing should be transferred to a mental health unit for treatment and observation." CNA Audit at 232.

The protracted SHU detention impacted Mr. Rogers' Fifth and Eighth Amendment rights by (i) interfering with his ability to present mitigating evidence at trial, and (ii) falsely creating a record indicating future dangerousness. By confining Mr. Rogers to the SHU, the government deprived him for four years of the opportunity to establish a record of positive behavior in a stable prison setting. This is powerful evidence that federal capital juries have found to be mitigating. For example, in *United States v. Brian Richardson*, another BOP homicide capital case, jurors found the following to be mitigating:

- Brian Richardson can be managed with a combination of medication and secure confinement that will minimize the risk of future dangerousness.

- BOP staff members who have interacted with Brian Richardson for four years have noticed a positive behavioral change in Brian Richardson since he has been properly medicated.

- BOP staff members who have interacted with Brian Richardson for four years believe that he can be housed safely, securely, and in a manner that will not pose a danger to others.

(*See* Verdict Form, *United States v. Brian Richardson*, No. 1:08-CR-139 (N.D. Ga. Apr. 26, 2012), at 11 (attached as Exhibit 7).)[49]

Relatedly, the prolonged SHU confinement of Mr. Rogers has the significant danger of leaving a jury with an impression that the perceived need for segregation implies future dangerousness, thus denying him his due process rights to contest that impression.

The Supreme Court and many other federal courts have repeatedly recognized the unique situation presented when the government seeks the death penalty. In *Skipper*, 476 U.S. at 8, the Supreme Court held that it was an Eighth Amendment violation to exclude evidence of a defendant's good behavior in prison. In *Gardner*, 430 U.S. at 362, the Supreme Court held that it was a due process violation for a defendant to be sentenced to death "on the basis of information which he had no opportunity to explain or deny." In *Stringer*, 503 U.S. at 235, the Court made the unmistakable pronouncement that it is constitutional error to place a "thumb . . . [on] death's side of the scale."

Here, the government, through the BOP—a part of the federal executive that has been an active participant in this capital prosecution—significantly interfered with Mr. Rogers' ability even to develop, much less present, the kind of evidence at issue in *Skipper*. *Skipper* recognized that a defendant might be able to save his own life by presenting evidence of positive adjustment in prison. "Placement in SHU limits the

---

[49] As demonstrated in Mr. Rogers' Motion for Specific Discovery (Doc. 49, pp. 21-22), jurors in other federal capital cases have found, as a reason to reject the death penalty, that the offender is able to be restrained by the BOP in a manner that reasonably assures the safety of prison personnel and other inmates. These cases include those involving prison homicides.

amount and kind of mitigating evidence that a capital defendant might bring in the

penalty phase." *Lopez*, 327 F. Supp. 2d at 144.

While evidence of positive institutional adjustment can be especially mitigating,

evidence that a defendant poses a continuing danger to those around him is, by its very

nature, exceptionally aggravating, and it is of great concern to capital jurors. *See, e.g.,*

Blume, John H., Garvey, Stephen P. & Johnson, Sheri Lynn, *Future Dangerousness in*

*Capital Cases: Always "At Issue"*, 86 Cornell Law Review 397 (2001) (finding that even

when prosecutors did not raise future dangerousness as an aggravating factor, sixty-

nine percent of jurors said "keeping the defendant from ever killing again" was fairly or

very important to their decision).  In seeking the death penalty against Mr. Rogers, the

government has given notice that it will rely on a record of institutional behavior that it

manipulated by not allowing Mr. Rogers to demonstrate positive change:

> 1. Future Dangerousness: ANDREW N. ROGERS is likely to commit
> criminal acts of violence in the future that would constitute a continuing
> and serious threat to the lives and safety of others, as evidenced by his
> pattern of criminal behavior, *his record of institutional misconduct*, his
> issuance of threats to kill others, his low rehabilitative potential, and his
> lack of remorse for murdering Thomas W. Sim.

(Doc. 13 at 3 (emphasis added).)

By claiming that security necessitated the long-term segregation of Mr. Rogers in

the most secure environment, the government (through the BOP) effectively created

damning aggravating evidence.  The government placed Mr. Rogers in an untenable

dilemma where a government-created situation made it difficult for him to live a stable

enough existence to demonstrate mitigation and the government-created situation

causing the instability can also be used to show future dangerousness.  As the *Lopez*

court recognized, "From this inability to present mitigating evidence, a fact-finder might

115

conclude that his continued placement in SHU implies 'future dangerousness,' in turn denying Defendant his due process right to contest that showing." 327 F. Supp. 2d at 144; *see also id*. ("By enacting a capricious unwritten policy, the Government is crafting an 'atmosphere of death' in capital cases by imposing unreasonable and unwarranted conditions of confinement, while simultaneously restricting Defendant[']s ability to 'explain or deny.'").

By interfering with Mr. Rogers' ability to develop mitigating evidence and by essentially manufacturing evidence of future dangerousness, the government has placed a thumb on death's side of the scale by imposing unreasonable and unwarranted conditions of confinement, while simultaneously restricting Mr. Rogers' ability to "explain or deny." As the *Lopez* court held regarding BOP's placement of capital defendants in SHUs, "The Bureau of Prisons is perverting the principle reiterated by the courts that death is different." *Lopez*, 327 F.Supp. 2d at 145.

Because the government itself manufactured a situation making Mr. Rogers seem like more of a future danger and simultaneously interfered with Mr. Rogers' ability to present compelling mitigating evidence, the Court should strike the non-statutory factor of future dangerousness.

X.    THE COURT SHOULD REQUIRE A DETAILED OFFER OF PROOF AND SCHEDULE A HEARING ON THE RELEVANCE, RELIABILITY, AND ADMISSIBILITY OF THE GOVERNMENT'S AGGRAVATING FACTORS EVIDENCE.

### A. Introduction: the notice of aggravating factors.

The Notice of Intent alleges both statutory and non-statutory aggravating factors. Specifically, the government will attempt to prove three statutory factors and one non-statutory factor. At the appropriate time for *in limine* motions, Mr. Rogers intends to challenge the admissibility of some of the aggravating factors and will move to exclude

and/or limit evidence in support of others. But first, Mr. Rogers must have more information than what is provided in the Notice of Intent. The notice lacks sufficient facts for Mr. Rogers to challenge admissibility on either constitutional or evidentiary grounds. The Court should require the government to submit a detailed proffer of the aggravating evidence it intends to present, set a briefing schedule to allow Mr. Rogers sufficient time to consider and challenge the evidence, and then conduct a hearing to determine the admissibility of the evidence offered to support the aggravating factors.

### B. A detailed proffer of aggravating factors is required.

A district court must decide all preliminary questions regarding whether evidence is admissible. Fed. R. Evid. 104. That mandate is of no greater importance than when that evidence is being offered to convince a jury that the accused should be put to death. The aggravating factors alleged here are intended solely for that purpose. (Dkt. 13 at 1 ("The United States proposes to prove the following factors as justifying a sentence of death.").)

In order for the Court to exercise its mandatory gatekeeping function in assuring that the "heightened reliability" standard of capital cases is met, it should adopt the procedures followed in other death penalty cases, and require the government to provide a detailed, informative outline of the evidence of its proposed aggravating factors, set a briefing schedule, and hold a hearing well before trial where the admissibility of the evidence can be tested for admissibility, reliability, and the danger of unfair prejudice. The Constitution and case law require no less. *See United States v. Karake*, 370 F. Supp. 2d 275, 279 (D.D.C.2005) ("[I]t has been uniformly recognized that if the death penalty [notice] provides insufficient notice to the defendant, the Court retains inherent authority to require the government to provide more specifics in order to

give the defendant the opportunity to prepare for the penalty phase, as well as to provide the court with some frame of reference for ruling on objections to the death penalty notice.").

This reasonable practice is routinely followed by district courts, particularly where, as here, the notice is wholly inadequate. *See*, *e.g.*, *United States v. Hammer*, No. 4:96-CR-239, 2011 WL 6020157, at *4 (M.D. Pa. Dec. 1, 2011) (granting "Motion for Informational Outlines summarizing how the Government intends to prove the intent factors, the statutory aggravating factor of substantial planning and premeditation, and the two non-statutory factors of future dangerousness and victim impact"); *United States v. Lujan*, 530 F.Supp.2d 1224, 1269-1270 (D.N.M. 2008) ("The severity of the penalty sought in this case warrants special efforts to ensure the fairness of the proceedings. Greater notice improves the truth-seeking process. Accordingly, in the exercise of the inherent authority given to the Court, I will order the Government to provide to Mr. Lujan a written informative outline on certain statutory threshold findings and aggravating factors . . . ."); *United States v. Wilson*, 493 F.Supp.2d 364, 378 (E.D.N.Y. 2006) (ordering government to provide particulars of victim impact evidence); *United States v. Gooch*, 2006 WL 3780781, *23 (D.D.C. Dec.20, 2006) (same); *United States v. O'Driscoll*, 250 F.Supp.2d 432, 434 (M.D. Pa. 2002) (court ordered the government to produce the evidence on which it would rely, resulting in the disclosure of two videotapes and six volumes of reports and other documents totaling in excess of 1,000 pages).

To determine admissibility of evidence regarding aggravating factors, the Court must assess the relevance and reliability of the evidence as well as its prejudicial and

probative impact. *United States v. Corley*, 519 F.3d 716, 724 (7th Cir. 2008) ("the district court in determining whether such information [of unadjudicated conduct in support of future dangerousness] may be considered must consider a number of factors, including the reliability of the evidence, the prejudicial and probative impact of the evidence, and the burden of proof both for determining reliability and for a jury to determine whether the conduct may be considered"). Here, the Court cannot make these determinations without further information regarding what the government intends to use to support its generalized allegations.

The need for a detailed, informational outline is manifest, given both the life-or-death stakes involved, and, as discussed next, the factual deficiencies in the Notice of Intent.

### C. The Notice of Intent is factually inadequate.

The Notice of Intent is broken down into three sections: 1) Notice of the preliminary ('eligibility") factors necessary to establish Mr. Rogers' eligibility for the death penalty; 2) the statutory aggravating factors; and 3) the non-statutory aggravating factor of future dangerousness. Mr. Rogers does not, at this time, seek additional information as to the eligibility factors. Mr. Rogers does, however, seek an informative outline as to two of the statutory factors and the non-statutory aggravating factor.

#### 1. The notice of statutory aggravating factors is insufficient.

Mr. Rogers seeks a detailed, informative outline with respect to two of the statutory aggravating factors in the Notice of Intent. First, with regard to the factor alleging that the offense was committed in an especially heinous, cruel, or depraved manner (Dkt. 13 at 2), Mr. Rogers requests an informative outline which describes the

witnesses, including any potential experts, and a summary of the witnesses testimony, and the documents and other information the government intends to present to the jury.

All murders, particularly where the weapon is a knife, and particularly in prison, are heinous and cruel.  What is missing from the notice are the facts the government intends to introduce to convince the jury that this murder is especially heinous and cruel, and facts that prove that this murder is demonstrably different than the multitude of murders—especially prison murders—where the accused, despite stabbing the victim many times, did not face the death penalty.  In other words, how does the supporting evidence rationally distinguish—and thereby justify imposition of the death penalty for this murder—from the vast majority of similarly atrocious murders where execution of the accused is not sought?  *See Zant*, 462 U.S. at 877; *Arave*, 507 U.S. at 474; *Godfrey*, 446 U.S. at 428-29.

Second, with regard to the factor alleging substantial planning and premeditation, Mr. Rogers seeks a complete informative outline that identifies the witnesses (including potential experts) and that provides a summary of the witnesses testimony, and the documents and other evidence the government intends to present to the jury.

First-degree murder by definition requires premeditation, which of course necessarily includes some degree of planning.  But the Notice of Intent lacks any facts that support the allegation that the killing in this case involved "substantial" planning. And, perhaps more importantly, the Notice of Intent provides no information that the alleged planning is rationally distinguishable (in other words, demonstrably greater) from the overwhelming majority of murders involving the same or greater level of planning and premeditation that are not authorized for the death penalty.  The defects in the

Notice of Intent with regard to the statutory aggravation factors can only be cured by an order directing the government to provide a detailed informative outline.

> 2.   <u>The notice of the non-statutory aggravating factor is insufficient.</u>

Mr. Rogers seeks a detailed, informative outline for the non- statutory aggravating factor alleged in the Notice of Intent.  The Notice of Intent alleges a single non-statutory aggravating factor—future dangerousness—and indicates that the government will offer evidence of: 1) a "pattern of criminal behavior," 2) a "record of institutional misconduct," 3) the "issuance of threats to kill others," 4) a "low rehabilitative potential," and 5) a "lack of remorse for murdering Thomas W. Sim."  (Dkt. 13 at 3.)  The Notice of Intent gives no specific information whatsoever of what the government alleges demonstrates these five categories.

For the reasons stated above, and to allow the Court to make the determinations required by *Corley*, 519 F.3d at 724, Mr. Rogers must be provided with an informative outline that identifies the witnesses (including potential experts) and a summary of the witnesses testimony, and the documents and other evidence the government intends to present to the jury.

As discussed, *supra* § IX.F.2, the future-dangerousness aggravating factor is unreliable to say the least.  To allow Mr. Rogers to raise any appropriate specific challenges, and to allow the Court to make informed rulings, the Court should order to government to provide the requested informational outline.

## XI.   CONCLUSION

For the reasons set forth above, the Court should grant this motion in all respects together with any and all such other relief as the Court deems just and proper.  A hearing is requested on all disputed facts and as further requested in this motion.

DATED this 18th day of June 2018.

Respectfully submitted,

*S/Nathan D. Chambers*
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-2222
Facsimile: (303) 825-4010
nchambers@nathanchamberslaw.com

*S/Patrick J. Burke*
Patrick J. Burke
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-3050
Facsimile: (303) 825-2992
Patrick-J-Burke@msn.com

*S/Monica Foster*
Monica Foster
Indiana Federal Community
Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

*S/Gwendolyn M. Beitz*
Gwendolyn M. Beitz
Indiana Federal Community
Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Gwendolyn_Beitz@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I certify a copy of the foregoing **DEFENDANT ANDREW ROGERS' MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY AND FOR OTHER MISCELLANEOUS RELIEF** was filed electronically this 18th day of June 2018. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*s/ Jennifer Feldman*
Jennifer Feldman