**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:16-cr-0018-WTL-CMM |
| | ) | |
| ANDREW N. ROGERS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MR. ROGERS' RESPONSE TO THE GOVERNMENT'S MOTION TO QUASH SUBPOENA TO UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF INDIANA JOSH MINKLER (Dkt. 385)**

---

Defendant Andrew Rogers, by and through undersigned counsel, respectfully files this Response in opposition to the government's Motion to Quash Subpoena to United States Attorney for the Southern District of Indiana Josh Minkler (Dkt. 385). Counsel for Mr. Rogers further state as follows:

**I.      Introduction**

The government's Motion is little more than a re-hash of its objections to Mr. Rogers' inclusion of Mr. Minkler as a witness. (*See* Dkt. 355-1.) Because Mr. Rogers has fully addressed those objections (Dkt. 362), he will try not to be redundant herein and will adopt and incorporate by reference the arguments made therein.

The government's incessant attempts to cast the upcoming hearing as something other than what the Court has clearly stated once more demonstrates why the Court simply cannot trust the government and why relief in the form of striking the Notice of Intent to Seek the Death Penalty is appropriate under this Court's supervisory powers.

The bottom line is that the Court cannot trust the government to comply with its obligations in this most serious of cases where a man's life is literally on the line. In seeking to quash the subpoena for Mr. Minkler the government continues to mislead and obfuscate. The government misstates the relevance and import of Mr. Minkler's testimony. It obfuscates the highly significant evidence of government misconduct and dishonesty that has existed from the inception of this death-penalty prosecution. And it even misinforms the Court of the holding of the sole case it cites for its meritless assertion that it did not waive its claim of deliberative process privilege in documents it voluntarily provided to the defense and for which it expressly waived any claim of privilege.

II.    **While this Court has made it clear that the upcoming evidentiary hearing is not limited to consideration of the undeniable misconduct that occurred during the authorization process, that significant misconduct is relevant to considerations of the later and ongoing government misconduct.**

While the government in the past has claimed that all that is relevant at the upcoming hearing is what occurred in the death-penalty authorization (or "protocol") process—i.e., "matters that occurred prior to January 19, 2016, the date on which the Attorney General authorized the notice to seek the death penalty" (Dkt. 365 at 3)—the government now does an about face and claims that there can be no inquiry into what occurred during that process. (Dkt. 385-2 at 2-4.) The government makes these arguments despite the Court previously clarifying for the government what is at issue. (*See* Dkt. 380.)

The government rehashes its claim that Mr. Minkler's testimony is not relevant because the death penalty protocol does not confer any rights on Mr. Rogers. (Dkt. 385-2 at 2-4.) As discussed in Mr. Rogers' Reply to the Response to Defendant's

2

Witness and Exhibit List, this is beside the point.  (Dkt. 362 at 12-13.)  Mr. Minkler will be able to offer testimony that will shed light on significant government misconduct from this case's inception.  That misconduct set the tone for how this case would be prosecuted, and forms the basis for the misconduct that continues to this day.

For example, in September 2014, Mr. Minkler submitted a memorandum stating his office's position on the death penalty in this case.  In that memorandum, Mr. Minkler made a statement that forcefully undermines the non-statutory aggravating factor of future dangerousness:

> [T]he most compelling aggravating factor is Roger's [sic] future dangerousness predicated on his threat to kill another cellmate until he receives the death penalty.  The Federal Bureau of Prisons has the ability to house Rogers in a manner that will eliminate this disturbing threat without expending the resources associated with seeking to eradicate the threat by resorting to the death penalty.

(Ex. 145 at 6 (to be admitted at hearing).)  This is a potent statement from the U.S. Attorney in a jurisdiction that is home to a major federal prison complex.  Mr. Minkler has stated unequivocally that the safety of that prison complex is a priority for him.  Mr. Minkler has served as a federal prosecutor in this district for decades, and he is no doubt familiar with the capabilities of the Bureau of Prisons.

Nevertheless, despite this powerful argument against the death penalty for Mr. Rogers, in December 2015, Mr. Minkler changed his office's position.  This change in position came only after the Capital Case Section (CCS) first assigned James Peterson to investigate Mr. Rogers' mental health treatment in an effort to "rebut" arguments made by the defense and then assigned Mr. Peterson to investigate *the U.S. Attorney's Office for the Southern District of Indiana*.  After these dual investigations, then-CCS Chief P. Kevin Carwile had a conversation with Mr. Minkler.  And as the seeming result

3

of that conversation, Mr. Minkler submitted a memorandum to the Attorney General changing his office's position from opposing the death penalty for Mr. Rogers to supporting the death penalty.

That memorandum to the Attorney General was rife with false statements, including on the most crucial issue for the Attorney General's consideration—Mr. Rogers' mental health.  In that later memorandum, U.S. Attorney Minkler falsely asserted, "While Rogers' mental health records do reflect that on various occasions and to varying degrees, Rogers sought and was denied mental health treatment, *a thorough examination of Rogers' mental health history reveals that he was not mentally ill prior to, during, or after the murder*."  (Ex. 160 at 2 (to be admitted at hearing) (emphasis added).)  This is a demonstrably false statement because Mr. Rogers' mental health records actually demonstrate that he was diagnosed with depressive disorder and placed on antidepressant medication within days of the homicide and a few months later was diagnosed with major depressive disorder.  In his deposition, Chief Psychologist Eckert testified that it is reasonable to believe that Mr. Rogers suffered from depression at the time of the homicide as well.

This brings us to the next falsehood in Mr. Minkler's December 2015 memorandum.  Knowing that Dr. Eckert had voiced his opinion that the death penalty was inappropriate because the BOP had not been as responsive to Mr. Rogers' mental health issues as it could have been *prior to the homicide* (*see* Dkt. 141 at 3-4), Mr. Minkler falsely moderated Dr. Eckert's opinion and falsely undermined it, telling the Attorney General:

> Although Dr. Eckert, Chief Psychologist at BOP Terre Haute, volunteered
> his opinion that this was not an appropriate death penalty case because

there were some issues with Rogers' mental health treatment and Rogers' medical records would provide fertile grounds for cross-examination, the medical records do not support this opinion and such concerns do not militate against the death penalty.

(Ex. 160 at 2.)  Again, this statement is demonstrably false.

The question thus becomes what CCS did to sway Mr. Minkler so much that he would not only change his meritorious position on the death penalty but would also be willing to make false statements to the Attorney General.  That corrupt influence by CCS is at the heart of the upcoming hearing.

But the relevance of Mr. Minkler's testimony is not limited to his false statements to the Attorney General.  Mr. Minkler also has relevant knowledge of the dueling investigations carried out by Mr. Peterson and Mr. Warden in November 2015.  Mr. Minkler, and *only* Mr. Minkler, knows why he assigned AUSA Warden to conduct a mirror investigation of that carried out by Mr. Peterson.  On November 13, 2015, Mr. Peterson began his interviews of USP Terre Haute medical and mental health personnel.  *That same day*, Mr. Minkler assigned AUSA Warden to conduct the same investigation, which Mr. Warden carried out on November 18, after Mr. Peterson had completed his interviews.  Although Mr. Warden's interview notes reflect that he was aware that Mr. Peterson had also interviewed those personnel, in his deposition Mr. Warden claimed that he found out about Mr. Peterson's interviews "after the fact."  Mr. Warden claimed that he did not know that Mr. Peterson had conducted interviews and that in conducting his own interviews he was merely acting at the direction of the U.S. Attorney.  So the only person with knowledge of why this parallel investigation was begun is Mr. Minkler.

5

But the relevance of Mr. Minkler's testimony does not stop there.  While CCS attorneys and AUSAs on this case have come and gone, the one constant has been the name Josh J. Minkler on every government filing in this case (except those recently filed by Special Assistant U.S. Attorney Weiser).  To counsel's knowledge, this is the only death-penalty prosecution during U.S. Attorney Minkler's tenure as acting, interim, or confirmed U.S. Attorney.  As such, he has surely paid attention to this most important of cases.  Thus, when allegations of the failure to disclosure favorable information were raised, he no doubt was aware and paying attention.  He likewise was no doubt paying attention to filings under his name that falsely promised that no *Brady* information was being withheld.  When depositions were ordered and FBI interview reports were completed in a manner to mislead the Court in an attempt to get the Court to reconsider that order, surely the U.S. Attorney was cognizant of what his underlings were doing and what was being submitted in his name.

The government claims, however, that Mr. Minkler "did not make any decisions about what information should be disclosed to Defendant or the Court."  (Dkt. 385-2 at 5.)  Well, this is perhaps as disturbing as if he did.  If Mr. Minkler were to testify that he was completely in the dark about his office's misdeeds in the only death-penalty case he has overseen—which began with him providing false information in an effort to get the Attorney General to authorize the death penalty—the Court would be left to wonder who is steering this ship and whether it can trust him or her to guide it to a fair conclusion.

These are but some of the relevant areas of inquiry for Mr. Minkler.  The government's bald (and repeated) claim that Mr. Rogers seeks "irrelevant testimony from USA Minkler" (Dkt. 385-2 at 5) is sorely misplaced.[1]

### III.   The government's reliance on the deliberative process privilege is both misplaced and further evidence of why the Court cannot trust the government with this prosecution.

Without referencing any specific topics, the government claims that "USA Minkler is protected from providing testimony by the deliberative process privilege."  (Dkt. 385-2 at 5.)  Preliminarily, this is an objection that should have been raised long ago.  The Court set a deadline to raise objections to any witnesses in writing with legal authority.  (Dkt. 309 at 2.)  The Court graciously granted the government an extension of time to comply with this Order.  (Dkt. 332.)  For Mr. Minkler, the government failed to file its objections by the date set and filed them a week later even though the Court had not granted its requested second extension of time.  (Dkt. 355.)  Notably, and as Mr. Rogers pointed out in his Reply (Dkt. 362 at 10), the government made no assertion of *any* privilege regarding the testimony of Mr. Minkler.  The only mention of deliberative process privilege was in the context of the government recognizing that it had waived privilege in the documents produced.  (Dkt. 355-1 at 4.)  Because the government has once again demonstrated a lack of respect for deadlines set by this Court, the Court should refuse to consider its arguments of privilege.

---

[1] The government asks the Court to quash the subpoena because it claims that Mr. Warden and Mr. Peterson would be better witnesses.  (Dkt. 385-2 at 5.)  But better is not the test for relevance.  By the government's rationale, in a bank robbery case it should be limited to calling the teller who got a best look at the robber and not be allowed to call any other witness.

In any event, this blanket claim of privilege is inappropriate and not a basis to quash a subpoena.  To the extent that the government believes there to be any remaining privilege that has not been waived, that is an appropriate objection to be made on a question-by-question basis, not a basis to quash a subpoena.  *See United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) ("The claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable.").  That the government makes this argument although Mr. Rogers raised this case law just a few weeks ago (Dkt. 354 at 6) demonstrates the lack of credulity in the government's arguments generally.

Most disturbingly, the government makes a misleading and baseless argument that it has not waived privilege in the documents that have been provided to Mr. Rogers and for which it has expressly waived privilege.  Mr. Rogers has already addressed the lack of merit in the government's claim that it has retained a privilege in documents it has provided to an opposing party.  (Dkt. 378 (sealed).)  Nevertheless, the government now comes before the Court and asserts, "Production of documents related to the capital case review process does not waive the privilege as deliberative process privilege is treated differently than other privileges."  (Dkt. 385-2 at 6 n.3.)  The government's assertion is both baseless and a complete mis-characterization of the case on which it relies.  As support for its claim that production of documents from the capital review process dos not waive the privilege, the government cites *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997).  But the D.C. Circuit held no such thing.  Rather, the court held the opposite: "release of a document only waives these privileges *for the document or information specifically released*, and not for related materials."  *Id*.

8

(emphasis added).  The court continued, "[T]he White House has *waived its claims of privilege in regard to the specific documents that it voluntarily revealed to third parties* outside the White House[.]"  *Id*. 741-42 (emphasis added); *see also Pupo-Leyvas v. United States*, No. 208CV344RLY-WGH, 2009 WL 2245073, at *2 (S.D. Ind. July 27, 2009) (ruling that "Defendant has waived the deliberative process privilege by previously disclosing a portion of the document").  It is truly amazing that the government would have the gall to cite this case in this manner when only six days earlier Mr. Rogers cited that very case (as well as others) for the actual holding.  (Dkt. 378 (sealed) at 2.)

In seeking to quash a subpoena for a hearing about whether the Court can trust the government to comply with its obligations in this most serious of cases, the government proves both the necessity of hearing testimony from the U.S. Attorney overseeing this prosecution and the need for the Court to grant Mr. Rogers relief.  Even at this late stage, and even when counsel are brought in from other jurisdictions, the government continues to demonstrate that no matter who is assigned to this case the lack of candor will continue.  *See* Ind. RPC 3.3(a)(1) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]").[2]

### IV.   DOJ's *Touhy* Regulations do not grant the government unilateral authority to decide who will or will not testify.

Mr. Rogers has previously addressed this issue at length with regard to Mr. Minkler.  (Dkt. 362 at 4-9, 13-14.)  The government makes no new arguments that

---

[2] Local Rule 83-5(e) states, "The Indiana Rules of Professional Conduct and the Seventh Circuit Standards of Professional Conduct . . . govern the conduct of those practicing in the court."

contradict the well-supported holdings of multiple courts that "neither [the *Touhy*] regulations nor the general 'housekeeping' statute that authorizes them (5 U.S.C. § 301) create a privilege that protects federal agencies or their employees from ever being required to provide evidence in federal court." *Leyh v. Modicon, Inc.*, 881 F. Supp. 420, 422 (S.D. Ind. 1995) (citing *Exxon Shipping Co. v. United States Dept. of Interior*, 34 F.3d 774, 777-78 (9th Cir. 1994)).  Nor does the government claim that the testimony is inappropriate under any of the factors under 28 C.F.R. § 16.26(b).  (*See* Dkt. 362 at 13-14.)

WHEREFORE, Mr. Rogers asks that the Court deny the government's Motion to Quash.

DATED this 2nd day of May 2019.

Respectfully submitted,

S/Nathan D. Chambers
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-2222
Facsimile: (303) 825-4010
nchambers@nathanchamberslaw.com

S/Patrick J. Burke
Patrick J. Burke
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 825-3050
Facsimile: (303) 825-2992
Patrick-J-Burke@msn.com

S/Monica Foster
Monica Foster
Indiana Federal Community
Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Monica_Foster@fd.org

S/Gwendolyn M. Beitz
Gwendolyn M. Beitz
Indiana Federal Community
Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: 317-383-3520
Facsimile: 317-383-3525
Gwendolyn_Beitz@fd.org

**CERTIFICATE OF SERVICE**

I certify a copy of the foregoing MR. ROGERS' RESPONSE TO THE

GOVERNMENT'S MOTION TO QUASH SUBPOENA TO UNITED STATES

ATTORNEY FOR THE SOUTHERN DISTRICT OF INDIANA JOSH MINKLER (Dkt.

385) was filed electronically this 2nd day of May 2019.  Notice of this filing will be sent to

the parties of record by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.

*s/ Monica Foster*
Monica Foster